UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MATTHEW TEEPLE,

Defendant.

ECF CASE
S1 13 Cr. 339 (RPP)

## DEFENDANT MATTHEW TEEPLE'S
## SENTENCING MEMORANDUM

KOBRE & KIM LLP
Eric B. Bruce
Matthew I. Menchel
Joshua L. Ray
800 Third Avenue
New York, New York 10022
Tel: +1 212 488 1200
Fax: +1 212 488 1220

*Attorneys for Defendant Matthew Teeple*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

I.  MR. TEEPLE'S LIFE HAS BEEN CHARACTERIZED BY ALTRUISM,
GENEROSITY, AND A CONSISTENT COMMITMENT TO HIS FAMILY,
FRIENDS, AND COMMUNITY ......................................................................... 4

    A.  Mr. Teeple's Personal Background, Education, And Professional Career. .................. 5

    B.  Mr. Teeple Has Given Unwavering Dedication And Support To His Family. .............. 9

        1.  Mr. Teeple Is A Devoted Partner And Companion To His Wife. ........................ 10

        2.  Mr. Teeple Is An Exemplary And Dedicated Father Whose Absence Will Be
Extremely Difficult For His Young And Vulnerable Family. ............................. 12

        3.  Mr. Teeple Is A Loyal Son And Surrogate Father To His Niece And Nephew. .. 16

    C.  Mr. Teeple Has Exhibited Steadfast And Invaluable Support Of His Friends And
Business Colleagues. ................................................................................. 18

    D.  Mr. Teeple Has Consistently Been Involved In His Community And With
Charitable Endeavors. ............................................................................... 22

ADDITIONAL SENTENCING CONSIDERATIONS .............................................. 26

II.  MR. TEEPLE'S PLEA AGREEMENT. ............................................................ 26

III.  THE STIPULATED GUIDELINES CALCULATION IS ALMOST ENTIRELY
DEPENDENT ON THE ESTIMATED AMOUNT OF INVESTMENT ADVISER A'S
GAINS AND AVOIDED LOSSES. .................................................................... 27

IV.  MR. TEEPLE'S OFFENSE CONDUCT IS DISTINGUISHABLE FROM OTHER
RECENT INSIDER TRADING CASES. ........................................................... 30

    A.  Mr. Teeple Crossed A Line While Conducting Otherwise Legitimate Research. ....... 31

        1.  Mr. Teeple Has a Long Relationship with Foundry and His Co-Defendant. ....... 33

        2.  Mr. Teeple Did Not Buy the Foundry MNPI or "Bribe" Mr. Riley. ................... 34

    B.  Mr. Teeple Did Not Breach Any Fiduciary Duties To Foundry Or Control Any
Of The Trading At Issue. .............................................................................. 36

C.    Mr. Teeple Has Not Been Alleged To Have Actively Concealed His Wrongdoing Or Otherwise Obstructed Justice. .............................................................................. 41

V.   MR. TEEPLE HAS ALREADY SUFFERED SEVERE EMOTIONAL, FINANCIAL, AND PROFESSIONAL REPURCUSSIONS SINCE HIS ARREST. ................................. 42

A.    The Criminal Forfeiture Provision Of Mr. Teeple's Plea Agreement Will Substantially Impact His Family's Financial Health And Serves As A Significant Additional Punishment For His Conduct. ..................................................................... 44

B.    Imposition Of A Fine Is Not Warranted In This Case. ................................................ 46

C.    Restitution Should Not Be Ordered ........................................................................... 47

VI.  ASSIGNMENT TO THE SATELLITE CAMP AT CI TAFT WOULD AMELIORATE SOME OF THE BURDEN OF INCARCERATION ON MR. TEEPLE'S FAMILY. ........ 47

CONCLUSION .................................................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985) ........................................ 37

*Chiarella v. United States*, 445 U.S. 222 (1980) ........................................................................ 36

*Dirks v. S.E.C.*, 463 U.S. 646 (1983) .............................................................................. 32, 37

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................................ 27

*In the Matter of Raymond L. Dirks*, S.E.C. Release No. 17480, 1981 WL 36329
    (Jan. 22, 1981) .................................................................................................. 32, 34

*Koon v. United States*, 518 U.S. 81 (1996) .................................................................................. 1

*Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51 (1937) ........................................................ 4

*Pepper v. United States*, 131 S. Ct. 1229 (2011) ...................................................................... 3-4

*Rita v. United States*, 551 U.S. 338 (2007) ............................................................................... 27

*S.E.C. v. Tome*, 638 F. Supp. 596 (S.D.N.Y. 1986) ................................................................. 37

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................ 5, 44

*United States v. Booker*, 543 U.S. 220 (2005) .......................................................................... 30

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) .............................................................. 27

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) .............................................................. 29

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ...................................... 29

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ......................................... 3, 28-29

*United States v. Johnson*, 567 F.3d 40 (2d Cir. 2009) ............................................................... 27

**Statutes**

15 U.S.C. § 78j ........................................................................................................................ 38

18 U.S.C. § 371 ..................................................................................................................... 1, 26

18 U.S.C. § 3553 .................................................................................................................. 26, 29

18 U.S.C. § 3572 ....................................................................................................................... 46

18 U.S.C. § 3621 ............................................................................................... 47

18 U.S.C. § 3661 ............................................................................................... 26

U.S.S.G. § 2B1.1 .............................................................................................. 28

**Other Authorities**

Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998).... 44

Marron C. Doherty, Note, *Regulating Channel Checks: Clarifying the Legality of Supply-Chain Research*, 8 Brook. J. Corp. Fin. & Com. L. 470, 477 (2014) .................... 32, 34

Richard Frase, *Punishment Purposes*, 58 Stan L. Rev. 67, 80 (2005)......................................... 44

U.S. Sentencing Commission, *Fifteen Years of Sentencing Guidelines* 56 (2004) ..................... 44

Defendant Matthew Teeple, by and through his counsel, respectfully submits this memorandum and the accompanying exhibits to assist the Court during the sentencing proceedings in this matter, following his acceptance of responsibility and plea of guilty to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.

## PRELIMINARY STATEMENT

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in . . . human failings." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Here, Matt Teeple stands before the Court as a 43-year old, married father of three young children who has accepted responsibility for a serious crime that reflects a profound lapse in judgment in an otherwise exemplary life.  His unfortunate conduct has already caused irreparable upheaval and distress in his life and the lives of his loved ones, and he will forever regret the undeniably poor choices that have compromised the high standards he set for himself and have put him and his family in this extremely difficult situation.  Indeed, the most painful realization for Mr. Teeple is the extent to which the consequences of his actions will befall those who are completely blameless—his wife and three young children.  The Teeples are a particularly close-knit and loving family and Mr. Teeple's period of incarceration will be devastating—not only will his family be without the constant presence, love, and support he now provides for a substantial period of time, but the significant economic penalties his crime entails will severely burden the family's well-being for many years to come.

Mr. Teeple is deeply remorseful, wishes to atone for his misconduct, and recognizes the inevitability of many painful consequences far beyond those which he has already borne in the time since his arrest.  For example, he recognizes the inevitability that he will miss, forever,

1

some of the most precious and formative years of his children's lives and the attendant adverse effects his absence will surely have on them; he recognizes that he will be unable to help his wife raise their three children for a lengthy period and that a prolonged absence will put a severe strain on his now-happy and successful marriage; he recognizes the irreversible damage he has caused to his once-promising career and his many professional and personal relationships; and he recognizes the many lives that have been disrupted and harmed by his mistakes.

Yet Mr. Teeple nevertheless remains hopeful, even while reflecting on his ruinous missteps and contemplating the daunting challenges that await him.  Buoyed by his faith, the strong network of family and friends around him, and the solace that comes from having accepted responsibility for his crime, Mr. Teeple knows and accepts that he will pay a steep price for his misdeeds but humbly looks forward to the next chapters of his life.  Beyond the aberrant behavior at issue in this case, Mr. Teeple has demonstrated over many years that he has a tremendous capacity for good works and positive contributions to society and he endeavors to return to such activities once his punishment is complete and his debt to society has been paid.  For now, though, Mr. Teeple's foremost priority in the current crisis is to accept responsibility for his crime and to minimize any further harm to those who love and depend on him.

To that end, it is our hope that this memorandum provides the Court with a more complete understanding of who Matt Teeple is—his character, background, and life circumstances—so that it can impose a sentence that is just.  As demonstrated in the scores of letters submitted on his behalf, Mr. Teeple is a fundamentally kind, generous, and unequivocally good and caring person whose nature and core values are directly at odds with the anomalous events of this case.  He is without question deeply committed to a great number of people around him, and is by all accounts an exceptionally devoted family man on whom his wife and three

young children rely upon daily for support, guidance, and compassion.  He is, in sum, a modest, sincere, and dignified man who lives an unpretentious and family-focused life—a life that has been otherwise admirable and honorable but for the conduct at issue.

As a part of our overall sentencing presentation, on behalf of Mr. Teeple we have created a short video of some of his family and character references describing the kind of man he is, the manner in which he lives his life, and his community and charitable contributions, which we respectfully submit to the Court for Your Honor's consideration as Exhibit 1 to this Memorandum.  Our hope is that this video will assist the Court in getting a clearer picture into Mr. Teeple's character, his family, and his prior good deeds in a way that written letters alone cannot completely convey.[1]

*     *     *

As the Court is obviously aware, "[i]mposing a sentence on a fellow human being is a formidable responsibility.  It requires a court to consider, with great care and sensitivity, a large complex of facts and factors."  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).  Matt Teeple is an undeniably good, albeit flawed human being who crossed a line from legitimate market research into illegality and forever altered his and his family's future.  He awaits his sentence as someone who has taken responsibility for his crime and understands, and deeply regrets, the harm that his impending absence will cause to the many people around him. Yet Mr. Teeple is a man whose 43 years have been about much more than the occurrences charged in the indictment, and it is an accurate and holistic portrait of his full life that we ask the Court to consider before a sentence is imposed.  *See Pepper v. United States*, 131 S. Ct. 1229,

---

[1]  "Sentencing Videos," as they have become known, are becoming more commonplace in order to assist judges throughout the country with the difficult task of sentencing and have been utilized in several recent federal court sentencings.

1240 (2011) (recognizing the underlying principle of sentencing is that "the punishment should fit the offender and not merely the crime"); *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.").

The outpouring of supportive letters from his family and friends make clear that Mr. Teeple's offense is not at all characteristic or reflective of his true character.[2]  Accordingly, after briefly recounting his early years and professional career, we focus on certain aspects of Mr. Teeple's personal history that the Court may find particularly relevant to its sentencing analysis: (i) his devotion to his family and the critical role he plays in the daily lives of his wife, Kathy, son ▮▮▮▮ (age 6), son ▮▮▮▮▮ (age 5), and daughter ▮▮▮▮▮ (age 3); (ii) his selfless and consistent support of his friends and extended family; and (iii) his charitable works and participation in his community.  We next discuss Mr. Teeple's acceptance of responsibility pursuant to a plea agreement and certain details regarding his offense.  Then, after addressing the consequences that Mr. Teeple has suffered to date and the severe financial ramifications he is currently facing, we conclude with a discussion of certain aspects of his impending sentence.

## I.   MR. TEEPLE'S LIFE HAS BEEN CHARACTERIZED BY ALTRUISM, GENEROSITY, AND A CONSISTENT COMMITMENT TO HIS FAMILY, FRIENDS, AND COMMUNITY.

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad . . . was plainly part of what Congress had in mind when it directed courts to

---

[2] The letters submitted in support of Mr. Teeple are designated as Exhibits 7 through 60 and are listed on the Exhibit List appended hereto.

consider, as a necessary sentencing factor, the history and characteristics of the defendant." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal quotations omitted). Here, there was a tremendous amount of "good" to give consideration to—as set forth below, Mr. Teeple has exhibited excellent character throughout his life and has consistently acted as a model father and husband, supported his friends and family, and devoted his time and resources to those in need.

