UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:     3/3/2015

----------------------------------------------------------- X
   UNITED STATES OF AMERICA,               :
                                                :        13-CR-339-1 (VEC)
          -against-               :
                                                :        OPINION & ORDER
   DAVID RILEY,                        :
                            Defendant.      :
----------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

After a 10-day jury trial and several days of deliberations, David Riley was convicted of two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2; and one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; the jury did not reach a unanimous decision on a third securities fraud count. At trial the Government adduced substantial evidence showing that Riley provided material, nonpublic information ("MNPI") to Matthew Teeple, an analyst who worked for a hedge fund.[1] Riley informed Teeple of, *inter alia*, nonpublic information regarding his employer's worldwide sales data, an impending (but unannounced) acquisition of his employer, and obstacles delaying the acquisition.

Relying on the Second Circuit's decision in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), Riley moves for a judgment of acquittal or, in the alternative, for a new trial. Fed. R. Crim. P. 29, 33. Although the Court's instructions to the jury would have been different following *Newman*, the evidence adduced at trial left no reasonable doubt of Riley's guilt. Accordingly, Riley's motion is DENIED.

---

[1]    Teeple, who was indicted as Riley's co-defendant, pled guilty in May 2014.

# BACKGROUND[2]

David Riley was the Chief Information Officer ("CIO") and the Vice-President for Information Systems ("IS") and Information Technology ("IT") at Foundry Networks, Inc. ("Foundry"), a network equipment company that was a leading producer of ethernet switch routers. Tr. 556, 722. As CIO, Riley was responsible for maintaining Foundry's sophisticated IS and IT infrastructure, which meant that he oversaw all of Foundry's computer hardware and software. Tr. 560-61. Riley, as a senior officer of the corporation, reported direct to Foundry's Chief Financial Officer ("CFO"). Tr. 560.

Foundry was historically a seasonal business; sales were weakest in the first quarter of each fiscal year, and strongest at the end of each year. Tr. 650-51. When Foundry experienced a quarter that was significantly above or below investor expectations, it would pre-announce its quarterly revenue to help smooth the market correction. Tr. 652-53. Although Foundry would share some information with investors who participated in "bus tours," Tr. 650, it was careful to tailor its responses to investor inquiries and to keep most information regarding its revenue secret, even from its sales force, until it was publicly announced each quarter. Tr. 912. Foundry relied on an Oracle software system to manage its worldwide sales and other information. Tr. 457, 481. Foundry Business Online ("FBOL"), part of Oracle, enabled Foundry's sales force to view their sales and the sales of staff below them in the organization (limited to their direct reporting chain). Tr. 482, 381-82. The sales portion of the FBOL database was called FNI Web BBB Data, for Bookings, Billings, and Backlog. Tr. 483-84. Regional sales directors could view BBB data for their entire region or sector, but very few Foundry employees could view

---

[2]    The Court assumes the parties' familiarity with the evidence that was introduced at trial and with the procedural history of the case; only the evidence relevant to Riley's specific claims is discussed here. The Court refers to exhibits by the exhibit number they were given at trial and references to "Tr." refer to the trial transcript.

worldwide BBB data.  Tr. 488.  BBB data was not identical to revenue information, but it was a "strong predictor of the revenue [of] the company."  Tr. 565, 1726.

When he was hired by Foundry, Riley was still in touch with Matthew Teeple, a man with whom he had worked at Riverstone Networks.  After Riverstone, Teeple had joined the Field Check Group, a company that provided research regarding technology companies to a small number of clients who made or managed investments.  Tr. 128, 203.  In 2007, Teeple left the Field Check Group to work as an analyst for Artis Capital Management, LP ("Artis"), a hedge fund.  Tr. 93, 766, 966, 980.  Teeple advised Artis's leadership, including Michael Harden, an analyst, Tr. 723, and Stuart Peterson, Artis's founder and president, Tr. 533-34, mostly about networking companies and the semiconductor industry, Tr. 1249.  While it is not clear whether Riley was aware of Teeple's exact employment, Riley knew that Teeple advised hedge and mutual funds "with a primary focus on Silicon Valley tech companies."  GX 4104.

From at least 2007 through 2009, Teeple would frequently travel to San Jose, where he would meet with Riley, among other Foundry employees.[3]  Tr. 203, 286, 331; GX 413, GX 414, GX 428, GX 429; *see, e.g.,* GX 4000, GX 4001.  After and during at least some of his trips to meet with Riley and other Foundry employees, Teeple would contact Harden and Peterson.  On at least some occasions, immediately thereafter, Artis would alter its position in Foundry.  GX 240, GX 4005, GX 708, GX 2218 (pattern of meeting between Teeple and Riley, Teeple's contacting Artis, and Artis's changing its position in Foundry in September 2007); GX 4008, GX 300, GX 701, GX 712, GX 2224 (same in February 2008).  Teeple's insights were predicated in part on information that was available only to a small subset of Foundry insiders.  *See, e.g.,* GX 18, Tr. 566.

---

[3]    The other Foundry employees with whom Riley regularly met were regional salespeople with limited access to Foundry's sales information.  Tr. 381, 923.

One of the most lucrative pieces of information that Teeple received was information concerning the planned acquisition of Foundry by Brocade Communications Systems, Inc. ("Brocade"), a storage area networking company that specialized in storage disk drives and arrays.  Tr. 98.  When this acquisition was publicly announced, the Foundry share price rose dramatically.  Tr. 625, GX 2258.[4]  On the morning of July 16, 2008 (prior to the public announcement), Teeple called 15 individuals who immediately obtained (or caused their companies to obtain) bullish positions in Foundry.  GX 704, GX 2257.  Several of the individuals whom Teeple called that day and thereafter, including Andrew Miller and Karl Motey, testified that Teeple informed them during the call that Brocade would be acquiring Foundry and told them a rough estimate of the per share acquisition price.  Tr. 346-47, 828-29. Immediately before his calling spree, Teeple had met with Riley, GX 4012, GX 3801, GX 716, who had been informed of the planned acquisition earlier that month, GX 271, Tr. 614.  Several months later, when Brocade had trouble securing financing for the acquisition, Riley again spoke to Teeple prior to the public announcement.  Also in advance of the public announcement, Artis sold Foundry's securities short, avoiding significant losses when the price dropped following the public announcement.  Tr. 633, GX 2208, GX 2209, GX 2210, GX 2211, GX 2212, GX 705.

Artis's trading pattern surrounding the Brocade acquisition was suspicious enough to elicit attention from the Securities and Exchange Commission ("SEC").  Tr. 531.  In explaining their fortuitous decisions to acquire and sell Foundry securities at the best possible times, Artis failed to mention Teeple at all, despite the fact that his phone calls to Artis's leadership, made from a location near to Foundry's office, immediately preceded Artis's well-timed securities transactions.  Tr. 543.

---

[4]     This acquisition had not been foreseen by investors, Tr. 354, Foundry employees, Tr. 905, or industry analysts, Tr. 864-65.

Teeple's communications with Riley were not confined to discussing insider information about Foundry, however.  The pair discussed Riley's "side business," an entity started by a friend of Riley, that sought to develop "the next generation CD/DVD-Rom and HD drives."  GX 4000; *see, e.g.*, GX 4002.  Teeple also gave Riley investment advice, notably in Marvell Technology Group Ltd. ("Marvell"), Palm, Inc., and Motorola.  GX 4005, GX 2235, GX 701, GX 300, Tr. 1176-77.  Teeple assisted Riley in a job search (first getting him a foot in the door at Marvell and later helping to shop his resume around more generally).  GX 4112, GX 4116, GX 4015.  Finally, when Riley formed an "angel" investment group with other former Foundry executives, Teeple advised the group regarding potential investment opportunities.  GX 4125.

Ultimately, several of the people whom Teeple tipped, including John Johnson and Karl Motey, pled guilty to insider trading, based in part on the information that Teeple provided to them.  Teeple pled guilty in May 2014.  Dkt. 150.  Riley was tried in September 2014; the jury convicted him on two of three counts of securities fraud and one count of conspiracy to commit securities fraud.  Dkt. 188.  The jury was unable to reach a verdict as to the third count of securities fraud.  Riley now moves for judgment notwithstanding the verdict and for a new trial, pursuant to Rules 29 and 33.

