UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

       - v. -                                        :        S1 13 Cr. 339 (VEC)

DAVID RILEY,                                        :

            Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING SUBMISSION

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
      of America

Telemachus P. Kasulis
Sarah E. McCallum
Assistant United States Attorneys

Michael P. Holland
Special Assistant United States Attorney

     - Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant David Riley (the "defendant"), scheduled for April 27, 2015 at 2:00 p.m. For the reasons set forth below, the Government recommends that the Court impose a below-Guidelines sentence that is nonetheless higher than that imposed upon the defendant's co-conspirator, Matthew Teeple, who entered a plea of guilty.   The defendant engaged in a protracted insider trading scheme that yielded over $39 million in profits and losses avoided for the hedge fund that employed Teeple.   For his actions, which involved repeated, grave breaches of fiduciary duty, all for advancement of the defendant's personal pecuniary and career interests, the defendant deserves a substantial sentence of incarceration.

## STATEMENT OF FACTS

## I.        PROCEDURAL BACKGROUND

On February 20, 2014, a grand jury in this District returned a superseding indictment (the "Indictment") charging the defendant and hedge fund analyst Matthew Teeple with crimes related to insider trading in the securities of Foundry Networks, Inc. ("Foundry"), a Silicon Valley technology company where the defendant had worked from 2005 through the spring of 2009.   The charges related principally to trading that Teeple's employer, Artis Capital Management LP ("Artis"), had conducted in 2008, when the defendant was Foundry's Chief Information Officer ("CIO").   The Indictment alleged that the defendant, a good friend and former colleague of Teeple's, had disclosed to Teeple secrets about Foundry's acquisition by Brocade Communications, Inc. ("Brocade") in 2008, and had repeatedly tipped Teeple with Foundry's financial results before they had been disclosed publicly.   The Indictment further alleged that Teeple's hedge fund, Artis, had made over $16 million in profits and avoided losses of

1

over $11 million based on the defendant's illegal disclosures.[1]

The Indictment charged the defendant and Teeple with one count of conspiring to violate the federal securities fraud laws, in violation of Title 18, United States Code, Section 371 (Count One), and three counts of substantive securities fraud related to Foundry trading in April 2008 (Count Two), July 2008 (Count Three), and October 2008 (Count Four), all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.   At the time the Indictment was returned, both Teeple's and the defendant's cases were pending before the Honorable Robert P. Patterson.

Trial on the Indictment was adjourned several times.   On May 28, 2014, Teeple entered a plea of guilty to Count One of the Indictment, pursuant to a plea agreement in which he acknowledged that a sentence of 60 months' imprisonment—the statutory maximum for violations of 18 U.S.C. § 371—would be reasonable.

A month later, the defendant's case was reassigned to this Court.   Trial against him on the Indictment commenced on September 8, 2014.   On October 2, 2014, the jury returned a verdict of guilty on Counts One through Three.   The Court declared a mistrial on Count Four after the jury relayed its inability to reach a unanimous verdict with respect to that charge.

On October 16, 2014, Judge Patterson sentenced Teeple substantially to a term of 60 months' imprisonment.

On December 29, 2014, the defendant moved this Court for a judgment of acquittal on all counts of the Indictment, pursuant to Federal Rule of Criminal Procedure 29, and, in the

---

[1] As discussed below, the proof adduced at the defendant's trial would establish profits and avoided losses greater than these.

alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33.   The Government

opposed both motions.   In an Opinion and Order dated March 3, 3015, the Court denied the

motions.

## II.      THE EVIDENCE AT TRIAL

The evidence at trial established beyond a reasonable doubt that the defendant, in

blatant breach of duties of trust and confidence he owed to Foundry, furnished two types of

material nonpublic information to Teeple during the period of the charged conspiracy: (1)

information about Foundry's worldwide sales figures, and (2) information concerning Foundry's

acquisition by Brocade in 2008.   The defendant divulged these secrets to Teeple in expectation of

personal gain; he hoped that by providing valuable information to Teeple and the hedge funds with

which Teeple worked over the years, he would reap in return, among other things, assistance with

a business venture, investment advice, and assistance with securing new employment once the

Brocade-Foundry deal had been consummated.