### A.    Mr. Teeple's Personal Background, Education, And Professional Career.

Matt Teeple was born and raised, along with his older sister Kim, in Southern California by Linda and Terry Teeple. Linda and Terry, who both come from humble beginnings in the same small town in rural Illinois, instilled in their children the importance of family and, as a result of these efforts, family has been the center of Mr. Teeple's life from an early age. Although Mr. Teeple's family was of modest means as he was growing up, they were lucky to be rich with love and traditions built on trust, humility, and integrity. Further blessed with the good fortune of having a large extended family nearby as a child, Mr. Teeple's upbringing was characterized by regular family dinners, get-togethers, and celebrations that shaped Mr. Teeple's perspective on the world and cemented the close bonds he continues to enjoy with his family today. *See* Aug. 27, 2014 Presentence Report ("PSR") at ¶¶ 52-54.

The Teeple family has also long found comfort and guidance in religion, which they rely on as a cornerstone of their values, beliefs, and family dynamic. Mr. Teeple was raised and confirmed in the Lutheran tradition and spent much of his youth at church-based trips and functions that helped him develop a solid moral foundation, a sense of greater purpose, and an awareness of the moral necessity of helping those less fortunate than himself. His faith remains

an important aspect of his life and he has sought to create a similar value system built on family, honor, and empathy for his own children.  *See id.*

Aside from his family and religion, another significant component of Mr. Teeple's life has been his passion for athletics.  Actively involved in competitive sports throughout his childhood, Mr. Teeple began to focus on water polo when he entered El Toro High School in Lake Forest.  There, he earned varsity letters in water polo, basketball, and swimming and was chosen to be the captain of his water polo team his senior year—the same year that his team won the state sectional championships and Mr. Teeple was named California Player of the Year and a First Team All-American, and had the privilege of playing internationally with the United States Junior National Water Polo team.  Following high school, Mr. Teeple accepted a scholarship to play water polo at the University of California at Santa Barbara, where he was honored to serve as the team's captain in both his junior and senior years.  In addition to his athletic career, Mr. Teeple excelled academically and graduated *cum laude* with a degree in psychology in 1993. *See id.* at ¶¶ 69-70.

Not yet ready to abandon the sport he loved, Mr. Teeple returned home and spent the years immediately following his college graduation as the assistant coach on his high school's varsity water polo team and as the head coach to the school's freshman team.  In these roles, Mr. Teeple was a scholastic and athletic mentor to the students on his teams and he generously gave his time to contribute back to the program that had given so much to him.  As his former coach Donald Stoll recounts, Matt was especially dedicated to helping the novices on his freshman team who were unskilled swimmers, like he had once been: "[Matt] did a remarkable job with these non-athletes, non-swimmers as he had been.  His players looked up to him eagerly waiting for the next bit of knowledge that would make them better players.  His cordial coaching style, in

the water demonstrations, and stressing academic achievement made him a favorite on the pool deck and with the parents."  Stoll Ltr. at 2-3.

Although he greatly enjoyed his coaching experience, Mr. Teeple sensed the need to move beyond water polo and his hometown, and began considering various career options. Wanting to take part in the innovations then-emerging from the San Francisco Bay Area, he ultimately determined that technology was the industry that he most wanted to focus on. Accordingly, in May of 1996, Mr. Teeple packed his car with the few possessions he had and moved to San Jose to live with his college roommate's parents, who graciously took him in for a few months until he was able to get on his feet.[3]

Shortly after his arrival in Silicon Valley, Mr. Teeple accepted a position in semiconductor sales, and would find considerable success in this role over the next few years due to his strong work ethic and winning personality.  In 1998, he joined Cabletron Systems to pursue a sales opportunity in computer networking technology and was eventually placed in charge of all North American sales at Riverstone Networks, an independent company that Cabletron spun-off in 2000.[4]  Following the slowdown precipitated by the bursting of the technology bubble in the early 2000s, Mr. Teeple was faced with the unenviable task of downsizing some of his employees, many of whom he considered close personal friends.  *See,*

---

[3] Like many of the people Mr. Teeple has encountered in his life, his relationship with this "foster" family is long-lasting and continues to this day: "Matt was an integral part of our family life during the four months that he lived with us.  He developed a very special relationship with our youngest son, Brian, who was then 16 years old.  Matt mentored him in both swimming and water polo, and was like an older brother to Brian, as well as a son to us. . . .  We have been proud to call him our friend for over 25 years."  Richard and Elizabeth Henry Ltr. at 1-2.

[4] It was approximately at this time that Mr. Teeple first began developing a relationship with the company at issue in this case, Foundry Networks, Inc.  Mr. Teeple's long history with Foundry and how his career progression specifically relates to his offense is discussed separately in Section IV *infra.*

*e.g.*, DeFranco Ltr. at 1 ("I can honestly say that the best thing to happen to me at Riverstone was being introduced to Matt."). By the summer of 2003, Mr. Teeple made the selfless decision to eliminate his own position in an effort to save the positions of two salesmen who worked for him after recognizing that he would likely be presented with other opportunities, while others might not be so fortunate. *See* PSR at ¶¶ 75-77.

Soon after his departure from Riverstone in 2003, Mr. Teeple was asked to be a partner in a small technology research firm, named the Field Check Group ("FCG").[5] Like himself, Mr. Teeple's partner in this venture was a former technology salesman and the two harnessed their industry experience to provide investors with research on publicly-traded technology companies, guidance on broad market trends, and insights into the technologies that were positioned to gain or lose market share. Market research firms like FCG were being widely replicated during this period (especially in Silicon Valley) and FCG was able obtain a moderate degree of success in this highly competitive and burgeoning industry. *See id.* at ¶ 74.

It was during this time that Mr. Teeple had the good fortune of reconnecting with his now-wife Kathy through mutual college friends, and the two began a long distance relationship between Southern California, where she lived, and the Bay Area, where Matt's business was located. At the time, Kathy had just recently finished her medical training and had joined a local clinic where she focused on children's health as a pediatrician. Following nearly two years of countless trips up and down the California coast, the couple became engaged and Matt returned home to Southern California in mid-2006 to live with his new fiancée. The relocation soon

---

[5] As recalled by Mr. Teeple's FCG partner: "I needed to find a business partner I could trust as I would trust a best friend or brother. And with that in mind, choosing Matt as my partner was the easiest decision I have ever had to make. And so was launched a partnership and friendship which extended to my wife, my children, and . . . friends, all of whom never failed to remind me how lucky I was to have found Matt as a business partner." Zaharias Ltr. at 1.

proved to be an impediment in his business partnership at FCG, however, and Mr. Teeple began to consider alternatives following his marriage in September 2006.  In late 2007, as the young couple were preparing for the arrival of their first child, Kathy encouraged Matt to accept a junior market analyst position that was offered to him at ███████████████,[6] an FCG client that he had worked with since 2003.

The position at Investment Adviser A was essentially an extension of what Mr. Teeple had been doing at FCG (researching the technology industry) but for a single investor rather than FCG's portfolio of clients.  The Investment Adviser A position was enticing because it ameliorated the responsibilities of running his own business and allowed him the flexibility to live in Southern California and commute to the Bay Area for a few days each week—an ideal situation for the young Teeple family since it allowed them to remain near Kathy's established medical practice.  Accordingly, then, and as discussed more fully below in Section IV, Mr. Teeple accepted a position as a junior market analyst at Investment Adviser A in October 2007. Fund managers such as Investment Adviser A routinely hire in-house research analysts and Mr. Teeple was hired to supplement an existing analyst team with his specific expertise in the networking and semiconductor sectors.

**B.     Mr. Teeple Has Given Unwavering Dedication And Support To His Family.**

Mr. Teeple's many professional successes merely serve as the backdrop to the primary focus of his life: his family.  As recounted in virtually all of the many letters submitted on his behalf, Mr. Teeple is a committed husband and an exceptionally involved father to his three young children.  He also remains extremely close to his parents—speaking with them daily and making them very much a part of his life.  Indeed, a prevailing theme that emerges from the

---

[6] Consistent with the indictment and previous filings in this case, ██████████████ will hereafter be referred to as "Investment Adviser A."

letters of those who have shared Mr. Teeple's life with him is that his character is rooted to a strong belief in the importance of family life and a dedication to supporting and caring for his family to the fullest extent of his abilities.  Those who know him best describe an earnest and honest man who spends his time quietly with his family, organizes games for neighborhood kids, and coaches his children's sports teams: he is, fundamentally, "a significant asset to his community, a wonderful husband, and a critical father figure to his three young children." Wolfard Ltr. at 3.

      1.     <u>Mr. Teeple Is A Devoted Partner And Companion To His Wife.</u>

For the last ten years, Mr. Teeple has enjoyed the extraordinary fortune of having a loving, loyal, and dedicated partner to build a family with and he is extremely proud to be able to call Kathy his wife and soulmate.  Matt's devotion to his wife and the success of the Teeples' marriage is obvious to outside observers, as made plain in the comments of the many people who regularly interact with them.  For example, one of Kathy's close friends relates:

> Matt holds the highest regard for his wife and I have witnessed countless random acts of kindness to show his love and respect for her over the years—thoughtful things like surprising her with framed pictures of their kids or running the last few miles of a marathon with her as a morale booster.  His actions are generally exemplary in demonstrating that "the little things" actually prove to be the important things, and I have frequently thought how fortunate their children are to have such a positive influence in their home that models good life values such as kindness, generosity, integrity and honesty.

Brigitte Alexander Ltr. at 1.  Similar sentiments have been expressed by several other members of the Teeples' social group:

> [Matt] is a loving and supportive husband to his wife.  They are a team.  There is always such laughter coming from their house as all their families come together on a consistent basis.  It is hard to calculate the impact of Matt not being with his wife and children—but it's irrefutable that the void will be huge as he is so committed and dedicated to family and it is clear that he loves them so very much.

Miller Ltr. at 1-2; *see also* Taccolini Ltr. at 1 ("He lives out his commitment to his family and kids on a daily and consistent basis.  He was the dad that rallied all the kids together at the end of the cul-de-sac each Sunday so the moms could all do yoga in the garage together. . . .  There was no personal gain attached to this—just an awesome guy giving his wife and her friends an hour together to get some exercise and girl time.").

Mr. Teeple's support of his wife has been especially exemplary during a recent double-mastectomy procedure that Kathy Teeple underwent out of concern for her family's extensive history with cancer.  *See* PSR at ¶ 55.  As Kathy Teeple wrote to the Court:

> Matt's tireless support as a husband and father was absolutely critical to me during a recent preventative bi-lateral mastectomy procedure.  Following an emotionally difficult and excruciatingly painful surgery, I remained in the hospital for several days and underwent an extensive recovery period.  During this time, Matt lovingly assisted me with all of my daily medical needs and with all other aspects of my life.  Especially since I was unable to lift the kids or participate in our normal daily routine with the children, I felt so fortunate to have a dedicated husband like Matt by my side.

Kathy Teeple Ltr. at 2; *see also* Taccolini Ltr. at 2 ("Matt is trustworthy, dedicated, supportive, gentle, caring and kind. . . .  He was a rock of support in 2012 and 2013 when Kathy was undergoing multiple medical procedures.  He is an outstanding husband and together he and Kathy are a wonderful couple: they are a team, they are a family, they are a unit.  They have displayed remarkable grace, strength and unity in such a difficult time. . . .  The way Matt and Kathy have handled this situation is a testament to their character.").

In addition to her appreciation for his support during her recent health crisis, Kathy is exceedingly grateful for the type of father Matt has proven to be to their children:

> Our young family has been truly blessed to have such a committed and loving father in Matt who continues to ambitiously invest his time with them on a daily basis.  Having 3 small children demands a lot of love, encouragement and extra hands every day and Matt does it all.  He will always take the extra time to teach the kids about life's little lessons, whether it is singing songs with ████ or

teaching her the ABCs, or showing ████████ how to swing a baseball bat, or teaching ████████ how to read and do his math.  Matt truly does it all with excitement and genuine love for the kids.

Kathy Teeple Ltr. at 2.

> 2.   <u>Mr. Teeple Is An Exemplary And Dedicated Father Whose Absence Will Be Extremely Difficult For His Young And Vulnerable Family.</u>

Since the birth of his first child six years ago, Mr. Teeple has been a critical pillar of support to his close-knit family and his extraordinary commitment to his children has been noted with admiration in virtually all of the dozens of letters submitted on his behalf.  As one long-term family friend and former member of the LA County Sheriff's Department put it: "Matthew took to fatherhood as a duck takes to water. . . .  It's obvious, even to a casual observer, that Matthew is a hands-on father.  His family is everything to him.  Matthew is immersed in every aspect of his children's lives.  Whether it is coaching his sons' baseball teams . . . or [being] the guest of honor at one of ████████'s afternoon tea parties with a group of her dolls."  Gajdos Ltr. at 2.  Similar observations are repeatedly echoed in the recollections of Mr. Teeple's many supporters.