## DISCUSSION

Although Riley raises scores of alleged errors, this Opinion addresses only those that the Court believes to have some weight.  Riley moves, pursuant to Rule 33, for a new trial, alleging that (1) the Court's "personal benefit" instruction was plain error; (2) the Court's response to a jury note regarding motive was inappropriate; (3) Riley was prejudiced by Johnson's testimony as to his plea deal; and (4) evidentiary errors deprived Riley of a fair trial.  Riley also moves, pursuant to Rule 29, for a judgment notwithstanding the verdict, alleging that there was

insufficient evidence for a reasonable jury to conclude that (1) Riley had access to MNPI; (2)

Riley passed MNPI to Teeple; (3) the information that Riley passed to Teeple was material and

nonpublic; (4) Riley knew that he was passing MNPI to Teeple; (5) a conspiracy existed; and (6)

Riley obtained a personal benefit from Teeple's insider trading.  For the following reasons, none

of Riley's arguments is persuasive.

## I.      Riley's Rule 33 Motion for a New Trial

"Federal Rule of Criminal Procedure 33(a) provides that 'upon the defendant's motion,

the court may vacate any judgment and grant a new trial if the interest of justice so requires.'"

*United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (quoting Fed. R. Crim. P. 33(a))

(alteration omitted).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict

stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir.

2001).  "To grant the motion, 'there must be a real concern that an innocent person may have

been convicted.'"  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *Ferguson*,

246 F.3d at 134) (alteration omitted).

### A.  Riley Was Not Prejudiced by the Court's Instruction as to Personal Benefit

A tipper cannot be prosecuted for just any revelation of MNPI – his disclosure of inside

information runs afoul of the law only if "the insider receives a direct or indirect personal benefit

from the disclosure, such as a pecuniary gain or a reputational benefit that will translate into

future earnings."  *Dirks v. S.E.C.*, 463 U.S. 646, 663 (1983).  The Second Circuit has "observed

that 'personal benefit is broadly defined to include not only pecuniary gain, but also, *inter alia*,

any reputational benefit that will translate into future earnings and the benefit one would obtain

from simply making a gift of confidential information to a trading relative or friend.'"  *Newman*,

773 F.3d at 452 (quoting *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)) (alteration

omitted).  In the context of an appeal from two remote tippees, in *Newman*, the Circuit narrowed

this "permissive" definition to exclude "the mere fact of a friendship, particularly of a casual or social nature," unless there is "proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Id.* The Circuit further emphasized that the tipper's gain does not have to be "*immediately* pecuniary," but "the personal benefit received in exchange for confidential information must be of some consequence." *Id.* (emphasis in original). The existence of some *quid pro quo* is the *sine qua non* of tipper liability for insider trading. *Cf. id.*; *Jiau*, 734 F.3d at 153. The precise exchange need not be known by the parties at the time of the tip, so long as the tip leads to a "'reputational benefit that will translate into future earnings.'" *Jiau*, 734 F.3d at 153 (quoting *Dirks*, 463 U.S. at 663).

Riley argues that the Court's instruction to the jury regarding the personal benefit element of securities fraud was erroneous in light of *Newman.* The Court's charge permitted the jury to find that Riley had obtained a personal benefit in exchange for the MNPI that he provided if he provided the information for the purpose of "maintaining or furthering a friendship." Tr. 2204.[5]

---

[5]        Specifically, the Court charged:

> Finally, you must determine whether Mr. Riley anticipated receiving a personal benefit of some kind from disclosing the information. The personal benefit does not need to be financial or tangible; it could include, for example, maintaining a useful networking contact, improving Mr. Riley's reputation, obtaining future financial or employment benefits, or just maintaining or furthering a friendship. But the government must show that Mr. Riley was disclosing inside information to Mr. Teeple for some personal reason, rather than a company-approved purpose, and was obtaining or hoping to obtain some personal benefit, however modest.

Tr. 2203-04. The challenged language was intended to cover "the benefit one would obtain from simply 'making a gift of confidential information to a trading relative or friend,'" *S.E.C. v. Obus*, 693 F.3d 276, 285 (2d Cir. 2012) (quoting *Dirks*, 463 U.S. at 663-64) (alteration omitted); and to note that "[t]he existence of 'a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the latter' may be sufficient to justify an inference of personal benefit.'" *Jiau*, 734 F.3d at 153 (quoting *Dirks*, 463 U.S. at 664) (alteration omitted).

Because he did not object to this part of the Court's instructions, Riley's argument is subject to the plain error standard of Rule 52(b).  *See, e.g., United States v. Middlemiss*, 217 F.3d 112, 121 (2d Cir. 2000).  "Plain error review applies equally where the defendant did not object . . . because he failed to recognize an error, and where the defendant did not object because the trial court's [charge] was correct at the time but assertedly became erroneous due to a supervening legal decision."  *United States v. Vilar*, 729 F.3d 62, 70 (2d Cir. 2013) (citing *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)).  "Under a plain error standard of review, if th[e] Court finds that the jury instruction (i) was error; (ii) that the error was plain; and (iii) that the error affected substantial rights, then th[e] Court (iv) has discretion to correct the error, 'but it is not required to do so.'"  *United States v. Botti*, 711 F.3d 299, 310 (2d Cir. 2013) (quoting *United States v. Olano*, 507 U.S. 725, 735 (1993)); *see also United States v. Marcus*, 560 U.S. 258, 262-63 (2010).  There are two types of plain error review – "modified," under which courts "place[] the burden on the government to demonstrate that the error did not affect the defendant's substantial rights," and "traditional," under which courts "requir[e] the defendant to show that it did."  *Vilar*, 729 F.3d at 71 n.5.  The Second Circuit has "declined to reach the question of whether the modified plain error standard of review continues to apply when there has been a supervening change in the law after a conviction," *Botti*, 711 F.3d at 309 (collecting cases), presumably because it is "skeptical that the allocation of the burden of demonstrating harm will ever be dispositive in this context," *Vilar,* 729 F.3d at 71 n.5.

Assuming *arguendo* that the Court's instruction was error in light of *Newman*, Riley fails the other three prongs of the "plain error" test.

### 1.   Any Error Was Not Plain

First, Riley has not shown that any error is "plain."  The existence of "error" and "plain error" are not coextensive.  *See, e.g.*, *United States v. Bastian*, 770 F.3d 212, 223 (2d Cir. 2014); *Vilar*, 729 F.3d at 87 n.22.  The *Newman* decision makes it "plain" that "the mere fact of a friendship, particularly of a casual or social nature," between the tipper and the tippee is not sufficient evidence that a personal benefit inured to the tipper.  773 F.3d at 452.  But the Court's instruction to the jury did not permit it to convict just because Teeple and Riley were friends – it required that the tip be given to "maintain[] or further[] a friendship."  Tr. 2204.  The *Newman* decision acknowledges – as it must, given *Dirks* – that a tipper has received a personal benefit when there is "'a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the latter.'"  773 F.3d at 452 (quoting *Jiau*, 734 F.3d at 153) (alteration omitted).  If a tip maintains or furthers a friendship, and is not simply incidental to the friendship, that is circumstantial evidence that the friendship is a *quid pro quo* relationship.  While a court could rule that merely maintaining or furthering a friendship is not a sufficient personal benefit,[6] it is not "plain" that the Second Circuit has done so already.  *Cf. S.E.C. v. Obus*, 693 F.3d 276, 285 (2d Cir. 2012) ("Personal benefit to the tipper . . . includes . . . the benefit one would obtain from simply 'making a gift of confidential information to a trading relative or friend.'") (quoting *Dirks*, 463 U.S. at 663-64) (alteration omitted).

---

[6]      It is worth noting that the "personal benefit" requirement exists to ensure that insiders are tipping in breach of their duties.  *See, e.g., Dirks,* 463 U.S. at 667 ("The tippers received no monetary or personal benefit for revealing [the company's] secrets, nor was their purpose to make a gift of valuable information to Dirks. . . . [T]he tippers were motivated by a desire to expose the fraud.  In the absence of a breach of duty . . . there was no derivative breach by Dirks.") (citation omitted).  In this case, there is absolutely no doubt that Riley disclosed MNPI in violation of his duty to Foundry and not for any legitimate reason.