### A.      The Relationship Between the Defendant and Teeple

Teeple and the defendant were friends who had worked together from 2001 to 2003

at a networking company called Riverstone Networks, Inc. ("Riverstone")—the defendant as

Director of Information Technology, and Teeple as Director of Market Development.   (GX 110;

GX 3400; Tr. 202-03).   In September 2003, when the defendant was still at Riverstone, Teeple

joined a hedge fund consulting group called the Field Check Group.   (GX 110).   Then, in the fall

of 2007, Teeple left the Field Check Group to go in-house with Artis, one of the Field Check

Group's clients.   (*Id.*).   Meanwhile, while Teeple was still with the Field Check Group, the

defendant left Riverstone and joined Foundry as its CIO and Vice President of Information

Systems ("IS") and Technology ("IT"), a job that had him reporting directly to the Chief Financial

Officer.   (GX 3400 at 2; GX 203).

The defendant stayed in touch with Teeple throughout these various job changes, and knew that Teeple's work following his departure from Riverstone involved advising hedge funds about "Silicon Valley tech companies."   (GX 4104).   Throughout the period of the charged conspiracy, the defendant and Teeple exchanged emails regularly and spoke by phone often. Teeple, who would in June 2009 refer to the defendant as his "best guy from Foundry" (GX 2504-T ; GX 4125), also traveled frequently from his home in Southern California to San Jose, near where the defendant worked and lived.   When he made these trips, Teeple would schedule coffee meetings with the defendant to keep abreast of developments at Foundry.   (Tr. 203; *see* GX 4100; GX 4001; GX 4004; GX 4005; GX 4006; GX 4007; GX 4008; GX 4118; GX 4119; GX 4010; GX 4011; GX 4012; GX 4124; GX 4016; GX 4017; GX 4018; GX 4125).   These meetings furnished the defendant his chief opportunities to divulge Foundry's secrets to Teeple.

**B.**     **The Defendant's Disclosure of Foundry's Secret Worldwide Sales Figures**

The first category of information that the defendant disclosed to Teeple in breach of fiduciary duties owed to Foundry was data about Foundry's worldwide sales figures.   Although not himself a member of the sales organization at Foundry, the defendant, as head of IT and IS for the entire company, had access to a database called "FNI Web BBB" in which Foundry recorded its worldwide sales figures.   (GX 281).   This database contained worldwide "bookings, billings, and backlog" information; it tracked, in real time, the dollar amounts of orders that Foundry salespeople had booked (the bookings), what dollar volume of those orders had shipped (the billings or shippings), and what dollar volume of the orders remained to be fulfilled (the backlog). (GX 283; Tr. 481-84).   These figures formed the basis for the quarterly revenue and earnings-per-share calculations that the company would announce after the close of a given

quarter.   (Tr. 565; *see also* Tr. 74; *id.* at 83; Tr. 1726).

Quarter after quarter, the defendant abused his access to Foundry's worldwide sales figures by divulging numbers from the FNI Web BBB database to Teeple.   In 2008 alone, the defendant accessed the BBB system 57 times.   (GX 300).   Several of those logins occurred while the defendant was on the phone with Teeple.   (*Compare* GX 300 *with* GX 701).   Other times, in advance of a morning meeting with Teeple, the defendant would log into the BBB system after hours.   (GX 300 (showing, for example, a 10:53 p.m. login for 21 minutes the night before an April 3, 2008 morning meeting with Teeple; a 7:22 p.m. login for 19 minutes the night before a July 16, 2008 morning meeting with Teeple; and a 10:22 p.m. login for six minutes the night before an October 16, 2008 meeting with Teeple)).   As testimony from cooperating witnesses and Artis-related phone and trading records made plain, this intersection of logins and communications was not just a coincidence; the defendant was passing Foundry's nonpublic sales figures to Teeple. (*See* Tr. 81-86; Tr. 777-78; GX 3300-A).

The evidence further established that Teeple passed the sales numbers the defendant gave him on to Artis, which traded on the information to massive profit.   (*See* GX 2200; GX 2233).   Sales information that the defendant illegally passed to Teeple on September 27, 2007, for example, made Artis nearly $5 million in profits.   (*See* GX 2221).   More such information in February 2008 yielded profits and avoided losses totaling over $3.5 million for Artis.   (GX 2226).   Similar disclosures by the defendant to Teeple in April 2008 prompted Artis to triple its short position in Foundry and make over $2.5 million in profits on bad news about Foundry's performance.   (GX 2232).