One of his friends and neighbors writes, for example, that, "Matt is a family man.  He is fiercely loyal to his wife and children and supports them in all aspects of life. . . .  Matt lives for his children.  He is more present with them than almost any father I know, not only in the home but outside of it."  Brigitte Alexander Ltr. at 1.  Or as another neighbor observes:

> When at home, Matt is the most involved husband and father I know.  He is involved in all the little things that keep a family and kids ticking.  He is the dad of big hugs, principle, optimism and words of encouragement.  He is the dad who plays with his kids when at home as well as taking them to school, picking them up, taking them to practice and helping them get dressed, brush their teeth and take their baths.  He is involved in every aspect of their family life.  He is the kind of father that sets an example for others and the type of father that every mom would want for their kids.

Taccolini Ltr. at 2; *see also* Czyz Ltr. at 2 ("Matt's love for his wife, Kathy, and children . . . is the kind of love that you rarely see from a man with so much responsibility.  Matt is an extremely involved father.  He is present.  He does what all of us wish we could do as fathers and that is to commit to his wife and kids. . . .  He is their world."); Siri Ltr. at 1 ("I have never met a man who is so devoted to his family and wants nothing but the best for those he encounters. . . . Nothing is more important to Matt than Kathy and their three kids.  Matt and Kathy are two peas in a pod and quite possibly the best parents I have seen or been around."); Linda Teeple Ltr. at 3 ("Matthew is a very hands-on father who assists in all ways to help care for their family of five. . . . He has valiantly assisted Kathy from the birth of their three beautiful children and on through the process of a double mastectomy for her.  They are definitely a team at work as they nurture their young family.").

In the same vein, another neighbor writes:

> Matt is a loving father who plays an important role in the lives of his three beautiful children. . . .  Indeed, without his knowing, I have heard him from our bedroom many mornings as he unguardedly engages them in a caring, gentle and kind fashion while they are out front with the dog, picking up the morning paper. Those children have been blessed to have the close love and support of their father from birth and it saddens me profoundly to contemplate their impending loss.

Stringfellow Ltr. at 2.

Mr. Teeple's extended family has also been impressed by his singular dedication to being a parent—his aunt, for example, relates that:

> The most important role Matt plays, and the one he relishes most, is being a father.  From the time that ▇▇▇ was born, Matt has played an active role in his children's lives.  I have watched him as he patiently bathed each one and got them ready for bed, fed them dinner, or played whatever their game of choice happened to be at the time.  I have watched as ▇▇▇ and ▇▇▇ playfully run and jump on him as boys will do.  I have watched as he tenderly accepts a baby doll from ▇▇▇ and participates in her make believe world. . . .  He seems to find joy

13

in every minute he spends with his children. █████, █████ and █████████ are his world and the love Matt has given his children is returned mega-fold.

Wolansky Ltr. at 2; *see also* Richard and Karen Krueckel Ltr. at 1 ("We know of no man, husband, father or friend who is as devoted and committed to his family, friends and those around him. [Matt] is an exceptional husband and father who readily makes breakfast for the family, who gets up constantly during the night to care for his awake young children, [and] who plays with his children for hours each day."); Powell Ltr. at 1 ("[S]ince Matthew became a husband and father I have witnessed none more devoted to their family, their well being, their education, and character development.").

Despite the personal turmoil and distress Mr. Teeple has been experiencing since his arrest, he has continued to be a constant and supportive presence in his children's lives and has done his best to shield them from the—incomprehensible to them—precarious predicament their family is in. Indeed, in anticipation of an extremely painful absence from his children, Mr. Teeple has been spending even more time than usual with them to ensure they have lasting memories of good times with their father during childhood. Despite these efforts, however, Mr. Teeple's prison term will be unavoidably catastrophic to his children and will forever impact his relationship with them—particularly so his daughter, who at only three years old is wholly unable to grasp to where, or for what reason, her father is leaving her.

Although prison sentences affect a defendant's family in all cases, incarceration in this case will be particularly wrenching and of long-lasting impact in light of Mr. Teeple's children's youth, the extraordinary degree of hands-on involvement he has in their upbringing, and the family's closeness. *See, e.g.*, Jeff Krueckel Ltr. at 3 ("[Matt's] loving nature, positivity and consistency foster the intellectual, emotional and social development of his children. Thinking of his children and the fact that Matt may soon be absent from their most precious moldable

moments is the hardest fact for me to grasp."); Wright Ltr. at 1 ("Because [his] wife Kathy is a practicing physician, Matt has provided an extraordinary amount of time to parenting. His absence will have a profound effect on what kind of people and attitudes [his children] will have in adulthood. Matt is a dedicated father, loving husband, and faithful son. His integrity and generosity toward our family has caused us to embrace him as our own son."). Indeed, in the Teeple family, Mr. Teeple is not only by far the primary breadwinner for the family but, because Kathy Teeple has a part-time but demanding medical practice, Matt Teeple is a co-equal primary caretaker for their three young children.

Mr. Teeple's children are each at critical social and developmental junctures: ███ and ███ have just entered first grade and kindergarten, respectively, and his youngest, ███, will begin her first year of pre-school this Fall. The countless milestones of the coming years in his children's lives will shape who they become as adolescents and teenagers—knowing that he will be unable to participate and help guide his children through this transformative time is extraordinarily distressing to Mr. Teeple and internalizing the extent to which his actions will negatively impact his kids' present and future lives has been an extremely painful process for Matt and his wife. *See, e.g.*, Kathy Teeple Ltr. at 3 ("Matt cannot even begin to grasp losing a single day to play an active role in the lives of our children and family. He is deeply saddened by the prospects of leaving me alone to work, support and raise our young children alone in his absence."); Mehta Ltr. at 3-4 ("Some days, Matthew talks to me about how much he will miss coaching his kids' little league baseball teams, and how much he will miss the opportunity to see his kids grow up. He wipes tears from his eyes every time he thinks about the time lost from his wife, kids, and parents when he will be away. He truly and fully accepts the lapse in judgment.").

3.     Mr. Teeple Is A Loyal Son And Surrogate Father To His Niece And Nephew.

Mr. Teeple's strength of character and commitment to his family is further revealed in his close relationship with his parents and in his assumption of the parenting responsibilities that his sister is unable to undertake for his niece and nephew.  As noted in the PSR, Mr. Teeple's only sister has for years suffered from severe drug addiction and has therefore not been a presence in the lives of her two children.  *See* PSR at ¶ 53.  Mr. Teeple has stepped in and filled that void, becoming a surrogate father to his niece and nephew.  For example, a family friend who has known Mr. Teeple since he was a child states:

> I have been privileged to see firsthand how much he gives of himself to others. Specifically, I have seen the way he cares for his parents.  He makes them a daily part of his life with his family. . . .   Just last weekend, I saw Matt with his dad, Kathy his wife and the kids, as well as his nephew Mike running together.  I have seen how he reaches out to his niece and nephew every summer to have them stay with him so he can keep them in the family and they can get to know his kids.  He has made sure his niece and nephew have had the experience of having family around and has mentored them even before he became a dad himself.

Kristin Nemeth Ltr. at 1.  The extent to which Mr. Teeple has positively impacted his niece and nephew's lives has been extraordinary, especially considering that he lives across the country from them and is fully committed to his own three children.  The deep appreciation for Mr. Teeple's role in their lives is made plain in the very heartfelt and moving letters submitted by his niece and nephew to the Court:

> [M]y Uncle Matt has been more of a rock for our family than we had ever imagined.  There were times that we were barely getting by and he would fly back and take us to the grocery store and stock the refrigerator and freezer with food. Other times if he couldn't fly back, he would send financial help so Michael and I could play the sports we wanted or do the extra-curricular activities that we wanted to.  My Uncle Matt . . . never let us down and always kept his word.  He truly has been there every step of the way. . . .   He is the true definition of my "hero."  When life was down in what seemed like the darkest days, he would always lift up my spirits, whether it was through a phone call or a visit.  He makes me want to be a better person, every single day of my life. . . .   I pray everyone

16

has an Uncle Matt in their life, not only for love, support, motivation and advice but, to ultimately make them a better person and that is exactly what my Uncle Matt has done for me.

Larissa Callas Ltr. at 1-2.

I have known [Matt] my entire life, and he has not only been a great uncle to me, but also an exceptional mentor and a genuine friend.  I have always and will continue to strive to be like my Uncle in every way possible.   My mother Kimberley, who is Matt's sister, essentially removed herself from my life and the lives of my family members because of her drug abuse and mental issues.  At that moment, Matt did a very honorable thing.  He stepped in and did all that he could to try and fill the void for my older sister, Larissa and me. . . .  I am so grateful that he has, on so many occasions, taken time out of his life to help me and fill a role that may not have been fulfilled without his involvement. . . .  There are so many examples of his compassion that I could cite, but one of which really strikes me.  In 2009, Matt jumped on a plane intending to surprise my sister at her high school graduation ceremony.  Little did we know just to make it on time, he had to divert course from Pittsburgh and fly to Cleveland due to a flight delay.  He then drove over two hours to Pittsburgh to ensure he wouldn't miss Larissa's graduation ceremony the following day.  His heart is bigger and stronger than anyone I know.  The things he does for family is second to no one.

Michael Callas Ltr. at 1.

Consistent with how he has treated multitudes of people in his life, the empathy and support "Uncle Matt" has selflessly given his niece and nephew have undoubtedly made them the successful young adults they now are.  Mr. Teeple's commitment to keeping his extended family together, and compensating for his sister's health and drug problems, will make his impending absence that much more devastating to the Teeple family.  Indeed, the struggles Mr. Teeple's family has endured with his sister's issues have exacerbated the impact of the current crisis on his aging parents in particular, with whom Matt shares an unusually close relationship. *See, e.g.*, Wolansky Ltr. at 2 ("Matt shared his concern for his mother and father [with me].  He knows the heartbreak they have lived with because of choices made by his older sister.  He knows the anguish his circumstances have caused them and it hurts him deeply.  Matt has always been there for his parents and he always will be; as will his parents always be there for Matt.").

17

### C.     Mr. Teeple Has Exhibited Steadfast And Invaluable Support Of His Friends And Business Colleagues.

The admiration and respect Mr. Teeple's large coterie of friends have for him is, in a word, astonishing.  His friends, most of whom he has remained close with for many years or decades, repeatedly note the positive impact he has had on their lives:

- "I have been friends with Matt Teeple going on 17 years now [and] I consider Matt to be one of my best friends in the world. . . .  Matt was and is such a positive person and a lot of who I am today is because of Matt."  Siri Ltr. at 1.

- "I've known Matt for 20+ years . . . [and] he is one of the most down-to-earth people I have ever known.  He is incredibly genuine and humble . . .,  has proven to be an extremely trustworthy friend, and always someone I could count on."   Brigitte Alexander Ltr. at 1.

- "[I]f there was ever a situation where I could only call one person to be there, that would drop everything, no matter what it was, no matter what was being asked, my first call would be to Matt Teeple."  MacLean Ltr. at 2.

- "Matthew Teeple is a sensitive, loving, caring, philanthropic, and positive citizen and family man.  He is willing to go out of his way to support those with whom he comes in contact . . . .  He is a role model . . . and lights up the room with his presence." Stoll Ltr. at 4.

- "My feelings about Matt's character could easily be summed up by saying—this world in general would be a much better place to live if it had more people like Matt Teeple."  Czyz Ltr. at 1.

- "Matt sets an example for me on how to live my life and treat others with his kindness, his selflessness, and the legitimate interest he takes in others and making everyone he meets feel important."  Rife Ltr. at 1.

- "[Matt] is one of those rare individuals who makes people around them better just by the stories he tells, his views on life and what he's done to help others. . . .  He's inspiring to me, and honestly raises the bar on what a father should be."   John Alexander Ltr. at 1-2.