### 2.   Any Error Did Not Affect Riley's Substantial Rights

To constitute plain error, an error must "affect defendants' substantial rights.  'In the ordinary case, to meet this standard an error must be prejudicial, which means that there must be a reasonable probability that the error affected the outcome of the trial.'"  *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *Marcus*, 560 U.S. at 262) (other citations omitted).  "When a jury is instructed on multiple theories of liability, one of which is defective, a court must ascertain whether a flawed instruction had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  *United States v. Ferguson*, 676 F.3d 260, 276-77 (2d Cir. 2011) (quoting *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (*per curiam*)); *see also Skilling v. United States*, 561 U.S. 358, 414 (2010).  When "'the jury would have returned the same verdict beyond a reasonable doubt,'" an error does not affect substantial rights.  *Nouri*, 711 F.3d at 140 (quoting *United States v. Gomez*, 580 F.3d 94, 101 (2d Cir. 2009)); *see also United States v. Mandell*, 752 F.3d 544, 549 (2d Cir. 2014) (*per curiam*) ("A defendant is not prejudiced by an 'infirm instruction' if 'the jury would have necessarily found him guilty on one of the properly instructed theories of liability.'") (quoting *Ferguson*, 676 F.3d at 277) (alterations omitted).

In this case, any rational jury would have found, beyond a reasonable doubt, that Riley obtained a personal benefit from providing MNPI to Teeple.  At a minimum, Riley obtained three concrete personal benefits that were "objective, consequential, and represent[ed] at least a potential gain of a pecuniary or similarly valuable nature."  *Newman*, 773 F.3d at 452.

### i.   Riley Obtained Help with His Side Business

First, Teeple helped Riley with his "side business" by connecting him to people in the technology industry and by shopping Riley's idea around to those at Marvell.  Riley was "working with a small company that [was] building the next generation [of] CD/DVD ROM and HD drives with essentially four times performance increase."  Tr. 732, GX 4000.  Riley was

deeply involved with this startup, *see, e.g.,* GX 4101,[7] and he benefited both from Teeple's briefing him on the lay of the land in the industry generally, GX 4107, and from Teeple's putting Riley in contact with people Teeple knew at companies that might seek to acquire the new technology, GX 4102.  Even if that were not enough, Teeple also served as a middleman of sorts; he forwarded Riley's write-up of the new company "to Marvell, Western Digital, Network Appliance, and EMC" and agreed to speak to those companies and to update Riley regarding those discussions.  GX 4104.  The fact that Riley included MNPI when asking Teeple for a favor is circumstantial evidence that Teeple's help was a *quid pro quo* for Riley's tips.  *See, e.g.,* GX 4002 ("I forgot to ask . . . if you received any feedback from M[arvell] or others regarding the HDD technology.  BTW, I checked this morning and before any cleanup the final number was $142M outbound.").  The reason that Teeple was "more than happy to assist" Riley on the HDD project, GX 4000, was tied to the nature of their relationship – a relationship in which each "friend" used the access acquired through his job to help the other financially.  Riley provided Teeple access to Foundry's proprietary information – worldwide sales data and information relative to the Brocade acquisition – while Teeple provided Riley with access to his contacts in whatever way benefited Riley.  Riley's providing MNPI to Teeple in this context was clearly not consistent with his fiduciary duty to Foundry; he provided it because he understood the value of trading Foundry's information for access to Teeple's rolodex.

---

[7]       Although Riley contends that there is no evidence that he had a financial stake in the business, Reply at 35, his substantial involvement was evident from the fact that he assigned himself major tasks on behalf of the company, GX 4101, participated in conference calls on its behalf, *id.*, allocated tasks both to himself and others, *id.*, and expressed a degree of pride in the company while noting, as a benefit, that using Teeple to deal with Marvell would keep himself "out of the picture," GX 4105.  While Riley asserts that it was Paul Gilovich's company, Reply at 35, that assertion does not square with the evidence presented at trial.  Riley wrote that he "was thinking Cynthia and Paul should present if a meeting ever materialize[d]," rather than having Riley present.  GX 4105.  But there is no reason that Riley would make a presentation on behalf of a company for which he did not work and in which he held no stake.

Finally, although Riley argues that Teeple's help to Riley's company ultimately did not help the business, that is irrelevant when determining whether Riley's tips were made as part of a *quid pro quo* agreement.  *Jiau*, 734 F.3d at 153 ("The fact that Ng did not receive any tips from Jiau's investment club in return for the tips he gave is of no moment.  In joining the investment club, Ng entered into a relationship of *quid pro quo* with Jiau, and thus had the opportunity to access information that could yield future pecuniary gain.").

### ii.    Riley Obtained Investment Advice

Second, Teeple provided Riley with investment advice, and Riley traded profitably based on that advice on multiple occasions.  Receiving information about stocks, even if the information is simply an industry analyst's view to which the tipper would not otherwise have access and is not MNPI, constitutes a personal benefit.  In *Jiau*, a tipper's participation in an investment club was held to be a personal benefit, even though the tipper "did not receive any tips from [the] investment club in return for the tips he gave."  *Id.*  The opportunity to gain access to information with a potential pecuniary yield is an adequate "personal benefit."

In this case, Teeple provided Riley with information regarding Marvell, Motorola, and Palm, and there is compelling circumstantial evidence that Riley relied on Teeple's information when making investment decisions.  *See, e.g.,* GX 4005 (explaining that Teeple had "a lot of details" regarding Marvell, explaining some and offering to "fill [Riley] in on the details" during a scheduled in-person meeting); Tr. 78-79; *see also* GX 2235 (Riley traded in Marvell the same day as Teeple's email).  On June 25, 2008, Teeple called Riley at 9:56 a.m., after two shorter calls that morning.  GX 701.  They remained on the phone for 20 minutes, during which time Riley first purchased Motorola stock, then logged in to Foundry's BBB database (which contained proprietary sales information), and then purchased Palm stock, all before hanging up

with Teeple.  GX 701, GX 300, GX 2235, Tr. 1175-76.  The inescapable conclusion is that

Teeple and Riley were discussing the merits of Riley's stock purchases;[8] Riley therefore

benefitted from the professional expertise of his friend, who worked for an investment advisor

and focused on technology companies like those in which Riley was investing.[9]  The fact that

Riley may have viewed himself to be an interlocutor rather than just a recipient of information,

*see* GX 4005, is irrelevant – the two shared stock tips with each other for mutual profit.  *Cf. Jiau*,

734 F.3d at 153.  Riley therefore obtained a personal benefit from Teeple in the form of

investment advice.

### iii.     Riley Obtained Help in Securing His Next Job

Third, Teeple helped Riley to plan his exit strategy from Foundry and Brocade.[10]  First,

Teeple helped Riley in late 2007 when Riley sought to obtain a job at Marvell.  After Riley had

---

[8]     In some circumstances people multitask in ways that are not apparent to the person on the other end of the telephone line.  But when a man trades technology stocks while on the phone with an investment analyst who specializes in technology stocks and to whom he is providing MNPI, it would be unreasonable for any juror to have concluded that the two were unrelated.

[9]     Teeple's advice had clear value; Artis paid him a salary and bonus simply for "[h]is information," which was "valuable."  Tr. 94.  Although Riley and the Government reached an agreement not to introduce the dollar value of Teeple's compensation, *see* Dkt. 165 at 1 n.1, the jury did not need to know his specific salary to know that Teeple was well paid for providing information exactly like what he provided to Riley.

        Although Riley argues that publicly-available information supported his investment decisions, *see, e.g.,* Riley Mem. at 58-60, even if true that in no way alters the analysis as to whether he received valuable investment advice from Teeple.  Because he is not accused of insider trading based on his use of Teeple's advice, Riley is not assisted by the fact that he did not always heed Teeple's tips or by the fact that some or all of the information that Teeple provided was not MNPI.  Receipt of an investment tip from an investment professional constitutes a personal benefit.  By culling publicly-available materials and proving insight gleaned from his work as an industry analyst, Teeple provided Riley with the services of a professional analyst for free; the "potential gain of a pecuniary . . . nature" is obvious.  *Newman*, 773 F.3d at 452.