**C.    The Defendant Disclosed to Teeple that Foundry Would Soon Be Acquired**

But the most valuable tip that the defendant gave Teeple about Foundry during the

course of their conspiracy came in the summer of 2008, when the defendant divulged that Foundry was going to be acquired by Brocade.

On July 1, 2008, the defendant was initiated into a small circle of Foundry insiders (just 24 people, in a company that employed approximately 1,300) entrusted with the secret that their company was going to be acquired by Brocade.   (GX 271 at 7-10, 42).   He was brought to a conference room at Foundry and shown a Powerpoint presentation "which emphasized the importance of maintaining all information related to the proposed business combination strictly confidential."   (GX 271 at 42; Tr. 614).[2]   The lengths to which Foundry went to keep the deal information secret were driven by concerns about effect on Foundry's shareholders.   As former Foundry CFO Daniel Fairfax testified at trial:

> [I]t would have been important information to the marketplace if, for instance, the price that we had negotiated on behalf of shareholders was considerably above the current trading price of our shares in the public market.   We believed that we were constructing a transaction that would be quite attractive to our investors.   And we didn't want that information to . . . get into the public market, if someone else would be able to trade on that, and not be able to have a full benefit of the owners of the company.

(Tr. 618).

Two weeks after learning the Brocade acquisition information, the defendant disclosed it to Teeple at a coffee meeting in downtown San Jose, California.   (GX 4012; GX 3801

---

2 The specific training that the defendant received regarding confidentiality of the acquisition information on July 1, 2008 supplemented Foundry's general policy mandating that employees keep information about corporate structure and transactions, as well as sensitive financial information, confidential and not disclose it to anyone outside the company.   (GX 200 (Foundry insider trading policy); GX 201 (defendant's signature on insider trading policy); GX 204 (Foundry's proprietary information policy, with defendant's signature, acknowledging that "[m]y employment creates a relationship of confidence and trust between the Company and me with respect to any information [a]pplicable to the business of the Company"—including, specifically, "financial information" and "corporate structure" information)).

at 45; GX 600 at 11).   Immediately following his meeting with the defendant, Teeple got on his

cell phone to spread the news to a select group of contacts—among them, Artis—all of whom in

turn immediately began buying Foundry stock and options.   (GX 704; GX 2257).   One of the

people Teeple called within hours of meeting with the defendant was trial witness Andrew Miller,

who testified that Teeple told him "Foundry was going to be acquired," and that the deal would be

announced the following Monday, July 21.   (Tr. 347).

        When Teeple conveyed the defendant's dynamite acquisition tip to Artis the

morning of July 16, 2008, Artis not only entered an order to purchase 1.1 million Foundry shares

(an order that would roughly triple before July 21), but also bought back the precise number of

Foundry call option contracts—3,826—that it had sold just the day before.   (GX 2204).   This call

option purchase represented a dramatic reversal on Artis's part—one that cost Artis approximately

$40,000 at the time.   (Tr. 1127).   Taking that hit paid off in spades when the news about the

Brocade-Foundry deal broke; by reversing the July 15 call option sale it had made, Artis avoided

$1.9 million in losses.   (Tr. 1132).   Ultimately, Artis would make $13.6 million in profits and

avoid losses of $7.4 million based on the defendant's tip of July 16.

        The defendant's tips to Teeple about the Brocade-Foundry deal did not stop at the

July 16 meeting, but continued throughout the fall of 2008, before the deal was consummated at

the end of 2008.   When Brocade executives "disinvited" Foundry executives from a meeting in

Lake Tahoe on October 8, for example, the defendant the next day conveyed to Teeple that things

were not going well with the deal—something the rest of the world would not learn until October

24, 2008, when Foundry announced a delay in a planned shareholder meeting.   (*See* Tr. 628-32,

GX 705, GX 2620).   Less than 10 minutes after Teeple learned this news from the defendant,

Artis began selling Foundry stock and call options—trades consistent with the view that Foundry's

7

share price would drop.   (GX 2210).   Later, on the morning of October 16, 2008, the defendant

met with Teeple over coffee and conveyed more bad news about the deal's progress.   (*See* 600 at

13; GX 717; *cf.* Tr. 370 (testimony of Andrew Miller that Teeple told him in October that "the deal

might not happen")).   Within minutes of the meeting, during a call from Teeple to Artis, Artis

began dumping *all* of its Foundry stock, flattening its position entirely.   (GX 2211; GX 2208).