- "I cannot recall a conversation that I have had with Matt over the past 20 years where he has not expressed how much he cares for the people in his life. . . .  Matt is a good man with a great heart . . . [who] enriches the lives of those that he comes into contact with."  Gustafson Ltr. at 1.

To be sure, "his long running friendships are a testament to his loyalty."  Wolansky Ltr. at 1.  These friends, who are uniformly distraught and in disbelief over Mr. Teeple's present circumstances, describe countless examples of his generous, positive, and empathetic nature.  Aram Janoyan, for example, is one of many people whom Mr. Teeple has selflessly gone out of his way to help professionally:

> He is one of the most loving, caring and giving individuals I have ever met. . . . .
> Matt introduced me to recruiters and people in his network when I was looking
> for employment.  His guidance, advice and faith in my abilities were a big factor
> in helping me get my own career back on track after I was laid off.  He worked
> tirelessly to ensure that I never felt frustrated or depressed during my trying job
> search.  Even after I was finally able to land a job, Matt would check in on me to
> make sure I was doing ok.

Janoyan Ltr. at 1.  Longtime friend Bion Rice expresses similar gratitude for Mr. Teeple's role in saving a family business:

> [In 2011], I had expressed to him that my family winery business was going
> through a very difficult time . . . [and] [w]ithout asking for his assistance in any
> way, Matt began offering advice and suggested that he could help us with a loan
> to bridge the gap until we could reposition our business.  It worked.   Without
> Matt's financial assistance and sound business advice, Sunstone Winery would
> most definitely have gone bankrupt. . . .  The amount of time alone that he has
> devoted to advising me on my financial options is a testimonial to his
> commitment to my family and our family business.  He truly just wants us to
> succeed, as it is in his nature. . . .  Even through the most difficult times during
> our financial challenges, Matt's optimism would always keep me believing that
> everything would work out. . . .   [I]t is his positive outlook and contagiously
> positive energy that made me believe my family business would survive.

Rice Ltr. at 1-2; *see also* Mehta Ltr. at 1-2 ("Without Matt's strong desire to help me by introducing me to different people, it would have been difficult for me to meet and speak to prospective customers.  I am truly grateful to Matthew for his willingness to help my business get on to the right path of success.  In addition, I truly admired how he never expected any favors in return."); DeFranco Ltr. at 1 ("Matt was instrumental in providing guidance on how best to incorporate and raise funding for [my] company.  But more importantly, his encouragement gave

19

me the confidence to leave the security of a large company and start my own company from

scratch.").

Mr. Teeple's friends describe him as a natural leader and he has mentored and guided

many of them through difficult times. His friend AJ Shanley recounts, for example:

> I had just relocated to the Bay Area . . . and was in the process of finding solid
> ground. Matt saw this and took me under his wing both socially and
> professionally. . . . Matt was always generous with his time. He made me feel
> like I was the only thing going on in his life. He made everyone feel this way.
> He never asked for anything in return. He also paid for every single coffee or
> meal we had—not in a flashy way but more in the way a big brother takes care of
> a younger brother. Matt is a multiplier. He makes every single person around
> him better. . . . I'm not sure what I'll do without him to be honest.

AJ Shanley Ltr. at 2-3. A similar experience is relayed by Brian Ballard, a water polo teammate

from college whom Matt helped during team tryouts:

> Despite the challenging situation, Matt—at risk of not making the team himself—
> selflessly provided me with coaching, guidance and encouragement which
> allowed me in particular to earn a spot on the team. What Matt displayed in this
> competitive and highly volatile setting was goodness, virtue, sincerity and an
> honest commitment to the betterment of others around him. Never once did I see
> Matt's behavior deviate from his foundational characteristics of propriety, fairness
> and ethical respect for the rules of the game. . . . Matt epitomized honesty and
> respectable behavior even in extremely intense and difficult circumstances. As
> my interactions with him progressed, Matt consistently displayed the same
> characteristics, traits and behaviors time and again in every imaginable setting.

Ballard Ltr. at 2.

The care and optimism Mr. Teeple naturally exudes has helped countless others,

including a friend who struggled through college:

> I struggled with life for the first couple years of college, and as any good brother
> would do, Matt was there to support me and helped me try to find myself. Matt
> never abandoned me and protected my confidences. Matt taught me how life
> should be lived with hard work and dedication by studying and making good
> grades. I never forgot these life lessons learned during such a vulnerable time in
> my life. I attribute significant weight to Matt's support and character to my own
> success and perseverance. . . . I remember a time when . . . I had just about
> enough of life, I wanted to give up. But after morning practice Matt took the time

20

to talk to me and convince me that I was worth continuing with college and getting my degree. . . .  Over the past 25 years of knowing Matt I have witnessed him always being there for his friends and family to offer support and lend a hand no matter what he was doing.

Allevato Ltr. at 1-2; *see also* Milton Ltr. at 1 ("Matt helps people because it is the root of his character not because he wants to gain anything for himself.  Over the years Matt's willingness to take the time to help anyone that needed help was evident and always stood out to me."); Schlutt Ltr. at 1 ("I fully believe that I would not be where I am today without the generosity, inspiration, and friendship of Matt Teeple. . . .  I have witnessed these types of actions over and over the 17 years I have known him.  Whether it is in his professional career, friendships, or with his family, he has inspired me to be a better and more generous person.").

Several of Mr. Teeple's friends also describe instances when Mr. Teeple provided support when they or their family members were confronted with serious illnesses.  For example, a fellow market analyst, Jack Whelan, discusses how Matt—without being requested to do so—helped him stay abreast of the markets while battling cancer:

When I was diagnosed with a rare, incurable blood cancer and began an aggressive chemotherapy regimen that didn't allow me to work, Matt helped me by providing much need channel research and technology research.  As I was able to work only a few hours each week for many months, because I was very sick from repeated, hard-hitting infusions, Matt stood by me always willing to help.  I saw first-hand how his caring, compassionate personality routinely helped me and others.

Whelan Ltr. at 1.  Another close friend remembers the remarkable extent of Matt's concern for his wife during a sickness:

I experienced his compassion on a first-hand basis [after] my wife had contracted a rare brain infection and had become severely ill.  Mr. Teeple would go out of his way to check in on us.  I never told him this, but the frequent, non-business related calls he made were like those of a concerned family member. . .  I cannot begin to express the gratitude I felt knowing how genuinely concerned he was.  I had very little family support left in my life—his effort to consistently reach out

21

with his calls of support and concern during my wife's years of illness meant the world to me.

Wolfard Ltr. at 2.

Mr. Teeple's tireless and selfless support of his friends has consistently persisted over many years and truly reveals his core characteristics.  It is therefore not surprising that even while enduring personal heartache and distress, his steadfast devotion to his friends continues: "[Just] [l]ast month . . . I met with Matt and wanted to see how he and his family were doing. Instead of talking about his situation he wanted to know how my life was going and ways in which he could help.  He is a friend, a father, and a serious contributor to society."  AJ Shanley Ltr. at 3.

> ### D.  Mr. Teeple Has Consistently Been Involved In His Community And With Charitable Endeavors.

Mr. Teeple's good and generous character extends to his community, where he is a fixture at sporting and other events, and where he acts as a warm, supportive, and patient mentor to his and the many other children in his neighborhood: "[The] amazing ability he has with children is what fueled my growing admiration of Matt as I watched what a dedicated father and family man he was.  The ability he has with his children and other kids in our community is a rare trait that is such a special gift, and in my experience rarely seen."  Taccolini Ltr. at 1; *see also* Issacs Ltr. at 2 ("Matt Teeple is an outstanding individual and valuable member of our community held in the highest esteem and trusted without reservation by all who know him."); David Nemeth Ltr. at 1-2 ("He is a loving and devoted husband and father.  He gives greatly of his time not only to his own kids, but others' as well. . . .  He has and will forever be a close friend to me and my family, as well as an invaluable member of our community in San Clemente.  His absence will obviously be especially difficult on his family, but it will also be one

that is felt by a very large circle of people that benefit from his charity and involvement in their lives.").

Many of his neighbors and supporters give particular attention to the extraordinary contributions he makes to his community as "Coach Matt":

> [Coaching] is where I really got to know Matt and see what a great parent, coach and role model he is. Matt . . . really took the time to focus on the kids that may not have received as much attention from another coach. Matt has a way with kids that not only drives them to be their best but to make them feel like they can accomplish anything. . . . Matt coached like he parents and that is with passion, conviction and lots of love! .

Nelson Ltr. at 1. Another neighbor writes:

> Matt exhibits such a refreshing spirit when it comes to coaching. He assembles amazing teams not just recruiting the best kids, but also including the kids that don't necessarily want to play or who think they aren't good enough. I have witnessed this personally, as my son is one of those kids. He was really worried about playing soccer, but Matt, who then became Coach Matt, took him under his wing, coached him and offered unwavering encouragement throughout the season.

Taccolini Ltr. at 1-2; *see also* Crone Ltr. at 1 ("He coaches each of the kids as if they were his own.").

Mr. Teeple also has been, and continues to be, an integral supporter of the local public school system, especially with respect to the non-profit "Splash Foundation" which raises money for the local elementary school (even prior to Mr. Teeple's children attending that school):

> When I brought up the fact that I was heading up a group to start a [charity] for our elementary school, Matt was immensely interested [and] he was ready to volunteer immediately and enthusiastically. He attended our meetings and brought many great ideas to the table. His enthusiasm and passion for education and improving our children's learning experience in our community was compelling. . . . [H]e and his wife Kathy continue to support our foundation as much as they can with time, talent, and treasure. . . . They are staunch advocates of public education. They could have easily sent their children to one of the myriad of fancy private schools in Orange County [but instead] are committed to supporting the [local public schools].

Litchfield Ltr. at 2.   Other examples of Mr. Teeple's local charitable endeavors include his consistent support of the Ronald McDonald House Charities and his assistance in helping them with fundraisers (Siri Ltr. at 1-2), as well as the support he provides to his former high school's athletic department, both in terms of financial support as well as his own time (Stoll Ltr. at 3).

Due in part to the fact that both of his grandfathers and his father-in-law served in the military, Mr. Teeple has also long been a strong supporter of our Nation's veterans.   Specifically, in 2005, Mr. Teeple and his then-business partner provided financial support to Frank Sandoval, a U.S. Army sergeant who suffered a traumatic brain injury in Iraq.   *See* Mark Emmons, *A River of Generosity*, Mercury News, January 14, 2007, at 1A, 15A (recognizing Mr. Teeple and his business partner for a $15,000 donation).   The intent behind this fundraising drive was to ease the difficulties for Sergeant Sandoval (who was returning home from Iraq with severe brain injuries) and his family by raising sufficient funds so that the Sandoval family would have enough for a down payment on a home of their own.   Additionally, Mr. Teeple is a supporter of an organization called "Socks for Heroes," which is a charitable endeavor run by the San Clemente Marine Corp Support Group. The idea behind "Socks for Heroes" was born when the founder of the local Marine Corp Support Group, who had lost his own son in combat, decided to ask his sons' colleagues what they needed most while they were stationed overseas.   The answer he received back from the troops, and the genesis of the organization, is explained on their website:

> Well the infantry spends all of their time on their feet. They have no laundry facilities, so they have to wash their socks in the canals and air dry them. While in California, this would be no problem, but where they are located the sand and grit gets into them and makes them unusable within a couple of days. Speaking to over 100 field Marines, the answer was uniform: "Send us Socks."

*See* "Socks for Heroes" Website, *available at* http://www.scmsg.org/volunteer.   "Socks for Heroes" has succeeded in sending over 330,000 pairs of socks (equating to 27 tons of socks) to Marines serving our country overseas.