[10]    Riley relies on *Newman* for the proposition that "[c]areer advice is not enough" to constitute a personal benefit.  Riley Mem. at 56.  That is an oversimplification of *Newman*.  In *Newman*, "the 'career advice' that [the tippee] gave Ray, the [] tipper, was little more than the encouragement one would generally expect of a fellow alumnus or casual acquaintance."  *Newman*, 773 F.3d at 453.  The tippee "testified that he would have given Ray advice without receiving information because he routinely did so for industry colleagues," "Ray himself disavowed that any such *quid pro quo* existed," and "the evidence showed [that the tippee] began giving Ray 'career advice' over a year before Ray began providing any insider information."  *Id.*  From that set of facts, it is not reasonable to read the Court's opinion to hold that career advice can *never* be a sufficient "personal benefit" to constitute a *quid pro quo* for inside information.

an interview scheduled with Marvell, Teeple provided him with a "download" on Marvell, including giving him the industry analyst's views on Marvell's leadership.  GX 4115.  Riley needed this tutorial, as two days earlier he did not even know who the company's CFO was.  GX 4112.  Later – but still before Riley's interview – Teeple sent along a list of proposed questions that he would ask if he were in Riley's shoes; Teeple also filled him in on breaking news in the company.  GX 4116.  While one certainly might share some insight with an old classmate, taking the time to think of nine specific, detailed proposed interview questions (many of which have numerous sub-questions) regarding the future of the company is not the sort of thing that one would do for "a fellow alumnus or casual acquaintance."  *Newman*, 773 F.3d at 453.   Although Riley did not ultimately obtain a job with Marvell, Teeple's assistance assuredly contributed to the likelihood Riley would be successful; it therefore carried with it a potential pecuniary gain.  *Cf. id.* at 452.

After the Brocade acquisition was finalized, Riley again began to look for a new job.  He announced this to Teeple in an email that, in its entirety, confirmed their next meeting and noted "BTW – attached is my resume.  I am ready to start talking with folks!"  GX 4015.  Thereafter, Riley formed an "angel" investment group, XF Ventures, with three other former Foundry executives.  GX 4019; GX 3400.  Teeple introduced Riley to Shawn Wasson, whose company – Bering Media – offered "the Internet's first addressable local advertising system."  GX 4125.  In short, whatever Riley's plan, Teeple continued to help him and to provide him with assistance that had significant pecuniary value.

### iv.    Totality of the Circumstances

Even if none of the specific benefits that Teeple provided to Riley were sufficient standing alone to satisfy *Newman*'s "personal benefit" standard, the totality of the circumstances

14

clearly demonstrates that Riley provided Teeple MNPI in anticipation of a personal benefit of a pecuniary nature.  Riley gave Teeple confidential information, and in exchange Teeple provided Riley with access to his many contacts (in the contexts of Riley's side business, his job search, and XF Venture's quest for investment-worthy companies), with investment advice (which Teeple provided to others, but not for free), and with insight into the companies with whom Riley was pursuing opportunities.  The relationship between Riley and Teeple was clearly a *quid pro quo* relationship in which each was trying to help the other; Riley's *quid* was Foundry's MNPI.

### 3.   Any Error Did Not Affect the Fairness or Integrity of the Trial

Finally, courts typically "recognize 'plain error' only if the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"  *Marcus*, 560 U.S. at 265 (quoting *Johnson v. United States*, 520 U.S. at 467) (alteration omitted).  In this case, the Government demonstrated, beyond a reasonable doubt, that Riley provided MNPI in anticipation of receiving a personal benefit.  The jury could not rationally have entertained a doubt that Riley's tips were anything other than a breach of the fiduciary duty he owed to Foundry.  *Cf. Dirks*, 463 U.S. at 667.  The facts established Riley's guilt beyond a reasonable doubt; the fairness or integrity of his trial is therefore not in doubt.  *Marcus*, 560 U.S. at 266.

### B.   The Court's Response to the Jury's Note Regarding Motive Was Proper

Riley next asserts that the Court erred in responding to a jury note regarding motive.  A response to a jury's note "is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'"  *United States v. Moran-Toala*, 726 F.3d 334, 342 (2d Cir. 2013) (quoting *United States v. Al Kassar*, 660 F.3d 108, 126 (2d Cir. 2011)).  Errors are categorized as "trial errors" or "structural errors."  *Id.* at 343.  Trial errors "'are of relatively limited scope and [] are subject to harmless error review,'" *id.* (quoting *United States*

*v. Feliciano*, 223 F.3d 102, 111 (2d Cir. 2000)), while structural errors are those that

"categorically 'vitiate *all* the jury's findings'" and are not subject to harmless error review,

*Hedgpeth*, 555 U.S. at 61 (quoting *Neder v. United States*, 527 U.S. 1, 11 (1999)) (alteration

omitted, emphasis in original).  Structural errors "'are the exception and not the rule.'"  *Id.*

(quoting *Rose v. Clark*, 478 U.S. 570, 578 (1986)).[11]

  In this case the jury asked: "Judge, please help us with the law.  We were reviewing four

counts regarding Securities Fraud, and Conspiracy to [sic]. . ., Is it necessary to establish <u>Motive</u>,

as well??"  Ct. Ex. 12 (emphasis in original).  Riley asked the Court to charge "that any alleged

tip would have to be in anticipation of receiving personal benefit."  Tr. 2246.  The Government

preferred that the Court answer, simply, no.  *Id.*  The Court responded to the note: "The only

elements that the government must prove are those that are set forth in the charge.  It is not

necessary for the government to prove any other element, including motive."  Tr. 2262.

  Riley argued at the time that the Court should reiterate its instruction regarding the

requirement that the Government prove that Riley tipped the information "intentionally . . . [and]

in anticipation of receiving a benefit."  Tr. 2256; *see also* Kaley Email Dated October 2, 2014,

Dkt. 249 ("[M]otivation for the tip is an element of the offense in that the Government must

prove that a defendant passed the 'tip' in anticipation of receiving personal benefit.").  Riley now

argues that "saying that the [Government] did not have to prove motive was tantamount to

saying that the government did not have to prove personal benefit."  Riley Mem. at 71.

  Riley is correct to a point – when a tipper provides MNPI for an altruistic reason, his

altruism may provide a defense to a prosecution for securities fraud.  *Dirks*, 463 U.S. at 667

(tippers were not in breach of a duty to shareholders because "the tippers were motivated by a

---

[11]  Riley does not argue that the Court's response to the note constituted a "structural error."

desire to expose the fraud"); *see also Newman*, 773 F.3d at 455 (requiring proof that a tippee

knew of a "source's improper *motive* for disclosure") (emphasis in original); *S.E.C. v.*

*Contorinis*, 743 F.3d 296, 303 (2d Cir. 2014) ("Whether the defendant's motive is direct

economic profit, self-aggrandizement, psychic satisfaction from benefitting a loved one, or future

profits by enhancing one's reputation . . . the insider trader who trades for another's account has

engaged in a fraud, secured a benefit thereby, and directed the profits of the fraud where he has

chosen them to go."); *Obus*, 693 F.3d at 286 ("The requirement that the tipper act with scienter is

effectively subsumed in proof that the insider's motive was personal benefit.") (alteration,

quotation marks and citation omitted); *United States v. Falcone*, 257 F.3d 226, 229-30 (2d Cir.

2001) (identifying the saving grace in *Dirks* as "the insider's benign motives").[12]

 In this case, however, the jury's note asked whether the Government had to prove motive

"as well" as the elements of the crime, which included the anticipated receipt of a personal

benefit.  The answer to that question is clearly "no," as the Government did not have to prove

anything in addition to all of the elements of the crime.  *See* 1-6 Leonard B. Sand et al., *Modern*

*Federal Jury Instructions: Criminal*, Instr. 6-18 (2011) ("If the guilt of a defendant is shown

beyond a reasonable doubt, it is immaterial what the motive for the crime may be – or whether

any motive be shown, but the presence or absence of motive is a circumstance which [the jury]

may consider as bearing on the intent of a defendant.").  Proving all of the elements of a crime

beyond a reasonable doubt is sufficient to sustain a conviction; Riley does not argue otherwise.