This trading, together with the October 9 trades on the earlier bad news, generated profits and

avoided losses totaling nearly $8 million.   (GX 2215).

### D.   The Defendant Acted for Personal Benefit

The defendant, who in 2007 described Teeple as a "good friend" (GX 4102), did

not engage in the above-described blatant breaches of his fiduciary duty to Foundry for friendship

alone; he did it to advance his own direct and indirect pecuniary interests.   At the very same

meetings in which the defendant divulged Foundry's secret financial information and its

impending acquisition by Brocade, he solicited (and secured) Teeple's assistance with promoting a

side business he was working on (*see* GX 4000, 4002, 4100, 4102, 4104, 4105, 4107), got

investment advice from Teeple (*see* GX 4005 (email communication regarding certain stocks), GX

4017 (email from Teeple to the defendant saying he was "still positive on" Motorola and Marvell,

among others, and offering a broader overview of stocks in the semi-conductor "space"), GX 2504

& GX 2504-T (recording in which Teeple discusses Palm); GX 2235 (summary of defendant's

trading)) , and secured Teeple's help in looking for a new job (*see* GX 4112; GX 4116).   Indeed,

when it became clear that Foundry would be acquired, the defendant began soliciting Teeple's

advice about management positions at other companies—something the two discussed during the

same July 16 meeting at which the defendant tipped Teeple about the Brocade deal.   (*See* GX

4122 (July 16, 2008 email following up on discussion that same day regarding management at

Marvell, Data Domain, and Solyndra); GX 4015 (January 2009 email from defendant to Teeple attaching resume and announcing "I am ready to start talking with folks!")).   In the end, the defendant chose as his next employment to join forces with other former Foundry employees, including former Foundry General Counsel Cliff Moore, to form an "angel" investment group called XF Ventures.   (GX 3400 at 2; GX 4125 at 2).   Teeple had a hand even in this; he worked to connect XF Ventures with potential investment opportunities.   (GX 4125).

## DISCUSSION

Applying the factors set forth in Title 18, United States Code, Section 3553(a), a sentence below the applicable Guidelines range of 121 to 151 months but longer than the term imposed upon co-defendant Teeple, who pled guilty, would be "sufficient, but not greater than necessary" to serve the goals of sentencing.   Such a sentence would be substantial enough to reflect the seriousness of the offense and the defendant's indispensable role in it, and to deter other insiders in high-level positions from committing similar crimes, but would also take account of the fact that the defendant profited comparatively little from the scheme.   Moreover, such a sentence would reflect that the loss amount driving the Guidelines analysis—over $39 million—was, while certainly reasonably foreseeable to the defendant, nonetheless not necessarily contemplated by him at the time of his actions.

## I.      APPLICATION OF THE GUIDELINES

In its Presentence Investigation Report dated March 9, 2015, the Probation Office calculates an offense level of 30, a criminal history category of I, and a resulting Guidelines range of 97 to 121 months' imprisonment.

With one exception, the Government agrees that these calculations are correct under the Guidelines.   The exception is that the Government believes the Guidelines call for a

two-level enhancement, under U.S.S.G. § 3B1.3, for the defendant's abuse of a position of trust. *See* U.S.S.G. § 2B1.4 cmt. 2.   Not only did the defendant hold the position of Chief Information Officer at Foundry during the period of the scheme, but it was his high level within the company that gave him the access he needed to collect and divulge to Teeple the sensitive information at the center of the scheme.   *See, e.g.*, *United States* v. *O'Hagan*, 139 F.3d 641, 656 (8th Cir. 1998) (holding that senior partner at law firm whose position was what gave him access to the sensitive information at issue merited the abuse-of-trust enhancement).   Applying this enhancement, the defendant's total offense level is 32, and his resulting Guidelines range is 121 to 151 months.

## II.   SECTION 3553(A) FACTORS

The "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), weigh heavily in favor of a substantial incarceratory sentence.   So, too, do the "history and characteristics of the defendant," *id.*, insofar as they are reflected in the defendant's sustained, calculated criminal conduct.   Moreover, a substantial term of incarceration is needed here "to reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," and adequately deter similar conduct.   18 U.S.C. § 3553(a)(2).