In addition to his significant financial contributions to a variety of causes and his willingness to share his time on behalf of worthy endeavors, his many "private acts of humanity and compassion" perhaps more readily attest to his character, as recognized by Judge Rakoff in a similar case: "private acts . . . that no one knows about . . . reveal something about the heart and conscience of the human being." *United States v. Whitman*, 12 Cr. 125 (JSR), Sentencing Tr. at 17:5-23 (Jan. 24, 2013).   Among the repeated instances of Mr. Teeple aiding others in need discussed in the attached letters, Kumar Mehta describes, for example, Mr. Teeple's selfless and automatic help of a disabled stranger:  "As we were sitting in the [coffee] shop and talking, a partially paralyzed man came to the coffee shop in a wheel chair.  He had no money to buy coffee, so the owner refused to give him service.  Immediately and without any hesitation, Matt stood up and offered to pay for the coffee. . . .  This specific incident truly touched my heart.  Overall, I admire his generosity and kindness, and I strive to achieve the same level of altruism."  Mehta Ltr. at 2; *see also* David Nemeth Ltr. at 2 ("[G]enerosity, kindness and selflessness are truly at the core of who [Matt] is, and always has been.").

Mr. Teeple's reputation in his community, therefore, is clearly outstanding, as summarized by the words of a neighbor: "We trust Matt completely and have had many occasions to observe his selflessness and community spirit. . . .  The accumulation of these experiences leaves no doubt in our minds that Matt is a person with a very caring and kind heart. . . .  Please know that Matt's absence from our community, and most importantly from his family, will be acutely felt."  Miller Ltr. at 1-2.

<u>**ADDITIONAL SENTENCING CONSIDERATIONS**</u>

**II.    MR. TEEPLE'S PLEA AGREEMENT.**

On May 28, 2014, Mr. Teeple accepted responsibility for his offense conduct in this case by pleading guilty to one count of conspiracy to commit securities fraud, pursuant to a plea agreement with the Government.   *See* May 28, 2014 Teeple Plea Agreement ("Teeple Plea Agreement"), attached as Exhibit 2.   Pursuant to his plea agreement, the parties have agreed to a Stipulated Guidelines Sentence of 60 months, which is the maximum statutory penalty for this offense.   *See* Teeple Plea Agreement at 3; *see also* 18 U.S.C. § 371.   Pursuant to the plea agreement, Mr. Teeple has agreed "not to seek a sentence other than the Stipulated Guidelines Sentence," and he will abide by that constraint.   Teeple Plea Agreement at 3.[7]   The plea agreement also states that "[i]t is understood that the sentence to be imposed upon the defendant is determined solely by the Court . . . [and] that the Guidelines are not binding on the Court."   *Id.* at 4.   Finally, the plea agreement further states that "nothing in this Agreement limits the right of the parties . . . to present to the Probation Office or the Court any facts relevant to sentencing." *Id.* at 3.[8]   Due to the terms of his plea agreement, Mr. Teeple therefore merely draws the Court's attention to the relevant statute for purposes of sentencing, 18 U.S.C. § 3553(a), which sets out the categories of "facts relevant to sentencing" in this matter.

The relevant sentencing statute, 18 U.S.C. § 3553(a), requires the Court to consider the following factors, among other things:

---

[7]   To the extent that any of the individuals who wrote character letters on Mr. Teeple's behalf have made explicit requests for a sentence below the Stipulated Guidelines Sentence, they speak for themselves and not on behalf of Mr. Teeple.  Mr. Teeple has not asked those writing letters for him to make such a request.

[8]   *See also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

(1)     the "nature and circumstances of the offense and the history and characteristics of the defendant";

(2)     the need to "reflect the seriousness of offense, to promote respect for the law, and to provide just punishment for the offense";

(3)     the need to "afford adequate deterrence to criminal conduct";

(4)     the need to "protect the public from further crimes of the defendant"; and

(5)     "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[9]

*See also United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (requiring district courts to conduct an "independent review of the sentencing factors" in all cases); *Rita v. United States*, 551 U.S. 338, 367 (2007) (noting that the Guidelines are "truly advisory"); *Gall v. United States*, 552 U.S. 38, 50 (2007) (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *United States v. Johnson*, 567 F.3d 40, 50-51 (2d Cir. 2009) (same).

## III.    THE STIPULATED GUIDELINES CALCULATION IS ALMOST ENTIRELY DEPENDENT ON THE ESTIMATED AMOUNT OF INVESTMENT ADVISER A'S GAINS AND AVOIDED LOSSES.

In his plea agreement, Mr. Teeple stipulated to an offense level of 27, which corresponds to a Guidelines range of 70 to 87 months' imprisonment. Since the statutory maximum term of imprisonment for the conspiracy offense to which he pled guilty is 60 months, the parties agreed to a Stipulated Guidelines Sentence of 60 months.

This stipulated offense level is highly dependent on the estimated nominal gains and avoided losses[10] made by Investment Adviser A using the information obtained by Mr. Teeple—

---

[9] To assist the Court's analysis on this point, attached as Exhibit 4 is a summary of recent insider trading sentences imposed in this District.

indeed, as outlined below, this estimate is by far the most heavily-weighted component of the guidelines calculation, accounting for 22 of the 27 total levels (81%). While there is no dispute that the Guidelines calculation was done in accordance with the applicable sections of the U.S. Sentencing Guidelines, as set out more fully below, it bears noting that Mr. Teeple had no control over the scale of any trades placed by Investment Adviser A or whether his employer would execute trades in the first place. As such, the considerable stipulated loss amount does not reflect a more culpable mental state or make Mr. Teeple's crime any more wrongful than if fewer, less profitable trades had been made.[11]

This is especially so since the primary harm of insider trading is to market integrity in general, and such harm is not necessarily magnified by the amount of shares being traded by someone in possession of unlawful information. For this reason, many courts in this District have questioned the utility of purported gain estimates in determining an appropriate sentence in insider trading cases. For example, in sentencing hedge fund owner Doug Whitman to a below-Guidelines 24 months' imprisonment (~53% below the applicable Guidelines), Judge Rakoff noted "that the guidelines place far too much emphasis on the alleged monetary gain" and "are skewed irrationally in this respect." *See United States v. Whitman*, 12 Cr. 125 (JSR), Sentencing Tr. at 7:19-20; 9:17-18 (Jan. 24, 2013). In *Gupta,* Judge Rakoff also noted the Guidelines'

---

[10] The U.S.S.G. § 2B1.1 loss estimate used in the guideline calculation is an approximation of the unrealized gains and avoided losses in Investment Adviser A's holdings based on fluctuations in Foundry's securities' prices shortly before and after the information at issue became public. The loss estimate is not, in other words, the actual amount of money gained or saved by Investment Adviser A or its investors by way of Mr. Teeple's misconduct.

[11] The U.S. Attorney prosecuting this case has appropriately recognized that one of the most important inquiries when sentencing financial fraud defendants is "differentiating between and among financial criminals and accurately gauging their relative culpability." Statement of Preet Bharara, U.S. Sentencing Commission Hearing (Feb. 16, 2011), *available at* http://www.justice.gov/usao/nys/pressspeeches/2011/doddfrankfraudtestimony.pdf.

overreliance on the gain calculations by stating: "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Gupta*, 904 F.Supp.2d at 351 (sentencing Gupta to 24 months' imprisonment); *see also United States v. Goffer*, 10 Cr. 56 (RJS), Sentencing Tr. at 20:20-24 (Oct. 7, 2011) (Judge Sullivan recognizing that the Guidelines are only able to "provide sort of a baseline" and are "at best, a blunt instrument" incapable of the "kind of precision and nuanced consideration that a judge is capable of" in crafting the appropriate sentence for an individual defendant).

Indeed, judges on the Second Circuit have also recognized a "widespread perception that the loss guideline is broken, [leaving] district judges without meaningful guidance in high-loss [fraud] cases." *United States v. Corsey*, 723 F.3d 366, 378-79 (2d Cir. 2013) (Underhill, J., concurring); *see also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (criticizing the "excessive weight on [the fraud loss] factor" and noting that loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

Even the United States Sentencing Commission itself has indicated an intention to revisit how the Guidelines are applied to economic crimes. *See* Christopher Matthews, *Insider Martoma's Sentencing Highlights White-Collar Crime Debate*, Wall Street Journal (Sept. 7, 2014) (attached as Exhibit 5). Each year the Sentencing Commission identifies specific provisions of the Guidelines which it intends to revisit, pursuant to its statutory authority, and sets about to review, analyze, and revise specific provisions of the Guidelines. Less than two months ago, on August 14, 2014, the Sentencing Commission publicly announced that it intended to "consider potential changes to the guidelines resulting from its multi-year review of

29

federal sentences for economic crimes." *See* U.S. Sentencing Commission News Release at 1 (August 14, 2014) (attached as Exhibit 6). Focusing specifically on securities fraud cases, like this one, the Sentencing Commission announced that they were going to "try to determine whether changes are needed in the way fraud offenses are sentenced in the federal system" and "decid[e] whether there are ways the economic crime guidelines could work better." *Id.* Thus, it appears that, in the near future, the Sentencing Commission itself is poised to revise the Guidelines section which is now driving Mr. Teeple's Stipulated Guidelines Sentence in this case.

## IV.  MR. TEEPLE'S OFFENSE CONDUCT IS DISTINGUISHABLE FROM OTHER RECENT INSIDER TRADING CASES.

The Supreme Court has instructed that there must be a "strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). Although Mr. Teeple in no way shirks from or seeks to diminish the severity of his offense, there are certain unique aspects of his crime that set him apart from the paradigmatic insider trader who purchases or misappropriates information to trade in their own account.[12] Most importantly, Mr. Teeple was not motivated by greed or direct financial gain[13] but rather allowed his better judgment to be clouded by a completely misguided desire to impress his employer and acquaintances with an ability to obtain actionable corporate information. Mr. Teeple did not himself make any illegal trades but was rather a conduit of information between a

---

[12] *Cf., e.g.*, *United States v. Chen*, 07 Cr. 730 (CM) (hedge fund analyst who made over $700,000 from trading on inside information obtained from his wife sentenced to 18 months' imprisonment); *United States v. Marshall*, 08 Cr. 924 (LTS) (executive who orchestrated insider trades based on his company's information to net over $1 million in profits sentenced to 18 months' imprisonment).

[13] If he were so motivated, we respectfully submit that he would have made trades himself or on behalf of his family members—which he at no point did. We address below the annual bonus which Mr. Teeple received from his employer in 2008.

company insider, who disclosed this information to Mr. Teeple for his own reasons, and others who traded.

### A.    Mr. Teeple Crossed A Line While Conducting Otherwise Legitimate Research.

As the Court is aware, Mr. Teeple's offense involved obtaining inside information from an acquaintance and former colleague, David Riley, about Mr. Riley's (now former) employer, Foundry.  At all relevant times, Mr. Riley was in charge of Foundry's information technology ("I.T.") systems as a vice-president and chief information officer and periodically had access to certain material, non-public information ("MNPI") pertaining to Foundry's financial results and strategic planning.  *See* Ind. ¶ 1.[14]  On various occasions, Mr. Riley provided MNPI concerning Foundry to Mr. Teeple, who gave it to others who used it as a basis for their own trades.  *See generally id.* at ¶¶ 7-17.

In so doing, Mr. Teeple crossed a line and violated the securities laws while doing what market analysts, like him, are otherwise expected to do—*i.e.*, perform research and procure information about a company, often by lawfully speaking to company insiders.  Indeed, Foundry was just one of numerous technology companies that Mr. Teeple researched in the course of his duties and Mr. Riley was just one of many industry insiders whom Mr. Teeple regularly corresponded with to garner lawful company, industry, and market information.  Such interactions are commonplace in the securities industry and the efforts of market analysts are generally recognized to inure to the benefit of the broader investing public: because the average investor lacks the time and wherewithal to regularly gather and synthesize company and market information, analysts serve the investing public by providing both objective and subjective data on which accurate stock prices may be based.

---

[14] "Ind." refers to the first superseding indictment filed on Feb. 20, 2014 (Docket Entry No. 65).

The Supreme Court, for example, recognized in *Dirks v. S.E.C.* that "the role of market analysts . . . is necessary to the preservation of a healthy market.  It is commonplace for analysts to ferret out and analyze information, and this often is done by meeting with and questioning corporate officers and others who are insiders.  And information that the analysts obtain normally may be the basis for judgments as to the market worth of a corporation's securities." 463 U.S. 646, 658-59 (1983) (internal quotations and citations omitted).  The Securities and Exchange Commission has similarly acknowledged that:

> In the course of their work, analysts actively seek out bits and pieces of corporate information not generally known to the market for the express purpose of analyzing that information and informing their clients who, in turn, can be expected to trade on the basis of the information conveyed.  The value to the entire market of these efforts cannot be gainsaid; market efficiency in pricing is significantly enhanced by such initiatives to ferret out and analyze information, and thus the analyst's work redounds to the benefit of all investors.