---

[12] It is not clear that the tipper's motive *must* be a personal benefit in all cases – if a tipper, out of spite for a
company whose employ he resented, provided MNPI for the purpose of harming the company, courts would likely
still hold that such a tip was inconsistent with the insider's fiduciary obligations to the company and therefore could
be a basis for a securities fraud case against the tipper.

And the Court's instruction did not permit the jury to find Riley guilty *without* reference to the elements contained in the Court's charge.[13]

Even if the Court's instruction were inaccurate or misleading – and it was not – any error was harmless. *Cf. Hedgpeth*, 555 U.S. at 61.  The Court, in its response to the jury's note, referred the jurors to the elements "set forth in the charge."  Tr. 2262.[14]  Riley does not explain how such an instruction would permit the jury to convict based on anything short of the elements set forth in the charge.  The elements in the charge include the discussion of "personal benefit" that Riley contends is the same as "motive."  Tr. at 2204.  Accordingly, the Court presumes that the jury followed the instructions that were provided and considered the question of whether Riley tipped "for some personal reason, rather than a company-approved purpose, and was obtaining or hoping to obtain some personal benefit."  *Id*.  The jury considered this question and found Riley guilty.

### C.  Evidence Regarding Johnson's Plea Did Not Prejudice Riley

The Government's first witness, John Johnson, testified that he had pled guilty to conspiracy to commit securities fraud and to a substantive count of "securities fraud with respect to insider trading specifically to [sic] Foundry."  Tr. 112.  Johnson was a second-degree tippee; he received Foundry's MNPI from Teeple.  Tr. 110.  Riley argues that the jury was affected by Johnson's plea in that Johnson testified to his belief that "the information traded on was both material and non-public, all elements of the offense with which Mr. Riley was charged."  Reply

---

[13]     The jury's note was susceptible to two alternative constructions – it could have been asking, as the Court believes, "is there an additional motive requirement on top of the elements the Court charged," or the jury could have simply forgotten that part of the Court's charge was that "the government must show that Mr. Riley was disclosing inside information to Mr. Teeple *for some personal reason*, rather than a company-approved purpose, and was obtaining or hoping to obtain some personal benefit, however modest."  Tr. 2204.  Each juror had a copy of the jury charge in the jury room during deliberations.  Tr. 2183.

[14]     Riley does not contend that the Court's response in some way highlighted a preexisting deficiency in the charge; he identifies as the only deficiency the Court's response to the note.

at 43; *see also* Riley Mem. at 72-73.  Riley asserts that this was error because "in light of the *Newman* decision, Johnson did not commit any crime."  *Id.*  Because Riley did not object to this aspect of Johnson's testimony, the admission of the testimony is reviewed for plain error.  *See* Tr. 102.

Riley's argument is unpersuasive.  Assuming *arguendo* that Johnson's allocution did not provide a factual predicate to support his guilty plea, that has no bearing on Riley.  Riley disputes whether Johnson's plea adequately addressed his knowledge that the initial tipper received a personal benefit.  *See* Riley Mem. at 72-73, Reply at 42-43.  But Johnson's testimony regarding his receipt of MNPI is unaffected by any change in the standard of his required knowledge that the tipper obtained a personal benefit.  If Riley is right, and Johnson's plea is inadequately supported, that would not affect Johnson's testimony (both at his allocution and at trial) that he received MNPI.  The fact that Johnson's alleged incentive to testify in a manner favorable to the Government, *see* Tr. 172-77, may have dissipated after the trial because of *Newman*, does not affect the credibility of his testimony.[15]

Finally, the Court's charge to the jury made it clear that it was the province of the jury to decide whether the Government had proven the elements of the crimes charged beyond a reasonable doubt.  *See, e.g.,* Tr. 2184 ("You are the sole and exclusive judges of the facts."); Tr. 2202 ("[W]hether the information Mr. Riley is alleged to have tipped to Mr. Teeple was nonpublic at the time of the alleged disclosure is an issue of fact for you to decide based on all of the evidence in the case.").  Absent evidence "suggesting that any juror disregarded these

---

[15]   Riley took advantage of his opportunity to argue that Johnson had an incentive to lie at the time that he testified, Tr. 172-77, 185-86, 2099, 2107-09, but the jury was not required to accept Riley's argument, *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011).  Moreover, disregarding Johnson's evidence in its entirety would not have altered the jury's conclusion, beyond a reasonable doubt, that the information at issue was material and nonpublic.  *See, e.g.,* Tr. 779-80.

instructions . . . [courts] 'presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court.'" *United States v. Esso*, 684 F.3d 347, 352 (2d Cir. 2012) (quoting *United States v. Rosario*, 111 F.3d 293, 300) (2d Cir. 1997)).

Permitting Johnson to testify that he pled guilty was neither error nor prejudicial to Riley in any discernible way.

### D.  No Evidentiary Errors Entitle Riley to a New Trial

Next, Riley challenges three evidentiary rulings.  First, he asserts that the Court erred by admitting evidence of his having worked at the HD/DVD "side business" and having pursued a job at Marvell while still employed at Foundry.  This evidence was admitted to show that Teeple provided Riley with substantial assistance in exchange for the MNPI that Riley provided.  Riley concedes that the evidence was admissible for this purpose, Reply at 39, but contends that the manner in which the Government introduced it suggested that Riley was generally a disloyal employee.[16]  The first 17 pages of the transcript to which Riley cites contain only the publication of concededly admissible exhibits; this was not unduly prejudicial.  Tr. 730-46.  The last page contains questions on cross-examination asking Ben Wong, a defense witness, whether Riley told him "about how he tried to leave Foundry towards the end of 2007 to go to another company called Marvell."  Tr. 1732.  Immediately thereafter, the Government asked whether Wong "hear[d] how Mr. Riley was asking Mr. Teeple for help so he could leave Foundry to go to Marvell."  *Id.*  Evidence regarding Riley's departure from Foundry was admitted and used to prove his reliance on Teeple to help him secure his next job; there was no unfair prejudice to Riley, much less prejudice that substantially outweighed the probative value of the evidence. Fed. R. Evid. 403.

---

[16]     It should be noted that Riley did not raise this objection at trial.  *See* Tr. 426, 730.

Second, Riley challenges the introduction of a Government recording in which Teeple –
the day before he was set to meet Riley at 10:00 – told Motey, a former coconspirator who was at
the time of the conversation covertly cooperating with the Government, that he was "actually
meeting with, with [his] best guy from Foundry at ten o'clock" the next day.  GX 2504-T.  Riley
appears to argue that this evidence was inadmissible hearsay because, but for an artfully-crafted
indictment, the alleged conspiratorial time span would have ended before this conversation.[17]
The evidence was admissible as a statement in furtherance of the conspiracy, because – although
Riley had left Foundry – he had not withdrawn from the conspiracy.  *See Mandell*, 752 F.3d at
552 ("The burden of proof was on [Riley] to demonstrate withdrawal, and 'mere cessation of the
conspiratorial activity is not sufficient to prove withdrawal.'") (quoting *United States v. Leslie*,
658 F.3d 140, 143 (2d Cir. 2011) (*per curiam*)) (internal citation and alterations omitted).  While
Riley had stopped working at Foundry, there is no evidence that he had told Teeple that he would
no longer provide inside information.  Moreover, Riley's argument regarding the indictment is a
red herring – the duration of the conspiracy charged in the indictment has no bearing on the
Court's findings that there was a conspiracy among Riley, Teeple, and others, and that Teeple's
comments to Motey were made in furtherance of that conspiracy.  *See United States v. Russo*,
302 F.3d 37, 46 n.3 (2d Cir. 2002) ("'The conspiracy between the declarant and the defendant
need not be identical to any conspiracy that is specifically charged in the indictment.'") (quoting
*United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999)).  Accordingly, Teeple's statement was
admissible as a statement in furtherance of an ongoing conspiracy.  *See* Fed. R. Evid.