The defendant repeatedly, over several years, betrayed the trust that was placed in him by his company to advance his own interests.   The testimony at trial established that he began leaking sensitive, worldwide sales figures to Teeple in or about 2005, and continued to do so through 2008.   (Tr. 80-82, 87 (testimony of John Johnson concerning Foundry inside information he received via Teeple beginning in 2005)).   As discussed above, the defendant accessed the FNI Web BBB database 57 times in 2008 alone—often either during or right before phone calls with Teeple or on nights before his coffee meetings with Teeple.   His purpose in doing so was to

10

collect and then disclose to Teeple some of Foundry's most sensitive financial data.   Then, in the summer of 2008, when the defendant was among the very few Foundry insiders entrusted with the news of the impending Brocade deal, and after having been specifically admonished about the importance of keeping the news secret, the defendant breached the duties he owed Foundry by leaking to Teeple among the most explosive—and valuable—information anyone can have about a public company.

Given the nature of the information at issue here—worldwide sales figures and acquisition information—the defendant cannot but have reasonably foreseen that it would be exploited to enormous financial advantage.   Thus, wholly apart from the protracted nature of the offense conduct, the sheer sensitivity and concomitant value of the information that the defendant chose, repeatedly, to disclose to an analyst friend whom he knew worked with hedge funds to advise them about technology stocks weigh heavily in favor of a substantial sentence of incarceration.

Another offense characteristic that weighs in favor of a substantial term of imprisonment is the one reflected in the abuse-of-trust enhancement under the Guidelines:   The enormous illegal gains generated in this case could not have been possible had the defendant not been willing to betray a special trust placed in him by his company.   The defendant was not just leaking inside information, but leaking information available only to those who, like the defendant, were at high levels or held special positions within the company.   As the evidence established, very few people at Foundry had access to worldwide sales figures; even salespeople were given only region- or sector-specific visibility into the FNI Web BBB database.   And only a handful of Foundry employees were let in on the secret about the Brocade acquisition before it

11

became public.   Most of the Foundry employees who testified at the defendant's trial explained that they learned the news of the acquisition at the same time the general public did.   Not so for the defendant; his company entrusted him with full access to worldwide sales figures and with the Brocade deal secret.   His breach of that trust sets him far apart from insiders at lower levels within companies who violate general duties of confidentiality.

As noted, a correct Guidelines calculation yields a range of 121 to 151 months' imprisonment—at the bottom end, a term more than twice as long as the one that Judge Patterson, at the Government's urging, imposed upon Teeple.   A term of 121 months or more would, in the Government's view, be unnecessarily lengthy to serve the goals of sentencing set forth in Section 3553(a).   There are two principal reasons for this, both related to the loss amount that is the principal driver behind the Guidelines calculation.

First, the defendant profited comparatively little from the charged scheme.   He received none of the proceeds directly, and his indirect pecuniary gains—returns based on stock tips that Teeple gave him, for instance—are dwarfed by the profits that Teeple's hedge fund, Artis, reaped based on the inside information the defendant provided.   Teeple himself made millions of dollars in compensation (salary and bonus) during the scheme.

Second, and particularly in view of the modest gains that the defendant personally saw as a result of his participation in the charged conspiracy, the defendant likely did not specifically contemplate that his illegal disclosures would generate the staggering profits they did. This is not to say that the gains were not reasonably foreseeable—again, they plainly were, given the identity of the defendant's tippee.   But the defendant likely did not predict that his disclosures would generate what, on a purely pecuniary measure, would turn out to be one of the biggest

12

insider trading cases this Office has ever brought.

    In view of these considerations, and of the 60-month sentence that Teeple justly received, the Government respectfully submits that a sentence below the Guidelines range but longer than that imposed upon Teeple would be reasonable and no greater than necessary to serve the goals of sentencing articulated in Section 3553(a).   While a sentence below that imposed upon Teeple would be inadequate to promote respect for the law, reflect the seriousness of the offense, and deter other insiders who hold positions of special trust within public companies from breaching their fiduciary duties for personal gain, a sentence of more than twice that length would, in the Government's view, be longer than necessary.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court impose upon the defendant a sentence that includes a substantial term of incarceration shorter than that yielded by application of the Guidelines but longer than that imposed upon co-defendant Teeple.

Dated: New York, New York.
      April 20, 2015

                        Respectfully submitted,

                        PREET BHARARA
                        United States Attorney


                  By:_____/s/_____
                        Telemachus P. Kasulis
                        Sarah E. McCallum
                        Assistant United States Attorneys
                        Tel. (212) 637-2411/1033

                        Michael P. Holland
                        Special Assistant United States Attorney

14