*In the Matter of Raymond L. Dirks*, S.E.C. Release No. 17480, 1981 WL 36329, at *6 (Jan. 22, 1981) (cited in *Dirks* at 658 n.17).  There is thus nothing inherently untoward or problematic about a market analyst speaking with a company insider, even where the analyst's employer is an investor in the insider's company.[15]

In this case, regrettably, an otherwise lawful relationship—the likes of which are ubiquitous in the technology and other industries—crossed the line into the exchange of illegal inside information.  While Mr. Teeple never, at any point, traded himself on unlawful

---

[15]  Such interactions are, in fact, routine and, as commentators have recognized, because "[i]nvestment analysts and other securities market professionals constantly strive for an informational advantage over their counterparties by collecting and analyzing all of the publicly available information about a company in order to take advantage of pricing inefficiencies in the company's securities. . . .  One of the ways that market professionals maintain an information advantage is by using their superior resources to poke around in the guts of companies in which they wish to invest."  Marron C. Doherty, Note, *Regulating Channel Checks: Clarifying the Legality of Supply-Chain Research*, 8 Brook. J. Corp. Fin. & Com. L. 470, 477 (2014).

information, by obtaining and passing inside Foundry information to others, Mr. Teeple acknowledges that he violated the securities laws.  He completely accepts responsibility for that transgression.  Before examining the details of Mr. Teeple's offense conduct further, however, there is certain background information, set out below, that is relevant to an understanding of how and why his violation of the securities laws came about.

1.    <u>Mr. Teeple Has a Long Relationship with Foundry and His Co-Defendant.</u>

Foundry was a technology company specializing in networking hardware that was headquartered in the California Bay Area.[16]  *See* Ind. ¶ 1.  Mr. Teeple has been knowledgeable about the company since at least 1996, when he was working as a salesman for a semiconductor distributor that sold parts to Foundry to be incorporated into their networking products.  During this time, Mr. Teeple developed close professional ties to a number of Foundry engineers and executives, many of whom eventually moved on to other technology companies and thereby broadened Mr. Teeple's expansive Silicon Valley professional network.

As his career progressed and his responsibilities increased, Mr. Teeple continued to develop close relationships with his counterparts at various technology companies— manufacturers, distributors, and retailers—throughout the West Coast and beyond.  When Mr. Teeple became a technology-focused market analyst, these industry relationships proved invaluable, as he would periodically speak with these colleagues in an effort to better understand what customers were buying, the general demand environment, and how the competitive landscape was evolving.[17]  Because the quality of an analyst's research depends in part on their

---

[16] Foundry has since been subsumed by Brocade Communications Systems, Inc. following Brocade's acquisition of Foundry in 2008 (the "Brocade Transaction").

[17] The analysis of a given company's upstream suppliers and downstream consumers—so called "channel checks"—is a common practice in the market analysis industry and is used to discern

capacity to garner legal information "not generally known to the market," as the Supreme Court has acknowledged, the maintenance of such relationships is predictably often critical to their ability to understand how companies within a certain sector can be expected to perform.  *See Dirks*, 1981 WL 36329, at *6.  One of the many relationships that Mr. Teeple developed during this period was with his long-time friend and current co-defendant, David Riley.

Messrs. Riley and Teeple first met in 2001 as coworkers at Riverstone.  At that time, Mr. Riley was responsible for managing a team of I.T. professionals who supported the company's electronic infrastructure. Mr. Teeple and Mr. Riley were both long-term technology industry veterans who shared an intense interest in the esoteric products that comprise computer network infrastructure.  With this common bond, the coworkers would often get together to discuss emerging technologies and the products that I.T. managers, like Mr. Riley, were interested in purchasing.  Since at this time Mr. Teeple was responsible for selling products to Mr. Riley's I.T. peers at other companies, Mr. Teeple understandably sought out Mr. Riley's views on the sector.

2.    Mr. Teeple Did Not Buy the Foundry MNPI or "Bribe" Mr. Riley.

Mr. Teeple reconnected with Mr. Riley in 2005, when Mr. Riley had moved to an I.T. position at Foundry.  In this new position, Mr. Riley remained deeply interested in emerging technologies that would better equip his I.T. team and Mr. Teeple remained interested in Mr. Riley's thoughts on the technology industry—as an I.T. manager and end-user of many of the products sold by companies covered by Mr. Teeple's research, Mr. Riley was uniquely

---

an approximation, through legal means, of how a particular company is performing.  *See* Doherty, *supra* note 15 at 470 ("In a channel check, an investment analyst communicates with suppliers and clients, as well as current and former employees of a company to obtain clues about the company's performance. *This practice is most common among technology analysts* . . . .") (emphasis added).  Engaging in such channel checks was a primary component of Mr. Teeple's job and a key reason he regularly communicated with various industry professionals, such as Mr. Riley.

positioned to provide insight into which products were poised for growth or failure.  Pursuant to these complimentary interests and their prior relationship as business colleagues, Mr. Teeple and Mr. Riley met periodically—generally for coffee after Mr. Riley had dropped his son off at school—to catch up with one another's personal lives, discuss market trends, and speculate on the direction various Silicon Valley companies were headed.  Like many work colleagues, they were simply two friends and former colleagues who caught up occasionally about their common business interests, as well as their families and other personal interests.  For the most part, these conversations did not directly concern Foundry's business or performance but rather focused primarily on other companies—companies that Mr. Teeple tracked through his duties at FCG or at Investment Adviser A and companies in which Mr. Riley invested or was considering an investment in.[18]

At some point, however, Mr. Riley began providing Mr. Teeple with MNPI about Foundry in violation of Mr. Riley's fiduciary duties to his company.  Mr. Teeple did not buy this information from Mr. Riley, "bribe" him in any conventional sense of the word, or engage in any express non-monetary *quid pro quo* arrangement, as was the case in several recent insider trading prosecutions in this District.[19]  Yet, in a terrible lapse in judgment, on several occasions in 2007 and 2008 Mr. Teeple passed MNPI from Mr. Riley to others, whom he knew could be expected

---

[18] It is important to note that Mr. Teeple's relationship with Mr. Riley continued even long after Mr. Riley left Foundry in early 2009.  This was, in other words, a true friendship and their interactions were not solely, or even primarily, based on the charged conspiracy.

[19] Mr. Teeple does not dispute that Mr. Riley received from him a "personal benefit" sufficient to meet the elements of an insider trading offense. However, at the time, Mr. Teeple's perspective was that any benefits he was providing Mr. Riley as alleged by the Government— such as, stock tips, "networking opportunities," and "friendship"—are things that he commonly did for all of his friends. *See, e.g.,* May 1, 2014 Gov't Bill of Particulars.

to, and who in fact did, use this information to execute certain profitable trades.  *See generally* PSR at ¶¶ 14-22.

These transfers of information by Mr. Teeple, which occurred during his first year as a junior analyst at Investment Adviser A, were not done to secure any direct monetary reward for himself—rather, Mr. Teeple was primarily motivated by a misguided desire to appear as a highly informed analyst and to impress his employer and acquaintances.  Indeed, considering the long list of acquaintances Mr. Teeple gave the most valuable merger information to, it seems clear that he was foolishly intent on impressing many people in his business network.  *See id.* at ¶ 12 (noting that Mr. Teeple informed over 15 parties of the impending Brocade Transaction).  To have been motivated to engage in illegal conduct by such a trivial interest is of course highly embarrassing to Mr. Teeple and he continues to struggle with why he ignored the sensibilities and values that guided his life and career previously.[20]

**B.     Mr. Teeple Did Not Breach Any Fiduciary Duties To Foundry Or Control Any Of The Trading At Issue.**

As an intermediary tippee between Mr. Riley and others, Mr. Teeple's crime was thus strictly derivative of Mr. Riley's initial fiduciary breach.  *See Chiarella v. United States*, 445 U.S. 222, 230 at n.12 (1980) ("'Tippees' of corporate insiders have been held liable under §

---

[20] While Mr. Teeple of course acknowledges that his conduct was illegal, the broader business context within which his offense took place is relevant to the Court's analysis in the sense that the market analyst culture in 2008, particularly in the technology sector, was rife with people edging towards or crossing the line between legal research and illegal insider trading.  As exemplified in the spate of technology-related insider trading prosecutions commenced in this District since the current U.S. Attorney's appointment in 2009, the passing of MNPI was apparently a widely prevalent and common practice, especially in Silicon Valley.  Although Mr. Teeple cannot, and does not, make any excuses for his own illegal conduct, with the harsh reflection and introspection that this case has forced him to undertake, Mr. Teeple admits that he was "swept up" in the analyst culture pervading Silicon Valley at this time and may have engaged in other improper communications as well. In short, tragically, Mr. Teeple acknowledges that he lost his ethical moorings during this timeframe and, again, he accepts responsibility for his transgressions.

10(b) because they have a duty not to profit from the use of inside information that they know . . . came from a corporate insider.  The tippee's obligation has been viewed as arising from his role as a participant after the fact in the insider's breach of a fiduciary duty."); *see also Dirks*, 463 U.S. at 654-662 (explaining why a tippee's violation is "derivative from that of the insider's duty").  In such situations, the Supreme Court has recognized that tippees have a lower degree of culpability than the company insiders who actually owe the duty not to divulge corporate secrets: "[i]n the context of insider trading, we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place."  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313 (1985); *see also id.* at n.23 ("[a]bsent the tipper's misconduct, the tippee's trading would not occur" and a tipper is therefore "most directly culpable in a violation"); *S.E.C. v. Tome*, 638 F. Supp. 596, 617 (S.D.N.Y. 1986) ("the tipper's conduct, almost invariably, is more culpable than that of the tippee").  In this respect, Mr. Teeple's offense is distinguishable from many of the other defendants recently convicted of insider trading in this District.  *Cf., e.g., United States v. Ebrahim*, 12 Cr. 471 (JPO) (company insider who sold his company's information in exchange for purported consulting fees sentenced to 366 days imprisonment); *United States v. Gupta*, 11 Cr. 907 (JSR) (Goldman Sachs board member who passed inside information to Raj Rajaratnam sentenced to 24 months' imprisonment); *United States v. Cutillo*, 10 Cr. 56 (RJS) (lawyer who sold client information in exchange for cash payments sentenced to 30 months' imprisonment); *United States v. Poteroba*, 10 Cr. 649 (PAC) (investment banker who sold client information in exchange for a portion of trading profits sentenced to 22 months' imprisonment); *United States v. Goldfarb*, 10 Cr. 56 (RJS) (lawyer who sold clients' information for cash payments sentenced to 36 months' imprisonment).

It is also significant to note that Mr. Teeple did not himself execute, formulate, or direct any of the Investment Adviser A trades at issue, nor did he at any point trade Foundry stock in any personal accounts controlled by him or his family members.  Indeed, Mr. Teeple was not even aware of the size of the trades being placed by Investment Adviser A at any given time.  Rather, as discussed, Mr. Teeple acted strictly as an intermediary between the insider, Mr. Riley, and others to whom he passed the information.[21]  Consequently, Mr. Teeple had no control over whether or how this information was used, the scope of the trading, or the size of the gains thereby realized.  Further, and critically, Mr. Teeple did not directly receive any portion of the gains from the Foundry trades at issue.[22]  Thus, even though Mr. Teeple concedes that the over $30 million profit and avoided loss estimate was properly calculated for purposes of the Sentencing Guidelines determination (discussed previously), the fact that the actual trading was done independently by others—only one of whom has been charged—remains pertinent.  And moreover, the lion's share of the gains obtained went to the third-party investors in Investment Adviser A's funds—in contrast, the maximum amount of money Mr. Teeple arguably indirectly

---

[21]  Consequently, Mr. Teeple's offense was wholly contingent on what others did with the information he obtained—without a trade, the securities laws, of course, would not have been violated.  *See* 15 U.S.C. § 78j(b) (prohibiting use of "manipulative or deceptive device or contrivance" "in connection with the purchase or sale" of a security).   According to the Government's main cooperator, John Johnson, the "highly material [and] non-public" nature of the information was apparently self-evident, and there have been no allegations that Mr. Teeple coaxed, duped, or otherwise incentivized any third party to act on it for their own benefit.  *See United States v. Johnson*, 13 Cr. 190 (JFK), Allocution Tr. at 15:6-20, 16:1-6 (Mar. 18, 2013).  Mr. Teeple was therefore merely a facilitator for trading decisions made solely at others' discretion.