---

[17]     The objection pressed in Riley's motion is somewhat different from the objection made at trial.  At trial
Riley simply renewed his previous objection to the recording, Tr. 793.  His pretrial objection contended only that the
reference to Teeple's "best guy from Foundry" "ha[d] nothing to do with Mr. Riley" and was inadmissible pursuant
to Rule 403.  Riley Mot., Dkt. 115, at 6-8.  Although the objection advanced post-trial is a different argument,
because the evidence was properly admitted, the Court need not subject the argument to a plain error analysis.

801(d)(2)(E).  Riley does not allege that the statement was not "in furtherance of" the conspiracy but only asserts that the conspiracy had "ended."[18]  Riley Mem. at 68-69.

Last, Riley contends that the discussion of the magnitude of Artis's gains and losses in its trades based on Riley's tips was unduly prejudicial.[19]  Riley asserts that, because Artis itself did not "know[] of any alleged benefit received by Riley in exchange for allegedly providing Teeple with [material] nonpublic information," it "violated no laws," and therefore the magnitude of the gains it made had no bearing on Riley.  Riley Mem. at 74.  The magnitude of the gains and losses that Artis enjoyed from its trades was clearly probative as to the materiality of the information that Riley provided.  Admitting this information in the more easily-digested form of Artis's return on its investment, which lent a sense of scope to the charts and graphs showing the peaks and valleys in Foundry's share price, did not prejudice Riley.

Accordingly, Riley's motion for a new trial is denied.

## II.    Riley's Rule 29 Motion for a Judgment of Acquittal

Riley also challenges the sufficiency of the evidence in support of his conviction.  "'A defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden,' because [courts] must uphold the judgment of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Vilar*,

---

[18]    Statements made "in furtherance of the conspiracy" include, *inter alia*, those "'informing coconspirators as to the progress or status of the conspiracy.'"  *James*, 712 F.3d at 106 (quoting *United States v. Diaz*, 176 F.3d 52, 85 (2d Cir. 1999)) (internal citations omitted).  Teeple made his statements under the belief that Motey was still a member of the conspiracy and would continue to exchange information with him; unbeknownst to Teeple, Motey was then cooperating with the Government.  *See* Tr. 769-71, 778.  The fact that Motey was not a member of the conspiracy at the time Teeple made his remarks does not affect the admissibility of Teeple's remarks under Rule 801(d)(2)(E).  *See United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) ("While that Rule 'requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, *there is no requirement that the person to whom the statement is made also be a member.*'") (quoting *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 139 (2d Cir. 2008)) (emphasis in original, other quotation marks omitted).

[19]    It does not appear that Riley objected to this evidence at trial; because it was properly admitted, however, the Court need not determine whether this argument should be subject to a plain error analysis.

729 F.3d at 91 (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) and *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (alteration omitted, emphasis in *Jackson*).  "A court examines each piece of evidence and considers its probative value before determining whether it is unreasonable to find 'the evidence in its totality, not in isolation,' sufficient to support guilt beyond a reasonable doubt."  *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).  Courts "resolve all inferences from the evidence and issues of credibility in favor of the verdict."  *United States v. Zayac*, 765 F.3d 112, 117 (2d Cir. 2014) (quoting *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000)).  "'The jury's verdict may be based entirely on circumstantial evidence.'"  *Goffer*, 721 F.3d at 124 (quoting *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (alteration omitted).  "'A judgment of acquittal' is warranted 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *Jiau*, 734 F.3d at 152 (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)) (alteration omitted).

   To prove that a tipper committed insider trading, the Government must show "that (1) the tipper had a duty to keep material non-public information confidential; (2) the tipper breached that duty by intentionally or recklessly relaying the information to a tippee who could use the information in connection with securities trading; and (3) the tipper received a personal benefit from the tip."  *Obus*, 693 F.3d at 289; *see also Newman*, 773 F.3d at 446.  Riley concedes that he had a duty to keep MNPI confidential but challenges the sufficiency of the evidence as to the other elements of securities fraud.

### A. There Was More Than Sufficient Evidence to Support the Jury's Conclusion that Riley Had Access to Material Nonpublic Information

Riley's argument that the jury could not reasonably conclude that he had access to MNPI is plainly without merit.  Riley presents this argument in the context of Foundry's global sales numbers and of the information surrounding the Brocade acquisition, but it is not persuasive in any context.

### 1. Riley Had Access to Worldwide Sales Figures

As Foundry's CIO, Riley was responsible for the maintenance of the company's databases.  Tr. 501.  The BBB database contained Foundry's worldwide sales figures, which were "a very important metric to investors and to general financial markets."  Tr. 566.  While employees whose access to Foundry's databases was predicated on their work in sales had access only to the sales for which they were responsible, Tr. 383, Riley was responsible for the entire database, Tr. 501.  Although nobody testified explicitly that Riley had access to every piece of information in the database, such access is a reasonable inference in light of Riley's emails regarding the database, *see, e.g.,* GX 222, GX 238, GX 246; his responsibility for the entire database, Tr. 501; and his status as CIO and Vice-President for IS and IT, Tr. 560.  Riley headed the department that was in charge of granting access to information contained in the Oracle system.  Tr. 562.  Riley, as the head of IT, indisputably oversaw people who had access to the worldwide sales figures.[20]  Tr. 495-97.  Moreover, Riley regularly logged into the BBB database

---

[20]      Riley makes much of the use of the word "admin."  *See* Reply at 9-10 (arguing that system administrators had super user status, but Riley, who was not assigned "administrative work," would therefore not have had it).  Scott Walter, who was Foundry's Sales Operations Manager, used the term "admin" differently in different contexts.  In the context of outlining access to the database, he referred to "super users" who "had administrative rights," meaning that they "could go in and add reps to the data bases, [] could change their role, and [] could terminate the rep from the data base."  Tr. 487.  In discussing why he did not ask Riley, the CIO, to assist him with minor issues with his own computer, Walter indicated that he relied instead on people well below Riley on the organization chart, because such individual computer help was "more of [an] administrative issue," and was not "at [Riley's] level."  Tr. 497-98.  Walter did not suggest or imply that Riley was not a system administrator by testifying that his own "administrative issues" were addressed by subordinates of Riley.

while speaking to Teeple or the night before a scheduled meeting with Teeple.  Tr. 1803-07; GX 701.  Finally, on the first business day after the close of the first quarter in 2007, Riley emailed Teeple that "before any cleanup the final number was $142M outbound."  GX 4002.  When Foundry publicly announced earnings over three weeks later, its worldwide revenue was $135.8 million for that quarter.  GX 2625.[21]

The remainder of Riley's argument is predicated on the testimony of two defense witnesses, Ben Wong and Emmanuel Mendoza.  Wong did not know whether Riley had access to BBB sales data, Tr. 1713, although he testified that in other databases, in some circumstances Riley's access was limited to his own department, Tr. 1711.  Mendoza testified that he did not believe that Riley had "super user" access to the database, Tr. 1675, but he also admitted that Riley's access to Oracle was not within Mendoza's responsibility, Tr. 1688-89, 1700.  Moreover, Mendoza admitted that when he was interviewed during the investigation that led to Riley's arrest, he misled the FBI agents.  Tr. 1690-91.  Accordingly, the jury could easily have disregarded Mendoza's testimony as not credible.  *See United States v. Truman*, 688 F.3d 129, 139-40 (2d Cir. 2012); *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011).

In short, there was ample evidence to support the jury's conclusion that Riley had access to Foundry's internal bookings and billings data.