[22]  While Mr. Teeple did have a relatively small amount of assets invested in Investment Adviser A's funds in 2008, any *pro rata* allocation of Investment Adviser A's Foundry gains to his modest investment would be miniscule in light of the fund's nearly $2 billion portfolio at the time.  Furthermore, although the forfeiture amount set out in the plea agreement requires Mr. Teeple to forfeit his entire after-tax 2008 bonus, because he covered numerous companies while working at Investment Adviser A, his efforts regarding Foundry were a small subset of his overall work in 2008 and not the only variable factored into his bonus amount.

received on account of his wrongdoing was his 2008 post-tax bonus of $553,890, which he has agreed to forfeit pursuant to his plea agreement.

As such, the fact that Mr. Teeple had no direct role in any trading is another distinguishing aspect of his crime and places the eight-figure gain estimate being attributed to him into a proper context. *Cf. e.g.*, *United States v. Hixon*, 14 Cr. 227 (RA) (investment banker who personally traded on inside information belonging to his clients sentenced to 30 months' imprisonment); *United States v. Steinberg*, 12 Cr. 121 (RJS) (hedge fund portfolio manager who personally traded on illegal information sentenced to 42 months' imprisonment); *United States v. Newman*, 12 Cr. 121 (RJS) (hedge fund manager who personally traded on illegal information sentenced to 54 months' imprisonment); *United States v. Whitman*, 12 Cr. 125 (JSR) (hedge fund owner who personally traded on illegal information sentenced to 24 months' imprisonment after "repeatedly perjuring himself" on the witness stand); *United States v. Longueuil*, 11 Cr. 161 (JSR) (hedge fund trader who personally traded on illegal information sentenced to 30 months' imprisonment); *United States v. Chiesi*, 09 Cr. 1184 (RJH) (hedge fund portfolio manager who personally traded on illegal information sentenced to 30 months' imprisonment).[23]

---

[23] A plea agreement similar to the one Mr. Teeple entered into was utilized in another recent insider trading case in this District, *United States v. Skowron*, 11 Cr. 699 (DLC). Mr. Skowron was a prominent hedge fund portfolio manager who directly obtained (via secret offshore cash payments to an insider) illegal information and personally executed trades that avoided over $30 million in loses for his fund. In addition, Mr. Skowron admitted to lying to the SEC and to urging the insider to lie to investigators as well. The direct illicit gains Mr. Skowron personally garnered from this scheme were many times larger than those at issue in this case, and he was held liable for nearly $21 million in forfeiture and restitution (compared with $553,890 in forfeiture in this case with no recommended restitution). Mr. Skowron pled guilty to conspiracy to commit securities fraud and to obstruct justice and, as here, his Guidelines range was above the five-year statutory maximum (87-108 months). Noting that Mr. Skowron made massive personal gains, used deception to purchase information from insiders, directly executed unlawful trades, and made "egregious and calculated [efforts] to escape the consequences of his deceit," Judge Cote imposed a sentence of 60 months. *See generally* Skowron Sentencing Tr. at 18:7-19:10, 30:19-31:20 (Nov. 18, 2011).

Another instructive comparison on this point is with Mathew Martoma, who was sentenced to a term of 9 years by Judge Gardephe on September 8, 2014. *See United States v. Martoma*, 12 Cr. 973 (PGG). Unlike Mr. Teeple, who was merely a junior analyst at Investment Adviser A, Mr. Martoma was a hedge fund portfolio manager who was directly responsible for ordering massive illegal trades on behalf of a fund he personally controlled, as well as passing the illegal MNPI to his boss, Steve Cohen, who also traded on it. *See id.*, Docket No. 293 (Gov't Sentencing Submission) at 20. After cultivating corrupt relationships with at least two insiders (for the specific purpose of eliciting inside information from them), Mr. Martoma and his boss ordered the sale of securities worth over $750 million, resulting in avoided losses of over $275 million. *See id.* at 1. This scope of this misconduct, the "most lucrative insider trading scheme ever charged," as described by the U.S. Attorney (*see id.*), is many orders of magnitude beyond that involved in this case: according to the Government, the unlawful gains indirectly caused by Mr. Teeple totaled approximately $36 million (*see* PSR at ¶ 29), a figure nearly 87%, or $239 million, less than the unlawful gains made in Mr. Martoma's case.

The difference in the amounts Mr. Martoma and Mr. Teeple personally derived from their respective offenses is even more dramatic: Mr. Martoma received a payment of over $9.3 million as a direct result of the illegal trading he directly controlled, while Mr. Teeple indirectly netted at most only $553,890. Mr. Martoma's personal illicit profits were, therefore, nearly 17 times larger than the amount Mr. Teeple made. Despite the unprecedented scope of Mr. Martoma's wrongdoing and the huge personal payout he received on account of the trades he ordered, Mr. Martoma was sentenced to approximately 80 months less than the low-end of his Guidelines range.

40

### C.     Mr. Teeple Has Not Been Alleged To Have Actively Concealed His Wrongdoing Or Otherwise Obstructed Justice.

The conspiracy charged in this case was relatively unsophisticated and decidedly "low-tech": Mr. Teeple and Mr. Riley arranged their morning coffee meetings over their personal emails and using their personal cell phones; neither defendant executed Foundry trades personally or engaged in any clandestine financial chicanery to hide illicit profits (which, of course, neither of them made); and, most importantly, neither defendant is alleged to have participated in any efforts to thwart investigators' efforts. Thus, as reflected in the PSR, the indictment, and the plea agreement, there are no allegations that Mr. Teeple took steps to actively conceal any criminality or otherwise obstruct justice, even after being alerted to the Government's investigation. *See, e.g.,* PSR at ¶ 32.

The Government has regularly highlighted such efforts as aggravating factors in other insider trading sentencing proceedings and the absence of such allegations here is another fact that materially distinguishes Mr. Teeple from defendants found guilty of similar crimes. *Cf., e.g., Hixon*, 14 Cr. 227 at Docket No. 23 (investment banker sentenced to 30 months who repeatedly lied, and coached others to lie, to federal agents); *United States v. Kinnucan*, 12 Cr. 163 (DAB), Docket No. 21 (analyst who sold illegal information sentenced to 51 months after waging an "extended campaign" to "intimidate the AUSAs and FBI special agents" through a "series of targeted, violent and extremely threatening voice mails"); *United States v. Skowron*, 11 Cr. 699 (DLC), Docket No. 22 (portfolio manager sentenced to 60 months who lied under oath and encouraged others to lie to investigators); *Longuiuel*, 11 Cr. 161 at Docket No. 111 (portfolio manager sentenced to 30 months who used "elaborate methods to preserve [his] scheme and conceal it from law enforcement," including destroying computer disks and hard drives); *United States v. Jiau*, 11 Cr. 161 (JSR), Docket No. 120 (analyst who took steps to flee the country and

obstruct justice sentenced to 48 months' imprisonment); *Chiesi*, 09 Cr. 1184 at Docket No. 284 (portfolio manager sentenced to 30 months who took "numerous steps to conceal her extensive criminal conduct").

## V.   MR. TEEPLE HAS ALREADY SUFFERED SEVERE EMOTIONAL, FINANCIAL, AND PROFESSIONAL REPURCUSSIONS SINCE HIS ARREST.

Put simply, much in Mr. Teeple's life has already been destroyed by his misconduct—the stigma and collateral effects of Mr. Teeple's felony conviction represent great penalties in and of themselves and are consequences that he will suffer for the rest of his life: he has lost his job, will never again work in the securities industry, has been publicly embarrassed, and will never be looked at the same by his family, friends, neighbors, and business associates.  The Teeple family has also suffered enormously since Mr. Teeple's arrest and the devastating emotional toll on his wife and children, who are barely old enough to understand their family's plight, will persist for many years to come.  Indeed, recognizing his responsibility for the anguish he has heaped on these innocent loved-ones has been understandably tortuous for a devoted father and husband like Mr. Teeple: "these past many months . . . have torn his heart apart with sadness and regret." Richard and Karen Krueckel Ltr. at 2.

The severe consequences of his offense that Mr. Teeple has already suffered, irrespective of a prison term, have been noted by many of those around him:

> From a friend's perspective, Matt's punishment began with a predawn arrest at his home and in front of his neighbors.  It continued with the public loss of his career and professional credibility, as well as abandonment of friends . . . .  Since his arrest, ever present has been the unrelenting pressure and anxiety about what the future holds. . . .  But Matt really isn't focused on any of these things, because he is a selfless guy and the personal trials he has been through as a result of his mistakes are at the bottom of his list of priorities.  The biggest regrets Matt has and the most important lessons he's learned spring from how his crimes have hurt the people he loves the most.

Rife Ltr. at 3.  Another friend observes that "what has transpired pains him beyond what most any person could possibly imagine."  Wolfard Ltr. at 3.  A long-time family friend similarly notes:  "I am aware of Matt's sadness, dismay, and embarrassment regarding the commission of these offenses.  I am also aware of his remorse and willingness to accurately compensate for his actions.  Finally, I am completely confident that he will take responsibility and emerge stronger and a more compassionate person."  Lorenze Ltr. at 1; *see also* Linda Teeple Ltr. at 4 ("This has been a very painful journey and I have witnessed the very physical toll this set of circumstances has taken upon him.  Matt has certainly borne the majority of the duress in an attempt to allay the pain for all of the family.").

Despite the tremendous personal suffering Mr. Teeple has endured over the past eighteen months, his supporters have been impressed by how his strong character has persevered—a long-time friend, for example, writes: "Throughout this legal situation, Matt's number one focus has not been himself but rather the impact this horrible process has had upon his loved ones.  It has amazed me that throughout this difficult process I have never heard him talk about 'me' ever.  It has always been about his parents, Kathy or the kids."  Milton Ltr. at 2.  Similarly, a family member notes:

> I was struck by the fact that Matt is very clear in his decisions and the direction his life is going.  He accepts responsibility without going against what he believes to be morally right because he does not want others to suffer the same fate. . . . He is devoted to his family and will do everything he possibly can to make things easier for them even as his heart breaks at the thought of being separated from them for any period of time. . . .  Matt is a true role model that makes everyone proud to know him. . . .  He can look into the eyes of family and friends and know with conviction that he has chosen truth.

Wolansky Ltr. at 2-3.  The current mayor of San Juan Capistrano (and former lieutenant in the Irvine Police Department) who has known Matt since high school relates:

> Although his life has been on hold and this situation has taken a serious toll on this young man's heart for the last several months, Matt has continued to be firm in his commitment to his wife and his young children. . . .  I have seen firsthand that Matt is very remorseful for what he did and he sincerely regrets what this has done to his wife, children and his parents, in addition to the harm it has done to his colleagues, his profession, and society as a whole.

Allevato, Jr. Ltr. at 2; *see also* Stoll Ltr. at 4 ("Matt has made a huge mistake, by his own words. This is the honorable way that Matthew Teeple has always conducted his business.  He has 'put his name on it' and has shown much integrity by this admission.").

### A.   The Criminal Forfeiture Provision Of Mr. Teeple's Plea Agreement Will Substantially Impact His Family's Financial Health And Serves As A Significant Additional Punishment For His Conduct.

Exacerbating the overwhelming emotional toll on Mr. Teeple and his family, the existing financial component of his punishment is extensive and will magnify the effects of his prison term on those who depend on him.  In addition to the anticipated years'-worth of lost wages and lifetime of diminished earning capacity, the extraordinary financial blow Mr. Teeple has taken on account of his offense (on top of being removed from his family and missing critical periods of his children's youth), much more than adequately suffices to dissuade other would-be financial criminals, who have been recognized to be deterred by "even relatively short sentences."  *See Adelson*, 441 F. Supp. 2d at 514 (citing Richard Frase, *Punishment Purposes*, 58 Stan L. Rev. 67, 80 (2005) and Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)); *see also* U.S. Sentencing Commission, *Fifteen Years of Sentencing Guidelines* 56 (2004) (acknowledging that the Guidelines were designed to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence.") (emphasis added).