### 2.  Riley Had Access to Information Concerning Brocade's Acquisition

Riley also argues that the jury could not have concluded that he had access to information regarding the timing or price of Brocade's acquisition of Foundry.  Riley Mem. at 13-16.  Riley

---

[21]     Riley sought to introduce evidence that there was a transaction in the technology industry around the time of Riley's email that included the figure $142 million.  *See* Tr. 1897-99.  That transaction was unrelated to anything else that Teeple and Riley had discussed and the $142 million figure was not an outbound, pre-cleanup number.  DX O-10.  The article Riley sought to introduce was unrelated to his email to Teeple, and there was no evidence that Riley had even seen it at the time of his email to Teeple.  Accordingly, the Government's objection to admission of that document was properly sustained.  Tr. 1899.

was on a short list of Foundry personnel who were informed of the *fact* of Brocade's acquisition,
GX 271, but there was no direct evidence that Riley was told when Brocade would acquire
Foundry or at what price.[22]   While it is unclear exactly how he learned it, the events of July 16,
2008, provide strong circumstantial proof that Riley had learned those details about the
acquisition.   Teeple and Riley met at approximately 8:15 a.m. that day; with the exception of one
call at 8:23, neither had any call activity until each resumed using his phone at 9:36.   GX 716,
GX 3801, GX 4012, Tr. 304.   At that point, Teeple began making a series of phone calls.   *See*
GX 704.   Teeple called 15 people who, immediately after speaking with Teeple or while on the
phone with him, acquired bullish positions in Foundry – in at least one case specifically because
Teeple told him that Foundry was about to be acquired at a substantial premium, Tr. 346-47.   *See
generally* GX 2257.[23]

Faced with a strong circumstantial case, Riley attempts to argue that the inference that he
provided information regarding the acquisition to Teeple is unreasonable because Teeple had so
many other sources of information.   Indeed, Teeple did meet with a number of other Foundry
insiders, although none of his known contacts had the same access as Riley.   But Teeple made
his calls – which conveyed a sense of urgency, prompting the people Teeple called to purchase
securities while still on the phone with him, GX 704, GX 2257 – right after speaking to Riley.
Moreover, several of Teeple's other sources at Foundry testified at trial and denied providing

---

[22]      There was evidence from which a jury could have concluded that, by applying reasonable intelligence,
Riley could have estimated the general ballpark of timing and price.   *See, e.g.*, Tr. 208 (pricing), Tr. 620 (timing).
The jury could also have inferred, as the Government argued, that Riley learned the details from his friend Cliff
Moore, Foundry's General Counsel, who was apprised of the deal's particulars.   Tr. 620-22; *see* Tr. 2098 ("The
government tries to suggest that Mr. Riley may have gotten this information because he was friendly with Cliff
Moore.").

[23]      *Compare* GX 704 *with* GX 1711-15, GX 2246 (Czyz); GX 2240, Tr. 1179 (Manuellian); GX 1872 (Artis);
GX 1720-21, GX 2245, Tr. 1180 (Wood); GX 2248, Tr. 1180 (Cornwell); GX 2247 (Ashraf); GX 1761-65, GX
2244, Tr. 1182 (Miller); GX 1780, GX 2254 (Street); GX 1800-01, GX 2253 (Mehta); GX 1770-72, GX 2249
(Olsson); GX 2250 (Reigel); GX 1861, GX 2255 (Garrison); GX 2251 (Wasson); GX 2256 (O'Shea); GX 1781, GX
2252 (Stelter); GX 5001.

information regarding the sale to Teeple (or even knowing about the information).  *See, e.g.*, Tr. 387-89 (Terry Wright); Tr. 904-06 (Douglas Schultz).

In short, David Riley, a high-level insider at Foundry who had been "read into" the fact of the acquisition by Brocade, met with Teeple on July 16, 2008.  Immediately thereafter, Teeple began rapid-dialing people and telling them to acquire, urgently, a bullish position in Foundry because it was soon to be acquired by Brocade at a substantial premium.  The fact that there is no direct evidence that Riley knew all of the finer points of the deal does not render unreasonable the only logical inference – that Riley knew enough about the deal to provide MNPI regarding it to Teeple.

### 3.   Riley Had Information Regarding Delays in Brocade's Acquisition

Finally, although there was less, there was still enough evidence to support a jury's conclusion that Riley had information regarding obstacles to Brocade's acquisition of Foundry.[24] Brocade cancelled a meeting with Foundry executives on October 8, 2008, as the Foundry team was preparing to leave Foundry to go to the meeting.  Tr. 631.  This cancellation was "a very bad sign" for the deal.  *Id.*  Riley worked in an open office with Foundry's top executives and was one of the senior officers of the company.  It would not have been unreasonable for the jury to conclude that Riley knew about the trip and then learned that it had been cancelled.  The morning after the meeting was cancelled, Riley spoke to Teeple for 26 minutes.  GX 705.  Shortly

---

[24]     Although the Court has already declared a mistrial as to Count IV, which charged Riley with providing information regarding October 2008 delays in Brocade's acquisition to Teeple, Riley nevertheless moves for a judgment of acquittal as to this count, contending that the evidence was insufficient to support a conviction. Because the evidence was sufficient, the Court need not reach the question of what effect, if any, insufficiency of the evidence would have on the Government's ability to retry Riley on that count.  *See United States v. Rosa*, 17 F.3d 1531, 1541 (2d Cir. 1994) ("[T]he Double Jeopardy Clause does not bar retrial of a defendant where the jury was unable to reach a verdict, even if at the first trial the government failed to introduce proof that was legally sufficient to establish guilt beyond a reasonable doubt.") (citing *Richardson v. United States*, 468 U.S. 317, 325 (1984)).

thereafter the same day, Teeple called Harden and, within minutes, Artis began selling massive amounts of Foundry stock and call option contracts.  GX 705, GX 2210.

The next week, before any indication of delays in the deal had become public, the evidence strongly suggests that Riley and Teeple met in person.  GX 600, GX 717.  After his meeting with Riley, Teeple called Harden, GX 717; while Teeple and Harden were on the phone Artis sold over a million shares of Foundry stock.  In all, there was sufficient evidence for a jury to have concluded that Teeple had inside information regarding obstacles to the acquisition and that Riley was the source of that information.

### B.  Sufficient Evidence Supports the Jury's Conclusion that Riley Was Teeple's Source

Riley argues that the jury could not reasonably have rejected his argument that Teeple obtained Foundry's MNPI from someone other than Riley.  At trial, Riley argued that Teeple could have obtained his information from any of a number of sources, including two Foundry salesmen (Schultz and Wright); two employees of Whitman Capital (Douglas Whitman and Dave Karson); two individuals who testified that Teeple provided the inside information to them (Johnson and Motey); and Brocade's Vice Present of Corporate Development (T.J. Grewal).

Four of these possible sources testified at trial that they did not provide Teeple with Foundry's worldwide sales figures or with information regarding Brocade's acquisition of Foundry.  Tr. 97 (Johnson); Tr. 402-03 (Wright); Tr. 779 (Motey); Tr. 919-20 (Schultz).  While the jury was not required to credit their testimony, it was within "'the province of the jury'" to determine whether these witnesses were credible.  *O'Connor*, 650 F.3d at 855 (quoting *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir. 1969)).  As to the Whitman Capital sources, the Government demonstrated that Whitman – unlike Artis – did not trade in Foundry stock around the times of the tips, strongly suggesting that Whitman did not possess the information that Riley

contends it passed on to Artis.  GX 1523.  Finally, no evidence suggested that Whitman sources or T.J. Grewal passed any inside information to Teeple at *any* time, much less at the specific times preceding Artis's trading.  The jury did not act unreasonably in failing to credit the defense theory that one of these sources provided Teeple with Foundry's worldwide sales figures or information concerning its acquisition.  *Cf. United States v. Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these theories in the record, the jury was free to reject it.").