As financial reparation for his offense, pursuant to the plea agreement, Mr. Teeple has already agreed to forfeit a sum equal to his after-tax 2008 bonus ($553,890), an amount

stipulated to "represent[] all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of his securities fraud offenses." *See* Teeple Plea Agreement at 2.   In connection therewith, Mr. Teeple has consented to an Order of Forfeiture/Money Judgment in the form attached as Exhibit 3.   Mr. Teeple respectfully asks that the Court approve his stipulation to the forfeiture allegations and enter the agreed-upon Order of Forfeiture/Money Judgment.   This substantial forfeiture amount represents a significant additional punishment for Mr. Teeple, since it reflects more than one-third of the Teeple family's current liquid net worth, the remainder of which Kathy and the children will need to live on during Mr. Teeple's incarceration. *See* PSR at ¶ 79.

This financial penalty will severely strain the Teeples' quality of life for the foreseeable future, especially considering that Mr. Teeple will have no income during his prison term and presumably for some period afterwards.   *See id.* at ¶ 80-81 (noting a current net shortfall of $13,000 per month in the Teeple family's finances).   As such, one of Kathy Teeple's paramount concerns (of the many she is confronting) at this juncture is trying to ascertain how she alone will be able to continue her medical career as a single parent during Matt's absence and support herself and her three children on severely diminished savings and her $105,000 annual income as a part-time pediatrician (approximately $56,400 after taxes).   *See id.*   Kathy Teeple obviously would like to minimize the impact of Mr. Teeple's imprisonment on her children as much as possible by maintaining a relatively consistent routine, but she is cognizant of the strong possibility that the family's new financial realities may necessitate relocating to a new house and school district, and foregoing many of the various education and sports programs her children now take part in.   Kathy Teeple is further aware of (and planning for) the high likelihood that Mr. Teeple will be unable to earn anywhere near his previous income upon his release in light of

the stigma of his felony conviction, his extended absence from the work force, and his ban from the securities industry. This likely eventuality has forced Matt and Kathy Teeple to completely rethink and restructure the upbringing and opportunities they had once envisioned for their children, a crushing recompense and deeply upsetting experience.

The forfeiture amount, in other words, is by no means an inconsequential penalty on Mr. Teeple and his family—it is a severe repercussion that Kathy Teeple will be at pains to overcome during Mr. Teeple's prison term and one that the family will continue to struggle with after his release.

### B.   Imposition Of A Fine Is Not Warranted In This Case.

Although Mr. Teeple and his wife were able to gain a degree of success—through years of hard work—significantly beyond that of the average American, their financial situation nevertheless remains quite modest as compared with most defendants convicted of similar crimes in this District. Thus, in light of the financial penalties discussed above that Mr. Teeple and his family already face, as well as the outstanding SEC civil case against Mr. Teeple, we respectfully suggest that no fine is appropriate or necessary in this case. *See, e.g.*, 18 U.S.C. § 3572 (requiring courts to consider a number of factors in determining whether to impose a fine including (i) the need to deprive the defendant of illegally obtained gains from the offense, (ii) civil obligations arising from the defendant's conduct, (iii) the defendant's ability to pay, and (iv) the burden that a fine would impose on the defendant and his family).

Especially where, as here, insider trading defendants are subject to substantial forfeiture orders and civil penalties, courts in this District have regularly declined to impose a fine and we respectfully ask the Court to do so in this case. *See, e.g.*, *United States v. Fleishman*, 11 Cr. 32 (JSR) (S.D.N.Y. Dec. 23, 2011), Docket No. 154 (no fine imposed after jury conviction on

46

counts of conspiracy to commit securities fraud and wire fraud); *United States v. Kimelman*, 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 13, 2011), Docket Nos. 287, 288 (no fine imposed after jury conviction on conspiracy and two insider trading counts); *United States v. Goffer*, 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 7, 2011), Docket Nos. 282, 283 (no fine imposed after jury conviction on conspiracy and two insider trading counts); *Jiau*, 11 Cr. 161 (JSR) (S.D.N.Y. Oct. 4, 2011), Docket No. 124 (no fine imposed after jury conviction on conspiracy and insider trading); *United States v. Contorinis*, 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 22, 2010), Docket Nos. 94, 95 (no fine imposed after jury conviction on conspiracy and seven insider trading counts); *United States v. Goffer*, 10 Cr. 56 (RJS) (S.D.N.Y. Sept. 22, 2011), Docket Nos. 270, 271 (no fine imposed after jury conviction on two counts of conspiracy and twelve insider trading counts).

### C.   Restitution Should Not Be Ordered.

Because there "are no identifiable victims in this offense" according to the U.S. Probation Office, "restitution is not applicable" and we respectfully assert that no amount of restitution should be ordered in this case, pursuant to the Probation Officer's recommendation. *See* PSR at ¶ 30.

## VI.   ASSIGNMENT TO THE SATELLITE CAMP AT CI TAFT WOULD AMELIORATE SOME OF THE BURDEN OF INCARCERATION ON MR. TEEPLE'S FAMILY.

As has been discussed at length throughout this memorandum, Mr. Teeple's life revolves around his extraordinarily close relationships with his children, wife, and parents, all of whom depend on him daily in a variety of ways.  Recognizing that his errors will prevent him from physically being with his family for an extended period of time, Mr. Teeple would obviously like to remain as much a part of their lives as possible while serving a term of incarceration.  To this end, we respectfully request that the Court recommend, pursuant to 18 U.S.C. § 3621(b)(4), that

Mr. Teeple be assigned to the minimum-security satellite camp at Taft CI, in Taft, CA.  If intake at Taft CI is unavailable, we respectfully ask the Court to recommend FCI Lompoc, in Lompoc, CA as an alternative.

The geographic locations of these facilities would facilitate regular visits by his parents and, most importantly, his wife and three young children who will understandably want to see their father as much as possible.  Since Mr. Teeple (a) has never before been convicted of any offense, (b) the Government has consented to allow Mr. Teeple to surrender voluntarily, (c) pled guilty to a non-violent offense, and (d) otherwise poses a minimal security risk, his incarceration at either of these facilities would be appropriate under the circumstances.  Because he is eager to atone for his mistakes, we also ask that the Court request the Bureau of Prisons to assign Mr. Teeple to one of these facilities as soon as possible so that he can continue the steps he has made towards accepting responsibility for his conduct and begin serving his sentence as soon as possible. Mr. Teeple, by no means, is looking forward to one day away from his beloved family; he simply understands he cannot finish paying his debt to society until he starts this process.  He has arranged his affairs so that he can start serving his sentence as soon as he is designated to a facility by the Bureau of Prisons.

## CONCLUSION

Matt Teeple stands before the Court ready to accept a just sentence after taking responsibility for his participation in the charged conspiracy.  He is sincerely remorseful for his misconduct and realizes that the hardships to which he and his family have already been exposed since his arrest are merely the preface to the next phase of his punishment.  In acknowledgment of his plea agreement's constraints, Mr. Teeple asks only that the Court consider the many positive contributions he has made in his life and the extent to which his family loves and

depends on him before a sentence is imposed.  In short, "[p]lease consider the total body of work

by this outstanding individual who has made this world a better place."  Wright Ltr. at 1.


Dated:  October 2, 2014                          Respectfully submitted,
       New York, New York

                                            KOBRE & KIM LLP

                                            /s/ Eric B. Bruce
                                            Eric B. Bruce
                                            Matthew I. Menchel
                                            Joshua L. Ray
                                            800 Third Avenue
                                            New York, New York 10022
                                            Tel: +1 212 488 1200
                                            Fax: +1 212 488 1220

                                            *Attorneys for Defendant Matthew Teeple*

49

## Exhibit List

Sentencing Video .............................................................................................................Ex. 1

Teeple Plea Agreement (May 28, 2014) ..........................................................................Ex. 2

Order of Forfeiture/Money Judgment (May 28, 2014) ...................................................Ex. 3

Summary of Recent Insider Trading Sentences ...............................................................Ex. 4

Christopher Matthews, *Insider Martoma's Sentencing Highlights White-Collar Crime Debate*,
   Wall Street Journal (September 7, 2014)....................................................................Ex. 5

U.S. Sentencing Commission News Release (August 14, 2014)......................................Ex. 6

Letter from wife Katherine Teeple ..................................................................................Ex. 7

Letter from niece Larissa Callas .....................................................................................Ex. 8

Letter from nephew Michael Callas.................................................................................Ex. 9

Letter from father- and mother-in-law Richard and Karen Krueckel ...................................Ex. 10

Letter from friend and neighbor Teresa Taccolini .........................................................Ex. 11

Letter from friend AJ Shanley ........................................................................................Ex. 12

Letter from college friend Brigitte Alexander ................................................................Ex. 13

Letter from friend and former coworker Anthony Siri ...................................................Ex. 14

Letter from friend John Alexander ..................................................................................Ex. 15

Letter from father Terry Teeple ......................................................................................Ex. 16

Letter from aunt Marsha Wolansky .................................................................................Ex. 17

Letter from mother Linda Teeple.....................................................................................Ex. 18

Letter from friend Aram Janoyan ....................................................................................Ex. 19

Letter from college friend Brian Ballard .........................................................................Ex. 20

Letter from childhood friend David Nemeth ...................................................................Ex. 21

Letter from former teacher and family friend Donald Stoll............................................Ex. 22

Letter from friend Jason Schlutt ......................................................................................Ex. 23

Letter from brother-in-law Jeff Krueckel .......................................................................Ex. 24

Letter from friend and former coworker Kumar Mehta...................................................Ex. 25

Letter from friend and neighbor Walter Stringfellow .....................................................Ex. 26

Letter from friend Robert Rife ........................................................................................Ex. 27

Letter from friend and neighbor John Isaacs ..................................................................Ex. 28

Letter from Founder of the Splash Foundation Amy Litchfield ......................................Ex. 29

Letter from college friend Sam Christopher Allevato .....................................................Ex. 30

Letter from college friend Bion Rice ........................................................................... Ex. 31

Letter from childhood friend Kristin Nemeth ............................................................. Ex. 32

Letter from friend and neighbor Kasey Nelson ........................................................... Ex. 33

Letter from friend Catlin Wolfard ............................................................................... Ex. 34

Letter from Mayor of the City of San Juan Capistrano Sam Allevato Jr. .................... Ex. 35

Letter from friends and neighbors Greg and Jeannette Miller ...................................... Ex. 36

Letter from former teacher and family friend Dana Lorenze .................................... Ex. 37

Letter from friend Roger Milton ................................................................................. Ex. 38

Letter from friend and neighbor Monica Crone .......................................................... Ex. 39

Letter from friend and former coworker Frank Czyz ................................................... Ex. 40

Letter from friend Don MacLean ................................................................................ Ex. 41

Letter from friend Jack Whelan ................................................................................... Ex. 42

Letter from friend and former coworker Nick Zaharias ............................................. Ex. 43

Letter from childhood friend Gunnar Gustafson ......................................................... Ex. 44

Letter from family friend Chaplain Herschel Powell .................................................. Ex. 45

Letter from college friend Roland Strick .................................................................... Ex. 46

Letter from family friend George Gajdos .................................................................... Ex. 47

Letter from family friends Clark and Barbara Wright ................................................. Ex. 48

Letter from friend and former coworker Joseph DeFranco ......................................... Ex. 49

Letter from family friend Robert Toolen ..................................................................... Ex. 50

Letter from family friend RB Alexander ..................................................................... Ex. 51

Letter from friend Jorinne Jackson .............................................................................. Ex. 52

Letter from college friend Steve Henry ....................................................................... Ex. 53

Letter from family friends Richard and Elizabeth Henry ........................................... Ex. 54

Letter from friends William and Alison Wight ........................................................... Ex. 55

Letter from friend and neighbor Jan Johnson .............................................................. Ex. 56

Letter from family friend Francis Shanley .................................................................. Ex. 57

Letter from uncle Arnold Appleman ........................................................................... Ex. 58

Letter from friend and former coworker Marc Cancilla ............................................. Ex. 59

Letter from friend and former coworker Eric Rowe .................................................... Ex. 60