### C.  Sufficient Evidence Supports the Jury's Conclusion that the Information Riley Provided Was Material and Nonpublic

Next, Riley claims that even if he did pass information to Teeple, the Government did not prove that the information he tipped was material and nonpublic.  "[I]nformation is nonpublic if it is not available to the public through such sources as press releases, Securities and Exchange Commission filings, trade publications, analysts' reports, newspapers, magazines, rumors, word of mouth or other sources."  *United States v. Cusimano*, 123 F.3d 83, 89 n.6 (2d Cir. 1997) (internal quotation marks omitted); *see also United States v. Contorinis*, 692 F.3d 136, 142-44 (2d Cir. 2012).  "[C]onfirmation by an insider of unconfirmed facts or rumors – even if reported in a newspaper – may itself be inside information."  *Contorinis*, 692 F.3d at 142 (approving district court's jury instructions to that effect).[25]

First, Riley argues that information related to Foundry's strong third quarter in 2007 and weak first quarter in 2008 was public.  Riley Mem. at 36-41.  The existence of news reports that Foundry expected to have a strong quarter does not render irrational the jury's conclusion that

---

[25]      "Information is material when there is a substantial likelihood that a reasonable investor would find it important in making an investment decision."  *Contorinis*, 692 F.3d at 143.  Although Riley argues that the Government did not establish materiality of the tipped information, the information that Riley was charged with providing to Teeple was clearly material.  *See* Tr. 566 (describing the worldwide revenue figures as "a very important metric to investors and to general financial markets"); Tr. 83 (same); Tr. 585-86 (describing the materiality of information pertaining to the acquisition).

Foundry's specific, detailed worldwide sales figures were nonpublic and material.  *See* GX 2220, GX 2231 (showing the market's dramatic reaction to Foundry's announcements of its worldwide figures for the relevant quarters); Tr. 489, 562 (detailing the steps taken to ensure that Foundry's worldwide sales figures remained confidential until announced).  Similarly, the seasonality of Foundry's business, which was "baked in" to the market price of the stock, Tr. 693, and the existence of a recession in 2008, do not render public the otherwise-proprietary detailed sales figures maintained in Foundry's possession.

Second, Riley asserts that the evidence was insufficient for a jury to conclude that the Brocade-Foundry deal was nonpublic.  Riley Mem. at 44-46.  Riley argued at trial that an astute analyst would have guessed that the two companies might merge, as there was a natural synergy between the two.  *See, e.g.*, Tr. 866.[26]  But multiple industry analysts testified that they had no idea that Brocade would acquire Foundry, Tr. 864 ("[W]hen this happened, it was a complete surprise, because I – I don't think, really, anybody had predicted that."); Tr. 892 ("[T]he only thing I remember is being surprised at the acquisition.").  The analysts' surprise was echoed by a number of former Foundry employees, Tr. 388 ("Shock.  I didn't expect us to ever be acquired.  This was not something that looked like it was ever on the horizon.  And so it was a little bit of flabbergast, if you will."); Tr. 481 ("I was shocked."); Tr. 905 ("Personally, for myself, I was in shock when I – I read the news.  It was a surprise.").  The jury's conclusion that this information was nonpublic was supported by sufficient evidence.

---

[26]     Riley attempted to introduce a number of reports and articles that were prepared *after* the merger was announced and that discussed the benefits to both companies of the acquisition.  *See United States v. Riley*, No. 13-CR-339(VEC), 2014 WL 3435721, at *2 (S.D.N.Y. July 14, 2014).  The Government's objection to this evidence was sustained as such after-the-announcement reports are not probative of what was known in the market prior to the public announcement.

Finally, there was also sufficient evidence suggesting that information regarding the October 2008 delay in the acquisition was nonpublic.  Riley argues that because the Dow Jones Industrial Average dropped 733 points on October 15, 2008, Brocade's reticence to pay the initially-agreed amount to acquire Foundry was known to the market.  Riley Mem. at 50.  If that were true, there would have been no market reaction to the public announcement that Brocade was experiencing troubles with financing, thus delaying in the acquisition of Foundry.  In fact, when that announcement was made, the market responded with a 25-percent drop in the value of Foundry's stock.  GX 2213.

In short, there was ample evidence in the record for the jury to conclude that the Government proved, beyond a reasonable doubt, that information regarding Foundry's worldwide sales figures, Brocade's acquisition of Foundry, and obstacles to Brocade's acquisition, was nonpublic.

### D.  Sufficient Evidence Supports the Jury's Conclusion as to Riley's Knowledge

"In order to establish a criminal violation of the securities laws, the Government must show that the defendant acted 'willfully.'"  *Newman*, 773 F.3d at 447 (quoting 15 U.S.C. § 78ff(a)).  This requires proof of "'a realization on the defendant's part that he was doing a wrongful act under the securities laws.'"  *Id.* (quoting *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005)).

Riley argues that the Government did not prove that he knew that Teeple would trade on the information that Riley provided (or cause others, including Artis, to trade on it), because "[t]here was no evidence that Riley knew that Teeple worked for Artis."  Riley Mem. at 52-54.  Several of Teeple's sources did not, in fact, realize that Teeple had a job in finance.  *See, e.g.*, Tr. 398 (Teeple told Wright that "he was a data analyst"); Tr. at 908-09 (Schultz did not know that Teeple worked at a hedge fund, consulted for hedge funds, or "that his work related to the stock

market at all").  But Riley represented to his colleagues that Teeple "works with several fund

(Hedge & Mutual) managers with a primary focus on Silicon Valley tech companies."  GX 4104.

Riley regularly obtained and acted on investment advice from Teeple.  *See, e.g.*, GX 4005; GX

4017 (providing detailed investment advice); *see also* GX 4115 (describing new hires at Marvell

as "very well connected with the analyst community and well liked").  Finally, Riley described

Teeple as "a good friend," GX 4102, making it more likely that he knew what Teeple did for a

living.  The jury's determination that Riley acted willfully and knew that Teeple would use the

MNPI that he provided to trade or cause others to trade in Foundry securities was not

unreasonable.

### E.  Sufficient Evidence Supports Riley's Conspiracy Conviction

"To sustain a conspiracy conviction, 'the government must present some evidence from

which it can reasonably be inferred that the person charged with conspiracy knew of the

existence of the scheme alleged in the indictment and knowingly joined and participated in it.'"

*United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (quoting *United States v. Hassan*, 578

F.3d 108, 123 (2d Cir. 2008)).  "The essence of the crime of conspiracy is 'the agreement to

commit the crime.'"  *Hassan*, 578 F.3d at 123 (quoting *United States v. Jimenez Recio*, 537 U.S.

270, 275 (2003)).  "'The traditional deference accorded to a jury's verdict is especially important

when reviewing a conviction for conspiracy because a conspiracy by its very nature is a secretive

operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the

precision of a surgeon's scalpel.'"  *United States v. Pica*, 692 F.3d 79, 86 (2d Cir. 2012) (quoting

*United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)) (alteration omitted).

Riley argues that the Government did not establish that he entered into an agreement with

Teeple to commit insider trading.  This argument is unavailing.  Riley regularly and deliberately

met Teeple.  *See, e.g.,* GX 4001, GX 4004, GX 4005, GX 4006, GX 4007, GX 4008, GX 4009,

GX 4011, GX 4012, GX 4015, GX 4016, GX 4018, GX 4020, GX 4100, GX 4119, GX 4123. There was ample evidence suggesting that during these meetings Riley conveyed MNPI to Teeple with the knowledge that Teeple would trade based on the information, and that he did so in anticipation of receiving a personal benefit.  The evidence more than sufficed to show that Riley, "in addition to knowing the essential nature of the plan, [] 'associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed.'"  *Santos*, 541 F.3d at 72 (quoting *United States v. Vargas*, 986 F.2d 35, 39 (2d Cir. 1993)).  Riley was an active participant, with Teeple, in a scheme to commit insider trading; this was sufficient evidence from which the jury could infer membership in the conspiracy.

### F.  Sufficient Evidence Supports the Jury's Conclusion that Riley Obtained a Personal Benefit from the Tips

For the reasons discussed in Section I.A, *supra*, the evidence was more than sufficient to support the jury's conclusion that Riley tipped inside information in anticipation of receiving a personal benefit.  Accordingly, the jury did not err in concluding that Riley's breach was in violation of a fiduciary duty to Foundry.

### CONCLUSION

The Court has considered the remainder of Riley's arguments and finds them to be without merit.  For the above-stated reasons, Riley's motion for a new trial and for a judgment of

acquittal is DENIED.  The Clerk of the Court is respectfully directed to terminate Dkt. 174, Dkt.

228, and Dkt. 232.

**SO ORDERED.**

**Dated: March 3, 2015**
       **New York, NY**

**VALERIE CAPRONI**
**United States District Judge**