UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,      :

    v.                            :          13 CR. 339 (VEC)

DAVID RILEY,                 :

          Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM SUBMITTED
## ON BEHALF OF DAVID RILEY

John F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007
(212) 619-3730

Anthony Cecutti, Esq.
217 Broadway, Suite 707
New York, New York 10007
(917) 741-1837

*Attorneys for David Riley*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. David Riley's Current Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        1. Present Family Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        2. David Riley's Professional Life   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        3. David Riley's Financial Situation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        4. David Riley's Family Health Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. David Riley's Earlier Life  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1. David Riley's Childhood  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2. David Riley's Schooling, Work and Professional
           History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        3. David Riley's Charitable Activities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. THE COURT SHOULD IMPOSE A NON- CUSTODIAL SENTENCE  . . . . . . . . . . . . . . . 6

    A. Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B. A Non-Custodial Sentence And Probation With Conditions Is Sufficient,
       But Not Greater Than Necessary, To Comply With The Purposes Set
       Forth In Section 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1. A non-custodial sentence is sufficient to reflect the seriousness of the offense,
           promote respect for the law and provide just punishment for the offense  . . . . . . 16

        2. A non-custodial and probation would not encourage criminal conduct  . . . . . . . . 18

        3. A sentence not requiring further incarceration is sufficient to
           protect the public from future wrongdoing by David Riley . . . . . . . . . . . . . . . . . 20

           a. Lack of means  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           b. Low risk of recidivism  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C. The Remaining Section 3553(a) Factors, Which The Court
Must Consider, Support A Non-Custodial Sentence . . . . . . . . . . . . . . . . . . . . . . . . . 23

  1. The nature and circumstances of the offense support a non-custodial
     sentence for David Riley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    a. Certain conflicts in the evidence support a non-custodial
       sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    b. David Riley had little motive to commit the offense . . . . . . . . . . . . . . . . . . . 25

  2. The history and characteristics of David Riley support a
     non-custodial sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    a. The offenses of conviction were an aberration –
       atypical, in David Riley's life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    b. David Riley's family circumstances support a
       non-custodial sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

  3. Considering the kinds of sentences available, this Court should
     impose a non-custodial sentence on David Riley . . . . . . . . . . . . . . . . . . . . . . . . . 33

  4. After considering the Guidelines sentencing range in this case, the
     Court should vary from the Sentencing Guidelines and impose a
     non-custodial sentence on David Riley. Additionally, we
     respectfully submit that the range calculated in the PSR is in error . . . . . . . . . . 34

    a. The Sentencing Guidelines are not mandatory and are only
       one factor to be considered when imposing a sentence . . . . . . . . . . . . . . . . . 34

    b. The Pre-Sentence Report contains specific errors that result
       in a miscalculated offense level for the offense conduct. . . . . . . . . . . . . . . . 35

      i. The Gains/Loss Calculation Is In Error.
         The Gains/Loss Avoidance Is Overstated . . . . . . . . . . . . . . . . . . . . . . . . 35

      ii. The Gains/Loss Avoidance Was Not Reasonably Forseeable . . . . . . . . . 37

    c. The "loss" factor in the Sentencing Guidelines drives up the
       offense level for white collar crimes disproportionately and
       should not be followed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

5.  Imposing a non-Guidelines and non-custodial sentence on
    David Riley will not result in unwarranted sentencing disparities  . . . . . . . . . . . . 42

6.  The Need To Provide Restitution  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

7.  No Fine Should Be Imposed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## TABLE OF AUTHORITIES

## **TABLE OF CASES**

*Cunningham v. California*,
   549 U.S. 270 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9 fn.

*Gall v. United States*,
   522 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10 fn., 13, 16, 24, 33, 34

*Irizarry v. United States*,
   __ U.S. __ (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kimbrough v. United States*,
   552 U.S. 85 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 10, 13, 27, 34, 38, 44

*Koon v. United States*,
   518 U.S. 81 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Nelson v. United States*,
   555 U.S. 350 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rita v. United States*,
   551 U.S. 338 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10 fn., 38

*Simon v. United States*,
   361 F. Supp 2d 35 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 34

*Spears v. United States*,
   555 U.S. 261 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9 fn., 27, 38

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 39, 40

*United States v. Antonakopoulos*,
   399 F.3d 68 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 fn.

*United States v. Booker*,
   543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 13, 27, 29, 34

*United States v. Canova*,
   412 F.3d 331 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 35

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2009)(*en banc*),
    *cert. denied*, 129 S. Ct. 2735 (2009) ........................................ 10

*United States v. Chase*,
    560 F.3d 828 (8th Cir. 2009) ............................................. 29

*United States v. Cole*,
    662 F.2d 632 (N.D. Ohio 2008) ........................................ 16, 20

*United States v. Collado*,
    No. 07 Cr. 1144, 2008 WL 2329275 (S.D.N.Y. June 5, 2008) ................ 26 fn.

*United States v. Coughlin*,
    No. 66-2005, 2008 U.S. Dist. Lexis 11263,
    at *27 (W.D. ARK. Feb 1, 2008) ......................................... 44

*United States v. Crosby*,
    397 F.3d 103 (2d Cir. 2005). ........................................... 29 fn.

*United States v. Davis*,
    No. 07 Cr. 727, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) ................ 28, 29

*United States v. Dominguez*,
    296 F.3d 192 (3d Cir. 2002) ........................................... 30 fn.

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) ..................................... 39

*United States v. Frias*,
    39 F.3d 391 (2d. Cir. 1994) ............................................ 25 fn.

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993) ...................................... 17, 18

*United States v. Gardellini*,
    545 F.3d 1089 (D.C. Cir. 2008) ........................................ 17, 21

*United States v. Germosen*,
    473 F. Supp. 2d 221 (D. Mass. 2007) ..................................... 27

*United States v. Greene,*
    249 F. Supp. 2d 262 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Gupta,*
    904 F.Supp.2d 349 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 fn., 28, 40, 41

*United States v. Hadash,*
    408 F.3d 1080 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Hoffmann,*
    No. 8:05CR282, 2006 WL 3390736 (D.Neb. Nov. 22, 2006) . . . . . . . . . . . . . . . . . 17, 21

*United States v. Howe,*
    543 F.3d 128 (3d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30 fn.

*United States v. Jones,*
    531 F.3d. 163 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Jiau,*
    11 Cr. 161 (JSR) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43 fn.

*United States v. Kloda,*
    133 F. Supp. 2d 345 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Kluger,*
    722 F.3d 549 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Mahan,*
    No. 05-1518, 2007 WL 1430288 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Menyweather,*
    447 F3d 625 (th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Milne,*
    384 F. Supp. 2d 1309 (E.D. Wis. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Munoz-Nava,*
    524 F.3d 1137 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 fn.

*United States v. Nellum,*
    No. 2:04-CR-30-PS, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005) . . . . . . . . . . . . . . . . . 21

*United States v. Olis,*

No. H-03-217-01, 2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) . . . . . . . . . . . . . . . . . . 20

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 39

*United States v. Pimental*,
   367 F. Supp.2d 143 (D.Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 fn.

*United States v. Prisel*,
   No. 07-3281, 2008 WL 4899451 (6th Cir. Nov. 13, 2008) (unpub) . . . . . . . . . . . . 30 fn.

*United States v. Peterson*,
   11 Cr. 665 (RPP). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Peterson*,
   363 F. Supp.2d 1060 (E.D. Wisc. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Ranum*,
   353 F. Supp. 2d 984 (E.D. Wis. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Ruiz*,
   No. 04CR.1146-03, 2006 WL 1311982 (S.D.N.Y. May 10, 2006) . . . . . . . . . . . . . . 21

*United States v. Samaras*,
   390 F. Supp. 2d 805 (E.D. Wis. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Samuels*,
   No. S 108 Cr. 08-03, 2009 WL 875320 (S.D.N.Y. Apr. 2, 2009) . . . . . . . . . . . . . 26 fn.

*United States v. Seval*,
   2008 WL 4376826 (2d Cir. Sept. 25, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Shonubi*,
   103 F.3d 1085 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 fn.

*United States v. Soto*,
   No. 09-CR-292, 2010 WL 1780313 (E.D.Wis. Apr. 30, 2010) . . . . . . . . . . . . . . . . 17

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Wachowiak*,
   412 F. Supp. 2d 958 (E.D. Wis. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 30

*Wisconsin v. Mitchell*,
     508 U.S. 476 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## **AUTHORITIES**

18 U.S.C. § 3553(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

18 U.S.C. § 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

18 U.S.C. § 3553(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 3553(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 3561(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 3582 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 fn.

28 U.S.C. § 944(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Sentencing Reform Act ("SRA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

U.S.S.G. § 1B1.3(a)(a)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S.S.G. § 2A1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2A1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2A2.1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2A3.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 35, 38

U.S.S.G. § 2B1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

U.S.S.G. § 2B1.4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

U.S.S.G. § 2B1.1(b)(L) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

U.S.S.G. § 2B3.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 2B3.1(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 2B3.1(b)(3)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 2B3.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 2B3.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G 2L1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 2M5(2)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 2M5.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. 2N1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 5H1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

U.S.S.G. § 5H1.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

U.S.S.G. § 5K2.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## **MISCELLANEOUS**

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds after Booker*,
    20 Fed. Sent. R. 167, 169, 2008 WL 2201039 at *4 (Feb. 2008) . . . . . . . . . . . . . . . . . . 40

Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity:*
    *An Analysis of Recent Research* (1999)(summary at
    http://members.lycos.uk/awnet/SENTENCE.pdf) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Immanuel Kant, *The Science of Right* (W. Hastie trans., 1790) . . . . . . . . . . . . . . . . . . . . . . . . 19

Gary Kleck, et al., *The Missing Link in General Deterrence Theory*,
    43 Criminology 623 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Kate Stith & Jose A. Cabranes,
    *Fear of Judging: Sentencing Guidelines in the Federal Courts* (1998) . . . . . . . . . . . . . 39

Derek R. Vollrath, *Losing the Loss Calculation:*
    *Toward a More Just Sentence Regime in White-Collar Criminal Case,*
    59 Duke L.J. 1001, 1025 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar*
    *Crimes,* 33 Criminology 587 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## ONLINE CITATIONS

*Costs of Imprisonment Far Exceed Supervision Costs,*
    (Sept. 5, 2012) <http://www.uscourts.gov/News/NewsView/09-05-12/
    Costs_of_Imprisonment_Far_Exceed_Supervision_Costs.aspx>. . . . . . . . . . . . . . . 19 fn.

*Measuring Recidivism: The Criminal History Computation of the Federal*
    *Sentencing Guidelines,* U.S. Sentencing Commission (May 2004)
    <http://www.lb5.uscourts.gov/ArchivedURLs/Files/08-10643%281%29.pdf> . . . . 21, 22

*Recidivism and the First Offender* (May 2004)
    <http://ussc.gov/publicat/Recidivism_General.pdf> . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Supervision Costs Significantly less than Incarceration in the Federal System*
    <http://news.uscourts.gov/supervision-costs-significantly-less-than-
    incarceration-in-the-federal-system> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 fn.

U.S. Sentencing Commission, *A Comparison of the Federal Sentencing Guidelines*
    *Criminal History Category and the U.S. Parole Commission Salient Factor Score,*
    (Jan. 4 2005) <http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf> . . . . 21

U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An*
    *Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of*
    *Sentencing Reform* at 47 (2004 ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 fn.

U.S. Sentencing Commission, *Supplementary Report on the Initial*
    *Sentencing Guidelines and Policy Statements* (1987),
    <http://www.fd.org/pdf_lib/Supplementary%20Report.pdf> . . . . . . . . . . . . . . 11, 12 fn.

## PRELIMINARY STATEMENT

The defendant David Riley respectfully submits this memorandum in support of his request for a non-custodial sentence. Considering David Riley's age, his role as a husband and as a father to his teenage son, his lack of any prior criminal record, and his life history as a decent man, such a sentence would be sufficient, but not greater than necessary, to achieve the purposes set forth in 18 United States Code § 3553(a) to be considered by the Court in imposing sentence. This is particularly so here, given Mr. Riley's many years of service to the national interests of this country while serving in the Air Force and in the Central Intelligence Agency.

## I. BACKGROUND

David Riley has no prior criminal record. He resides in North Carolina with his wife, Lays, and their teenage son. David Riley has worked his entire adult life, first in public service and then in private industry. He is and has been a "good neighbor" in his communities in every sense of those words. His hard-working and decent life of devotion to his family and his community and his country, his hard work, volunteerism and good deeds and acts of kindness and compassion bespeak more of David Riley's true character and the "giving" and good man that he is than any contested evidence at the trial of this case.[1]

### A. David Riley's Current Status

#### 1. Present Family Life

David Riley is married with one teenage son. However, the family life he once knew, today is in total disarray. The family moved across the country from San Jose, CA to North Carolina because they could no longer afford to remain in their home in California. Mrs. Riley

---

[1] For the purpose of this memorandum, we accept, as we must, the facts that may be reasonably inferred from the verdict returned by the Jury in this case on October 3, 2014.

has been overwhelmed by the pressure of trying to keep life moving for herself and the family. For some time, she has suffered and continues to suffer from clinical depression. The adjustment to life in North Carolina has been difficult. While Mr. Riley's son and wife are blameless for the crimes determined by the jury to have occurred, they suffer and have suffered every day first-hand, and continue to suffer, from the collateral consequences of the jury's verdict. In their letters to the Court they express their love for David Riley. All they want is for him to be given "back to his family."

### 2. David Riley's Professional Life

David Riley's professional life is in shambles and at an end. After a career in government service in the Air Force and in the Central Intelligence Agency, and after many years working in the Information Technology field for public companies, Mr. Riley has been unable to find work in that field and his ability to do so is at an end. Once a valued and capable IT professional, he now is a man unemployable in his chosen field and a man whose professional proficiency and his many accomplishments and good deeds in life cannot now provide relief from his inability to find work in his chosen profession.

### 3. David Riley's Financial Situation

David Riley's financial condition and prospective financial outlook are poor. We also recognize that there are financial consequences resulting from his conviction. A lifetime of hard work and saving is being vaporized. Since he was charged in the Complaint in 2013, Mr. Riley has had to deplete his life's savings to survive and has mounting debts.

4. David Riley's Family Health Issues

Over the last few months, David Riley's father has been hospitalized numerous times. He suffers from congestive heart failure and his condition continues to deteriorate. He is not a candidate for a heart transplant due to his worsening condition and for other medical reasons as well. His present care mostly is palliative, designed to keep him comfortable. His frequent hospital admissions are like putting bandages on a condition that has no cure and only grows worse with each passing day. His most recent hospital discharge occurred on April 18, 2015 (with an admission on April 15, 2015). A copy of his discharge summary is annexed hereto as Exhibit "1." That summary notes Mr. Riley's congestive heart failure. He was prescribed Digoxin and Metorprolol – both to lessen the discomfort of his congestive heart failure. The discharge summary concludes: "He needs additional help at home which I discussed with his son [David Riley]. He is at high risk of re-admission due to his heart renal condition 24 hour support at home would be beneficial." There are no monies to provide 24 hour support. Since the death of his father's second wife in 2003, David Riley, with some help from his half-brother, Stephen, has been supporting his father. If not incarcerated, David Riley himself will, for the most part, provide that 24 hour support.

As noted in prior filings in the case (Docket Entry Nos. 60-62), Mrs. Riley (David's wife), suffers from clinical depression. That condition has worsened with the stress of the move from California to North Carolina, the stress of the investigation, arrest and trial and now the stress of the pending sentencing. Annexed hereto are Exhibit "2" are copies of documents submitted previously in this matter (Docket Entry Nos. 60-62), documenting Mrs. Riley's

-3-

depression. Additionally, annexed hereto as Exhibit "3" is a copy of Mrs. Riley's most recent prescription for anti-depressant medication.

## B. David Riley's Earlier Life

### 1. David Riley's Childhood

David Riley had some difficulties in his childhood. Those difficulties stemmed from his parents divorce and the movements back and forth that often accompany those circumstances. Nonetheless, over the years he has maintained a loving and supportive relationship with both parents and has been a major support person (both financial and emotional) for his father as his father's health has deteriorated over these past several years.

### 2. David Riley's Schooling, Work and Professional History

David Riley received a Bachelor of Science degree from Nova Southern University in 1993, a Masters in Business Administration from Pepperdine University in 2004, and a certificate in Operations Technology and Strategy from the Massachusetts Institute of Technology in 2010.

Mr. Riley served in the United States Air Force from 1983-1987 and thereafter, served in the Central Intelligence Agency from 1987-1995. His service was honorable, at times dangerous, and always valuable and in the national interests. The details of his service, including the nature of his duties and the locations of that service stateside and abroad, are set forth in the CIPA Notice previously provided to the Court. We incorporate that Notice herein, along with the transcripts of the two sealed CIPA proceedings related to that Notice. These items explain more fully David Riley's honorable service.

After leaving government service, beginning in late 1995, Mr. Riley held a number of responsible positions at Sprint International, MCI, Riverstone Networks and Foundry Networks.

-4-

After leaving Foundry early in 2009, Mr. Riley attended MIT (as noted above) and thereafter worked at Synaptics, Inc. in San Jose, CA.

He was held in the highest regard by his colleagues and co-workers everywhere he worked.

### 3. David Riley's Charitable Activities

David Riley has lived a life of service to his country, to his family and to his community. We already have described his service to his country and to his family. Regarding service to his community, David Riley has long been active in community and charitable activities. He has been involved with Toys For Tots through the Armed Forces and local police departments (2007-2012). He supported Veterans Outreach sponsored by Synaptics (by whom Mr. Riley was employed). David donated and set up computers and networking equipment in 2012 and went on to become Ambassador to the program and visited local VA branches. He has made donations to Sankara Eye Foundation to help eradicate curable blindness in India (2005-2008). He has been a supporter of and made donations to the Iraqi Veteran Fund sponsored by Foundry Networks to help family members who lost husbands or wives in battle (2006-2008). He has made donations and provided volunteer services to the China Orphanage Fund sponsored by Synaptics to support Chinese orphans (2011-2012). He has been a supporter of the Wounded Warrior Project, Stand Up 2 Cancer, St. Jude's Children's Research Hospital. He also donated time and resources to the Special Olympics while in the Air Force, and he and his family regularly participated in Job-a-Thons and Walk-a-Thons to help raise money for various charitable causes as members of his parish church and supported his church both monetarily and with his time. Through the United Way, he has volunteered his time to teach English to immigrant children in grades K-3 (2014).

-5-

And in 2014, he also participated as a mentor and instructor, along with his son, in a "Yes We Can . . . Read" program, a program designed to strengthen young children's educational outcomes and to help build a thriving immigrant community. In that program, he and his son, both of whom are bilingual, aided young immigrant children to become literate in English. In addition to strengthening the students' reading skills, the Mentors, such as David and his son, provided the students with a caring and positive role model and literally changed lives. Both David and his son each worked with two kindergarten students for 12 weeks from February 24, 2014 through May 26, 2014. What is interesting about that service is that notwithstanding the stress and preparation for the impending trial, David still made time to give back to his community with his son and he made a difference in the lives of the students he taught, providing yet another window into the true heart and soul of the man standing before the Court for sentencing.

## II. **THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE.**

### A. **Introduction**

The Presentencing Report ("PSR") calculated an advisory Guidelines sentencing offense level of 30 for David Riley. This offense level was based on: a base offense level of 8 with an additional gain/losses avoided enhancement totaling twenty-two levels. According to the Sentencing Table in the Guidelines, this calculation of Offense Level 30 in Criminal History Category I places David Riley, as a Guideline starting point, in a sentencing range of 97 - 121 months in prison, a term that far exceeds reason in this case for this Criminal History Category I defendant. This memorandum addresses why this offense level calculation is not appropriate and why, regardless of the sentencing range calculated under the Guidelines, the Court should impose

-6-

a non-custodial sentence, which in our respectful view, is appropriate considering the factors set forth in 18 U.S.C. § 3553(a).

We start with the obvious. The Sentencing Guidelines no longer are mandatory[2] and this Court should consider whatever Guideline range it determines is applicable as only one factor in determining David Riley's sentence. *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558 (2007). The Supreme Court's decision in *Booker/Fanfan* requires sentencing courts to treat the Guidelines as but one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). As the Supreme Court held, the now revised Sentencing Reform Act ("SRA")

> requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C. § 3553(a)(4) (Supp. 2004), but it permits the courts to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a).

*Booker*, 543 U.S. at 245, 125 S.Ct. at 757.

Our view further is that the Guidelines are entitled to weight no greater than that afforded to the other factors listed in § 3553(a). Any approach that automatically gives heavy weight to the Guidelines range comes perilously close to the mandatory regime found to be unconstitutionally infirm in *Booker*.

Judge Scalia explained this point in his dissent from *Booker's* remedial holding:

> [L]ogic compels the conclusion that the sentencing judge, after considering the recited factors (including the [G]uidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise - if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed - its opinion would surely say so.

---

[2] The sentence this Court imposes on David Riley is subject to appellate review only for "unreasonableness". *United States v. Booker*, 543 U.S. 220, 261, 125 S.Ct. 738 (2005).

*Booke*r, 543 U.S. at 305-06, 125 S. Ct. at 791 (Scalia, J., dissenting in part). Likewise, if the remedial majority thought that the Guidelines had to be given "heavy weight," its opinion would have said so. The remedial majority clearly understood that giving any special weight to the Guidelines range relative to the other Section 3553(a) factors would violate the Sixth Amendment. As Justice Scalia observed more recently in his concurring opinion in *Kimbrough*, 552 U.S. at 114, 128 S. Ct. at 577, there can be no "thumb on the scales" in favor of Guidelines sentences. There is no presumption as to the reasonableness of the Guidelines sentencing ranges. *See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 596-97 (2007). *See also Nelson v. United States*, 555 U.S. 350, 351, 129 S.Ct. 890 (2009). As such, in each case a court must make an "individualized assessment" of the appropriate sentence "based on the facts presented" and the factors detailed in § 3553(a). *Kimbrough*, 552 U.S. at 114, 128 S.Ct. at 577. *See also Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) (Sifton, J.) (the "Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by §3553(a.)."). Judge Sifton based his holding in *Simon* on three important considerations: first, the SRA does not "distinguish between the weight to be given to any of the factors;" second, "the greater the weight given to the Guidelines, the closer the Court draws to committing the act that *Booker* forbids - a *de facto* mandatory Guidelines Sentence based on facts found by a preponderance of evidence by a judge;" and third, Judge Sifton recognized that there is "tension, if not conflict" between the SRA and the Guidelines. *Simon*, 361 F. Supp. 2d at 40.

In sum, as noted previously, in every case, a sentencing court must now consider all of the Section 3553(a) factors, not just the Guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing and a judge is not prohibited from including

in that consideration the judge's own sense of what is a fair and just sentence under all circumstances. Further, as one district judge has noted, "the Guidelines may be tempered by compassion." *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001) (Hellerstein, J.).

Additionally, Judges "may vary [from the Guidelines ranges] based solely on policy considerations, including, disagreements with the Guidelines," *Kimbrough*, 552 U.S. at 101-02, 128 S. Ct. at 570 (internal quotations marks omitted). *Spears v. United States*, 555 U.S. 261, 264-67, 129 S.Ct. 840, 843-44 (2009). Whether a judge may draw any useful advice from a guideline depends first on whether the Sentencing Commission in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109-11, 128 S.Ct. at 575. As described in *Rita v. United States* 551 U.S. 338, 127 S.Ct. 2456 (2007), the exercise of this role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita*, 551 U.S. at 349-51, 127 S.Ct. 2464-65. Where, as here, with respect to 2B1.1, a guideline that was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *See Kimbrough*, 552 U.S. at 109-11, 128 S. Ct. at 575. *See also Spears*, 555 U.S. at 264-67, 129 S. Ct. at 843-44 (2009).[3] Although it does not appear that Guideline 2.B1.1 was based on any

_____

[3] The court's ability to impose a non-guidelines sentence based solely on a policy disagreement with a guideline itself applies to all guidelines not just the crack guidelines at issue in *Kimbrough* and *Spears*. *See Cunningham v. California*, 549 U.S. 270 (2007), where the Court recognized that the ability of judges to sentence outside the guidelines range based solely on general policy objectives, without any fact finding anchor, is necessary to avoid a Sixth Amendment violation. *Id.* at 279-81. In *Rita,* the Court held that because guidelines may not be presumed reasonable at sentencing, sentencing judges are permitted to find that the guidelines

congressional directive, even were it to have been so derived courts are free to disagree with any

of the guidelines, including guidelines that do emanate from congressional actions. *See United*

*States v. Cavera*, 550 F.3d 180 (2d Cir. 2009)(*en banc*), *cert. denied*, 129 S. Ct. 2735 (2009). *See*

*also United States v. Seval*, 2008 WL 4376826 (2d Cir. Sept. 25, 2008); *United States v. Parris*,

573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008).

Moreover, the Guidelines as presently constituted contain anomalies in their treatment of

offenses which undermine their utility and permit a sentencing court to disagree with a particular

guideline on a policy basis. In this case, the PSR places David Riley at a total offense level 30.

However, in what essentially is a non-violent crime by a Criminal History Category I offender,

Mr. Riley is treated under the Guidelines as, or more, harshly than someone convicted of

Voluntary Manslaughter under U.S.S.G. §2A1.3 (offense level 29-3 for acceptance); Involuntary

Manslaughter under U.S.S.G. § 2A1.4 (even after trial) (offense level 12, 18 or 22 depending on

the circumstances); Assault with Intent to Commit Murder or Attempted Murder under U.S.S.G. §

2A2.1(a)(2) (offense level 27);  Statutory Rape under U.S.S.G. § 2A3.2 (offense level 18);

---

sentence itself fails properly to reflect § 3553(a) considerations, that the guidelines reflect an unsound judgment, or that the guidelines do not generally treat certain defendant characteristics in the proper way. 551 U.S. at 350-51, 127 S. Ct. 2465, 2468. In *Kimbrough*, the Court reiterated that a district judge may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps the case warrants a different sentence regardless," 552 U.S. at 570, 128 S.Ct. at 102, quoting *Rita*, 551 U.S. at 351, 127 S. Ct. at 2465, and, thus, "courts may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." 552 U.S. at 570, 128 S.Ct. at 102. While *Kimbrough* and *Gall* referred to the drug guidelines generally as not having been based on empirical data, *see Kimbrough*, 552 U.S. at 109-10, 127 S. Ct. at 575; *Gall*, 552 U.S. at 534, 127 S. Ct. at 594 n.2, *Rita* made clear that judges may disagree with any guideline. *See* 551 U.S. at 356,127 S. Ct. at 2465, 2468. Indeed sentencing courts must be free to disagree with the guidelines on the basis of policy so that judges can play their role in providing information to the Sentencing Commission so that "the Guidelines [can] constructively evolve over time." *Rita*, 551 U.S. at 109-10, 127 S. Ct. at 2469.

Robbery under U.S.S.G. § 2B3.1 (offense level 20); Robbery with Serious Bodily Injury under

U.S.S.G. § 2B3.1(b)(3)(B)(level 24); Robbery with Permanent or Life Threatening Bodily Injury

under U.S.S.G. § 2B3.1(b)(3)(D) (offense level 18); Extortion under U.S.S.G. § 2B3.2(a) (offense

level 18); or U.S.S.G. § 2B3.2(b) (Extortion with Firearm Discharge) (offense level 18 + 7 levels

for firearm discharge); Alien Smuggling under U.S.S.G § 2L1.1(a) (offense level 25); Exportation

of Arms without a Valid Export License under U.S.S.G. § 2M5(2)(1) (offense level 26); Providing

Material Support to Terrorist Organizations under U.S.S.G. § 2M5.3(a) (offense level 26);

Tampering with Consumer Products Involving Risk of Death or Bodily Injury under U.S.S.G.

2N1.1(a) (offense level 25). These are just some examples. The somewhat arbitrary nature of the

differing offense levels when juxtaposed against each other and against the PSR's Guidelines

calculations in this case for this offender, we submit respectfully, are not supported by empirical

data, simply make no sense and should be rejected on policy grounds.

     Indeed, the 2B1.1 Guidelines "loss" table used in this case was not based on pre-

Guidelines practice and the Commission appears to have adopted the "loss table" without any

empirical basis. At its inception, this Guideline called for sentences higher than pre-Guidelines

sentences and the increases in the loss tables over the years also were done without any empirical

basis. The Sentencing Commission's Supplementary Report on the Initial Sentencing Guidelines

and Policy Statements[4] discussed the lack of agreement regarding an underlying philosophy for

---

[4] *U.S. Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987) (hereinafter "*Supplementary Report*"), available at http://www.fd.org/pdf_lib/Supplementary%20Report.pdf.

the Guidelines.  As stated in a fifteen-year "look-back" and follow-up study, the Sentencing
Commissions noted that

> "the Commission, either on its own initiative or in response to
> congressional actions, established guideline ranges that were
> significantly more severe than past practice"

for the most frequently sentenced offenses in the federal courts, including white collar offenses.[5]
Further, in estimating past practice sentencing levels, the Sentencing Commission in
promulgating the initial guidelines did not include probationary sentences. *See Supplementary
Report* at 24.  This was no small omission, since nearly 40% of all defendants were sentenced to
straight probation in 1984.[6]  Here, David Riley already has been punished.  Our point, in any
event, is that the "loss" table in this case produces an overly harsh result and that imposition of a
Guidelines sentence in this case is a sentence "greater than necessary" to achieve the aims of
sentencing.

Written in another time and for a different purpose (and which I only recently was
reminded of) Albert Einstein's observation that "Not everything that can be counted counts, and
not everything that counts can be counted," we think has a particular application to this case.  A
man's life and the measure of that life cannot simply be reduced to a box on a sentencing grid
impelled by an equally uncaring slot on a "loss" table.

As the Supreme Court reminded almost 20 years ago, the "uniform and constant . . .
tradition for the sentencing judge {is} to consider every convicted person as an individual and

---

[5]*U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of
How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at
47 (2004 ) (hereinafter "*Fifteen Year Review*"), citing *Supplementary Report*.

[6]*Fifteen Year Review* at 43.

-12-

every case as a unique study in human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensure." *Koon v. United States*, 518 U.S. 81, 113 (1996). *See also United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008). It has been observed that sentencing is not an exact science. Rather it is a "fluid and dynamic process." *Irizarry v. United States*, 553 U.S. 708, 128 S.Ct. 2198 (2008). Its aim should be to impose a sentence that is reasonable and fair and just given the facts of a particular case and the facts relative to the particular person being sentenced. The overarching goal is to fashion a sentence that is sufficient, but not greater than necessary.

Further, the Court should not follow the Guidelines range set forth in the PSR both because it is in error and because it is not in line with the factors set forth in 18 U.S.C. § 3553(a), which require the court only to "impose a sentence sufficient, but not greater than necessary." *See Gall*, 522 U.S. at 39 (stating a sentencing court "may not presume that the Guidelines range is reasonable."). The Court must consider the individual defendant, David Riley, when imposing his sentence. *See Gall*, 522 U.S. at 50; *Kimbrough*, 522 U.S. at 108. This Court has the discretion under *Booker*, 543 U.S. 220; *Gall*, 552 U.S. at 38; and *Kimbrough*, 552 U.S. 85, to sentence David Riley to a sentence of probation even if the Sentencing Guidelines do not provide for it because 18 U.S.C. §3561(c)(1) authorizes probation.

As we discuss more fully herein, the Court should not impose the calculated Guidelines sentence or the Recommended sentence and should impose a non-custodial sentence on David Riley because: (1) such a sentence for this offender is sufficient, but not greater than necessary, to

-13-

comply with the purposes set forth in Section 3553(a)(2)[7]; (2) the factors that the Court must consider, which are set forth in Section 3553(a), support the non-Guidelines sentence sought herein; and (3) the PSR's Recommendation of a Guidelines sentence is the product of an erroneously high starting point and otherwise fails to give appropriate consideration to the Section 3553(a) factors.

First, a non-custodial sentence is sufficient, but not greater than necessary because: (1) David Riley already has been and is being punished by collateral consequences of his trial and conviction; (2) studies show that certainty, not severity, of punishment affords adequate deterrence to criminal conduct; (3) David Riley will have no opportunity to repeat the conduct of which he was convicted; and (4) David Riley is 49 years old, a husband and father, is in Criminal History Category 1 with zero criminal history points, he has a college education, and has never had a substance abuse problem - all factors that result in a low rate of recidivism and mitigate strongly here in favor of lenity, and are important factors not considered in the Guidelines' calculus.

Second, the Section 3553(a) factors that the Court must consider all support a non-Guidelines sentence for the following reasons: (1) the conduct on which the jury based the verdict was an aberration in the life of a decent man, (2) David Riley's characteristics indicate that he has a low risk of recidivism, (3) David Riley already has lost virtually everything, (4) alternatives to prison exist and should be used in cases such as this when, as here, they are

---

[7] The corollary to this argument is that the calculated range is far greater than necessary to promote the goals of sentencing and is out of balance with the purposes of sentencing set forth in the statute.

-14-

"sufficient," (5) the Guidelines calculation set forth in the PSR itself is in error, (6) the PSR's

Guidelines calculation is a product of a guideline not based on empirical data and the gain/loss

avoidance factor drives up the offense level disproportionately, and (7) adherence to the

Guidelines calculation in imposing sentence would result in a sentence disparate from similarly

situated defendants in similar cases.

Third, the PSR's Recommendation itself not only is the product of an unreasonably high

Guidelines starting point, but it also fails to give appropriate consideration to the Section 3553(a)

factors.

**B.**     **A Non-Custodial Sentence And Probation With Conditions Is Sufficient, But Not Greater Than Necessary, To Comply With The Purposes Set Forth In Section 3553(a)(2).**

Section 3553(a) requires a sentencing court to "impose a sentence sufficient, but not

greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

Paragraph 2 specifies that the court must consider:

> the need for the sentence imposed – (A) to reflect the seriousness of the offense,
> to promote respect for the law, and to provide just punishment for the offense; (B)
> to afford adequate deterrence to criminal conduct; (C) to protect the public from
> further crimes of the defendant; and (D) to provide the defendant with needed
> educational or vocational training, medical care, or other correctional treatment in
> the most effective manner . . . .

These purposes in this case all would be satisfied by a non-custodial sentence.

Generally, speaking, "[d]eterrence, incapacitation and rehabilitation are prospective and

societal – each looks forward and asks: What amount and kind of punishment will help make

society safe? In contract, retribution imposes punishment based on moral culpability and asks:

What penalty is needed to restore the offender to moral standing within the community?" *United*

-15-

*States v. Cole*, 662 F.Supp.2d 632, 637 (N.D.Ohio 2008). In this case, each of these purposes can be served by a non-custodial sentence. The answer to the first question is that society is safe and need have no fear of David Riley. So too, incarceration is not needed to restore David Riley to moral standing in the community. He continues to support his family's emotional needs and tries to meet their physical needs. His moral compass at this time is where it should be. Incarceration will not alter those answers.

In considering these factors, the Court should conclude that in the case of David Riley, the calculated sentencing range – erroneous in our view – and the Report's Recommendation, is still far greater than necessary to comply with these purposes of sentencing.

### 1. A non-custodial sentence is sufficient to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense.

In this case the calculated Guidelines range runs contrary to the statutory mandate that the:

> Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . .

28 U.S.C. § 944(j). As a non-violent person in Criminal History Category 1, a non-custodial sentence is appropriate and sufficient to reflect the seriousness of the offense of which David Riley was convicted and to promote respect for the law and to provide just punishment. In fact, a sentence of lengthy incarceration may undercut respect for the law. *See Gall*, 552 U.S. at 54, 128 S.Ct. at 594 ("'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing'") (quoting the district court).

-16-

Courts have varied from a Guidelines sentence when the defendant was already punished by collateral consequences of a trial and conviction. *See e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (departing downwards from guidelines where defendant already lost business due to EPA-related charges); *United States v. Soto*, No. 09-CR-292, 2010 WL 1780313, at *6 (E.D.Wis. Apr. 30, 2010) (sentencing defendant to below-guidelines sentence of one year and one day instead of 21 to 27 months based on defendant's lost employment and forced abandonment of goal to become a law enforcement officer due to his conviction); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (upholding non-guideline sentence of probation and fine for defendant convicted of filing false tax returns in part because he had already suffered substantially, and been treated for stress and the only real deterrent in this type of case was the effort of the prosecutors to enforce the laws rather than prison sentences); *United States v. Wachowiak*, 412 F. Supp. 2d 958, 963 (E.D. Wis. 2006) (granting variance in part because "the guidelines failed to account for the significant collateral consequences defendant suffered as a result of his conviction," such as ruining the offender's career and being forced to live with the stigma of being a sex offender), *aff'd* 496 F.3d 744 (7th Cir. 2007); *United States v. Hoffmann*, No. 8:05CR282, 2006 WL 3390736, at *6 (D.Neb. Nov. 22, 2006) (considering harm to defendant's reputation and stigma of felony conviction among other factors in reducing defendant's sentence from 8 to 14 months to three years of probation); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-guideline sentence for offender convicted of fraud in part because "as a consequence of his conviction and sentence, defendant lost a good public sector job, another factor not considered by the guidelines."). In such cases,

-17-

collateral consequences themselves satisfy the deterrence objectives of Section 3553(a) without the full range of punishment called for by the Guidelines. *See Gaind*, 829 F. Supp. at 671.

The substantial period of time David Riley has been involved in this matter, i.e., investigation, arrest, indictment, preparation for trial, trial, and sentencing - - all have had a dramatic effect on David Riley's life and have had a great impact on him and his family. David's son only recently asked him "when can we have our lives back." In a very real way, David Riley and his family already have served a very substantial sentence of personal turmoil and suffering and David's future prospects for employment have been diminished greatly. So too, it would appear that Mrs. Riley's employment prospects also have been diminished by the publicity surrounding this case and by information widely available on the internet. Twice Mrs. Riley has had a verbal job offer with a start date but then something changed so that the offer was rescinded.[8]

### 2. A non-custodial sentence and probation would not encourage criminal conduct.

Imposing either the calculated Guidelines sentence or that Recommended in the PSR in this case would have little, if any, bearing on deterrence. Empirical research shows no relationship between sentence length and deterrence. In a pre-Guideline study of specific deterrence, which involved white collar offenders (presumably among the most rational), no difference in deterrence was found as a result of sentence severity, including between probation and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders*

---

[8] David Riley, as a result of his conviction, will lose his ability to work as an IT professional for a public company. Not only is this a serious collateral consequence, but removal of David Riley from the IT areas of public companies also dramatically reduces even the remotest possibility of recidivism.

*Convicted of White Collar Crimes*, 33 Criminology 587 (1995). *See also* Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").[9] "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms. Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

In addition to the ineffectiveness of imprisonment on deterrence, an over-emphasis on general deterrence poses the ethical problem of punishing one person to promote deterrence of others. "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never to be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, *The Science of Right* 195 (W. Hastie trans., 1790).[10] General deterrence simply is not a

---

[9] A summary of the Von Hirsch report is available at http://members.lycos.uk/awnet/ SENTENCE.pdf.

[10] The practical problem of the high cost of imprisoning an individual also is a consideration militating in favor of a non-custodial sentence with probation supervision. In 2008, the cost of imprisoning an individual was $25,894.50 per year. *See Costs of Imprisonment Far Exceed Supervision Costs*, available at http://www.uscourts.gov/News/NewsView/09-05-12/Costs_of_Imprisonment_Far_ Exceed_Supervision_Costs.aspx. In 2012, the annual cost of imprisoning an individual was $28,948.00 per year. *See Supervision Costs Significantly less than incarceration in Federal system*, available at http://news.uscourts.gov/supervision-costs-significantly-less-than-incarceration-in-federal-system. In comparison, its costs $3,347.41 for

-19-

good reason for a lengthy prison term. *See Cole*, 662 F.Supp.2d at 637. Taken together, these considerations support our view that a sentence of probation with conditions is appropriate and sufficient in this case.

Lastly, to the extent there is any need for general, as opposed to specific, deterrence, that need has long been satisfied by the publicity widely trumpeted by the United States Attorney's Office and in the media reporting on the over 80 securities fraud convictions obtained by that office. Given all that he already has lost, it would hardly be a blow to any concepts of general deterrence were David Riley to be given a sentence of probation with conditions.

3. A sentence not requiring incarceration is sufficient to protect the public from future wrongdoing by David Riley.

*a. Lack of means.*

In imposing a sentence on David Riley that protects the public from any future criminal conduct, the Court should consider that he will not have any opportunity to engage in the conduct which underlies the verdict. Given his conviction, David Riley will not be hired as a CIO of any public company. As noted by one court, a defendant is substantially incapacitated from committing future crimes of fraud after losing his employment and professional licenses. *See United States v. Olis*, No. H-03-217-01, 2006 WL 2716048, at \*13 (S.D. Tex. Sept. 22, 2006). David Riley has no intention of committing a future crime and has no means to do so -- the public need have no concerns regarding David Riley.

*b. Low risk of recidivism.*

---

supervision. Placing an offender in a Bureau of Prisons institution was roughly eight times the cost of placing the same offender under post-conviction supervision by a federal probation officer.

The facts of David Riley's background and personal history are indicative of the documented statistical conclusion that he has an almost zero risk of recidivism. The Court should consider this low risk of recidivism in assessing the need to protect the public from any future crimes by David Riley. *See United States v. Ruiz*, No. 04CR.1146-03, 2006 WL 1311982 at \*4 (S.D.N.Y. May 10, 2006) (noting courts have imposed non-guidelines sentences for defendants based on age due to markedly reduced recidivism risk); *Gardellini*, 545 F.3d at 1091 (affirming district court's sentence of a fine and five years of probation rather than 10 to 16 months of imprisonment under the guidelines based in part on defendant's low risk of recidivism); *Hoffmann*, 2006 WL 3390736 at \*6 (because of defendant's low risk of recidivism, court sentenced defendant to three years of probation instead of 8 to 14 months under guidelines); *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at \*3 (N.D. Ind. Feb. 3, 2005) (in consideration of defendant's age and lower risk of recidivism, court reduced sentence from 168-210 months to 108 months).

The Sentencing Commission has published studies concluding that the Guidelines overstate the risk of recidivism and that, on the contrary, "there is no correlation between recidivism and [a] guidelines' offense level." *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) available at http://www.ussc.gov/publicat/Recidivism_General.pdf ("Measuring Recidivism"); *Recidivism and the First Offender* (May 2004) available at http://ussc.gov/publicat/Recidivism_General.pdf ("First Offender"); *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4 2005) available at http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf. "The guidelines' offense level

-21-

is not intended or designed to predict recidivism." *See* USSC, *Measuring Recidivism*, at 15. The

Sentencing Commission itself has found that "[t]here is no correlation between recidivism and

guidelines' offense levels whether an offender has a low or high guideline offense level,

recidivism rates are similar.  While surprising at first glance, this finding should be expected.

The Guidelines offense level is not intended or designed to predict recidivisim." *See Measuring*

*Recidivism* at 15, http://www.ussc.gov/publicat/Recidivism_General.pdf.  Conversely, the

Commission's own studies have shown that the following factors, consideration of which the

Guidelines either prohibit or discourage, *do* correlate with reduced recidivism:

- Age:  Recidivism rates decline consistently as age increases. *Measuring Recidivism* at 12;

- Education:  Recidivism rates decline with increased education level, with college graduates having the lowest rate of recidivism. *Id.* at 12;

- Family:  Recidivism rates decline for defendants who have families. *Id.*  Mr. Riley has a wife and teenage son whom he loves without limit, and who are supportive of him.

- Abstinence from Drug Use:  Recidivism rates are lower for offenders who did not use illegal drugs for one year prior to the offense. *Id*. at 13; David Riley has no history of illegal substance use;

- Non-Violent Offenders:  Offenders sentenced under the fraud guidelines are the least likely to repeat criminal activity. *Id.*;

- First Offenders:  The rate of recidivism for first offenders is 11.7%, compared with 22.6% for defendants with one criminal history point and 36.5% for

defendants with two plus criminal history points. *See First Offender* at 13-14.

David Riley has no criminal history points and is a first offender.

Taking these factors in turn, David Riley is 49 years old. He has an education and professional degrees. He has a supportive wife and a teenage son. He has no drug use issues. The offenses for which he was convicted are non-violent. He has no criminal history prior to this offense. An analysis of these factors demonstrates that David Riley has an extremely low risk of recidivism and thus, a custodial sentence is not called for to protect the public and prevent future criminal activity. Indeed, Congress has directed that, in considering whether and to what extent imprisonment is appropriate based on the § 3553 (a) factors, a sentencing judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C § 3582.

## C. The Remaining Section 3553(a) Factors, Which the Court Must Consider, Support a Non-Custodial Sentence

Section 3553(a) requires a sentencing court to consider additional factors when determining its sentence. These additional factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the range established by the Sentencing Guidelines, any pertinent policy statement from the Sentencing Commission, the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims. Consideration of these additional factors supports a non-Guidelines and non-custodial sentence.

### 1. The nature and circumstances of the offense support a non-custodial sentence for David Riley.

-23-

Section 3553(1) requires a sentencing court to consider the circumstances of the offense when imposing a sentence. A sentencing court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented." *Gall*, 522 U.S. at 48-9. We are not unmindful of the fact that David Riley stands convicted of serious offenses. Nonetheless, in our respectful view, consideration of all of the circumstances of the offense supports a non-custodial sentence.

*a. Certain conflicts in the evidence support a non-custodial sentence.*

The court should consider certain conflicts in the evidence regarding the offenses of which David Riley was convicted as a reason for a non-Guidelines sentence. That is not to reargue herein the jury's verdict but only to point out certain facts which the undersigned believes mitigate the offense conduct. Courts have granted variances from the Sentencing Guidelines where a defendant's conduct in the offense was mitigated, even in cases where a downward adjustment for playing a lesser role was already factored in. *See United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (securities fraud defendant sentenced to 42 months rather than life in part because defendant did not participate in conspiracy until final months).

Here, as the evidence shows, there were conflicts, which admittedly at least some of which the jury found against David Riley. Nonetheless, these conflicts, we submit, mitigate somewhat the offense conduct. For example, the jury was presented with evidence regarding the tip charged to have been given on April 3, 2008 that was in conflict with the fact that the change in trading strategy, which the Government alleged, occurred before David Riley ever met with Mr. Teeple or that day. David Riley's access to information in the "BBB" database also was in

-24-

sharp dispute and not resolved definitively in the evidence.[11] Additionally, the jury was unable to

reach a unanimous verdict on Count Four,[12] and made no specific finding on any count regarding

the gains/losses avoided amount for which David Riley should be held accountable. Lastly,

while the jury found personal benefit, any personal benefit was quite minimal and, contrary to the

statement in the PSR's Recommendation, David Riley's actions simply were not motivated by

greed.

### b. David Riley had little motive to commit the offense.

A sentencing court must consider motive as part of the nature and circumstances of the

offense in analyzing the factors set forth in Section 3553(a). *United States v. Mahan*, No. 05-

1518, 2007 WL 1430288, at *3 (10th Cir. 2007). *See also Wisconsin v. Mitchell*, 508 U.S. 476,

485 (1993) (concluding a defendant's motive is relevant at sentencing). Courts have departed or

varied from the sentencing guidelines where a fraud defendant had a motive other than personal

---

[11] Information in "BBB" was a sales order tracking tool. It was not audited, and, as such, could not have been financially material. If it was material, "SOX" would have required that it be audited.

[12] Apart from the fact that the evidence on Count 4 was thin, at best, and rested on the pure speculation that because a meeting had been cancelled – which there was no evidence David Riley even knew about – David Riley had to know and in turn provided that alleged inside information to Teeple, conduct for which a defendant has not been convicted, should not be considered either in reaching an appropriate Guidelines calculation or in imposing sentence. *See United States v. Gupta*, 904F. Supp.2d 349, 352, fn. 1 (S.D.N.Y. 2014); cf., *United States v. Frias*, 39 F.3d 391, 393 (2d Cir. 1994) (As noted by Judge Oakes in his concurring opinion, "a person's sentence for crimes of which he has been convicted may be multiplied fourfold by taking into account conduct of which he has been acquitted. This is jurisprudence reminiscent of *Alice in Wonderland*. As the Queen of Hearts might say, 'Acquittal first, sentence afterwards.'"). Imposition of a sentence based on conduct of which a defendant has not been found guilty runs the risk of trivializing a jury's verdict, *see United States v. Pimental*, 367 F.Supp.2d 143 (D.Mass. 2005), and that concept should apply both where a jury has rendered a not guilty verdict and where it has been unable to reach a verdict at all. *See United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997).

financial gain. *See e.g.*, *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11, 1312 (E.D. Wis. 2005); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005).[13]

Here, David Riley had no apparent motive to commit any offense. He received nothing. Any personal benefit which he is alleged to have received was *de minimis*.[14] He had some assets, a strong educational background and a good work history. He previously had withdrawn himself from consideration for a CIO position at Marvel and would not have had difficulty in finding a fulfilling position after the Foundry-Brocade merger.[15]

> 2. The history and characteristics of David Riley support a non-custodial sentence.

Section 3553(1) also requires a sentencing court to consider the history and characteristics of the defendant when imposing a sentence. The sentencing Judge "has greater familiarity [than

---

[13] *See also United States v. Samuels*, No. S 108 Cr. 08-03, 2009 WL 875320 at *1 (S.D.N.Y. Apr. 2, 2009) (imposing time served rather than guideline range of 70-87 months where defendant sold narcotics for economic reasons and dropped out of school to support her family); *United States v. Collado*, No. 07 Cr. 1144, 2008 WL 2329275 at *2 (S.D.N.Y. June 5, 2008) (imposing time served, supervised release and community service where defendant did not turn in ammunition he found to authorities because he thought his possession would be suspect).

[14] The stocks purchased and which the Government alleged were based on "tips" from Teeple, were in fact based on David Riley's own research, and available public information. Exhibits offered but excluded at trial demonstrated the public information available at the time and which fully supported the stock purchases.

[15] Interestingly, in his sentencing memorandum (Docket Entry #189 at pp. 35-36) Teeple made the following point: "Mr. Teeple did not buy this information from Mr. Riley, 'bribe' him in any conventional sense of the word, or engage in any express non-monetary *quid pro quo* arrangement. . . ."

Teeple described their relationship as a "friendship," *Id.* at 35, fn. 18, and that he and David Riley were both "long-term technology industry veterans who shared an intense interest in the esoteric products that comprise computer network infrastructure" and "would get together to discuss emerging technologies and the products that I.T. managers, like Mr. Riley, were interested in purchasing." *Id.* at 24.

-26-

the Sentencing Commission] with the individual case and the individual defendant before him ...

[and] is therefore in a superior position to find facts and judge their import under § 3553(a) in

each particular case." *Kimbrough*, 522 U.S. at 108, 128 S.Ct. at 574 (internal quotations and

citations omitted). In imposing sentence, we ask the court to consider that the offense was an

aberration in the conduct of David Riley's life and that his age, and family ties demonstrate that

incarceration in this case is neither necessary nor warranted.

> a.      *The offenses of conviction were an aberration – atypical, in David
> Riley's life.*

In 28 USC § 994(j), Congress directed the Sentencing Commission to "insure that the

guidelines reflect the general appropriateness of imposing a sentence other than imprisonment"

in cases of non-violent first-offenders. Additionally, Section 5K2.20 of the Sentencing

Guidelines provides that aberrant behavior is a basis for departure in limited circumstances where

the defendant committed a single criminal occurrence or transaction without significant planning

and of limited duration. Using their post-*Booker* discretion, however, courts have concluded that

this departure for aberrant behavior should not be so limited because the Commission failed to

fulfill its institutional role of considering empirical data or policy questions relevant to how first-

time offenders should be punished. *United States v. Germosen*, 473 F. Supp. 2d 221, 228-9 (D.

Mass. 2007) (stating Commission "*did not* study the relationship between the varying court

definitions of aberrant behavior and the statutory purposes of sentencing . . . evaluate alternatives

to incarceration for non-violent offenders," or explain why it drew various lines and adopted

various exclusions and definitions) (emphasis in original); *Spears v. United States*, 552 U.S. 261,

264-66 (2009) (stating when Commission fails to fulfill its institutional role court can vary from

-27-

guidelines based on policy disagreement and not just determination that they result in an excessive sentence).  Thus, as noted earlier in this memorandum, courts have varied from the calculated Guidelines range for defendants who were first-time offenders and who had led otherwise decent lives. *See United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (affirming sentence of probation and home confinement for wire fraud conviction despite 18-24 month guideline range where offense was "isolated mistake" in upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (upholding 6 level departure where defendant was "law abiding citizen who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 at *5 (S.D.N.Y. June 5, 2008) (imposing time served where first-time offender had history of long marriage, working many jobs to provide for six children, and being actively involved with his children's education).  As discussed elsewhere in this memorandum, apart from his conviction in this case, David Riley has led an honorable and decent life, defined by love of country and family and guided by charity towards others.  When fashioning an appropriate sentence, this Court should consider the fact that these offenses were an anomaly in the life of David Riley. *See United States v. Gupta*, 764 F. Supp 2d. 349, 354-55 (S.D.N.Y. 2014), an insider trading case where the Court concluded that the conduct at issue was aberrant - - not as defined by the U.S. Sentencing Guidelines, but rather as defined in the dictionary as "atypical."  Such plainly is the case here, and warrants a non-Guidelines sentence.

> b. *David Riley's family circumstances support a non-custodial sentence.*

In determining an appropriate sentence, the court should considering David Riley's age and family circumstances.[16]  In the context of departures, Guideline 5H1.1 recognizes that one's extraordinary family circumstances may provide a basis for a Guidelines variance.  However, under *Booker*, even if not extraordinary, family circumstances are factors which may militate against incarceration and which a court may rely on in considering the § 3553(a) factors to ameliorate in particular cases the harshness of the Guidelines.  *See United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (remanding case because advanced age, military service, health issues, and employment history could warrant variance under 3553(a).

Consideration of David Riley's age and family circumstances support a non-custodial sentence. As discussed previously, David Riley is 49 years old.  His wife suffers from clinical depression.  His father is gravely ill.  These factors, combined with other characteristics of David Riley, support imposition of a non-custodial sentence with Probation and supervision and even home confinement, if the Court were to find that necessary.

Additionally, David Riley is and has been a devoted and contributing member to his family, community and country.  The Sentencing Guidelines allow for a departure from a Guidelines sentence on the basis of loss of caretaking or financial support of family in extraordinary circumstances, *see* Guideline 5H1.6, and courts have granted departures and/or variances from Guidelines sentences based on family ties and responsibilities.  *See Davis*, 2008

---

[16] Courts must consider all Section 3553(a) factors, including those that the Guidelines reject, ignore, or demand to an extraordinary degree. *Booker*, 543 U.S. at 220; *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Pursuant to 18 USC § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

WL 2329290, at *2 (imposing time served where defendant was married 15 years, devoted to education of 6 children, and incarceration would deny them care and guidance needed).[17]   Courts also have granted departures and/or variances from guidelines sentences after considering community ties/contributions and military service, *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming 6 level downward departure where defendant served in Marine Corps' reserves 20 years ago, and performed exceptional public service and good works); *United States v. Greene*, 249 F. Supp. 2d 262 (S.D.N.Y. 2003) (granting seven level departure in tax case where defendant performed extraordinary charitable good works and had extraordinary family circumstances); *Wachowiak*, 496 F.3d at 754 (affirming non-guideline sentence in part because record showed defendant was kind and caring with support of family, friends and colleagues).   Under Section 3553(a), here also, the circumstances need not be extraordinary to merit a court's favorable consideration.   David Riley is and has been a contributing member of his community with strong family ties to his wife and their teenage son, to his ailing father and to his many former colleagues and friends.   Copies of letter of support are annexed hereto as Exhibit "4".

---

[17] *See also Howe*, 543 F.3d at 137 (affirming sentence of probation and home confinement for conviction of wire fraud where district court based variance in part on defendant's devotion to his family); *United States v. Antonakopoulos*, 399 F.3d 68, 82 (1st Cir. 2005) (district court may consider defendant's role as caretaker for brain-damaged son even though alternative means of care available); *United States v. Dominguez*, 296 F.3d 192, 194 (3d Cir. 2002) (district court erred in saying it could not depart 4 levels for bank fraud defendant who lived with elderly parents who were physically and financially dependent on defendant); *United States v. Munoz-Nava*, 524 F.3d 1137, 1141-42 (10th Cir. 2008) (court varied from guideline sentence in part because defendant was sole supporter of eight-year old son and elderly parents); *United States v. Prisel*, No. 07-3281, 2008 WL 4899451 at *8 (6th Cir. Nov. 13, 2008) (unpub) (court varied from guideline range where defendant worked from home and had a dependant wife with whom he had a joint mortgage).

In her letter to the Court, Lays Riley gives a truer picture of David Riley. She describes some of David's many and simple acts of kindness and speaks of David as "someone that really cares not only about his family, but those of others." He was a mentor to many. And she describes in vivid detail the trauma and circumstances of David Riley's arrest at their home, in front of her, their son and her elderly mother, punishment enough for any man and more so for a man of sensitivity, as David Riley is. Mrs. Riley comments on her own depression and the medications she has been taking and David Riley's role as a caregiver to her, to their son, to David's father and many others whom David has supported in his charitable activities with veterans and children. She concludes her letter with this heartfelt plea:

> "It is my sincerest desire that you consider these facts in his sentencing. I also plead with you to give my husband back to his family, and consider what he and his family have already gone through. My husband has paid a very high price. We are a small family that needs to pick up the broken pieces, heal and start over."

David Riley's son also describes his father in warn and loving words. He describes how David "always thinks of us, his family, first," and how David has taken action to aid and assist family members sick or in need, veterans and needy children. David Riley's father (also David) describes his physical aliments and the help that David Riley has been to him and how David Riley "always puts family and friends first, and would give the shirt off his back if that is all he had." He concludes his letter with this plea:

> "Your Honor, God can take me any day now. I need my son and he needs to support his family and be part of our lives. It is hard to explain how important he is to me and his family right now. I know he was charged and convicted of passing company information. My son was in the Central Intelligence Agency for nine years and we never knew nor has he ever told anything about

-31-

> his job. I would do anything for my children and not too proud to
> beg for leniency. He has been a wonderful son . . . ."

David Riley's half-brother Stephen, writes and also asks for "compassion and mercy" for

his brother. He describes David Riley's help for their father and with an open heart expresses

their need now more than ever to have David in their lives.

His friends and former colleagues also speak highly of the person that David Riley is.

Prashanth Prahlad speaks of David's kindness towards others and many of David's charitable

efforts. Andy Rafeedie speaks of David's "considerate and caring" nature, and describes David

as a person "who has constantly looked out for others." He also comments on David's "deep

respect and love for his family." He asks the Court to "consider the positive things David brings

to the world." Eric Kwok, another friend and former co-worker, speaks of David's sacrifices at

work and David's "strong sense of duty . . . in his job, family and community." He too recounts

the suffering that David and his family have gone through over the course of this case and

concludes that David "deserves a chance to set his life back on track." Others voiced similar

sentiments (Jim Arnold, Todd Gower, Janie Hargett Appleman, Edwards Pitts and Cliff Moore).

Their letters are also annexed as part of Exhibit "4."

For the reasons expressed in these letters, along with the many other reasons discussed

herein, the court should depart and/or vary from the Guidelines sentence on account of David

Riley's family responsibilities and military service and his past contributions to the greater

national interests of his country and to the more local communities in which he has lived.

-32-

3.    Considering the kinds of sentences available, this Court should impose a
      non-custodial sentence on David Riley.

Section 3553(a)(3) requires sentencing courts to consider the kinds of sentences available

when imposing a sentence, even if under the Guidelines the only permitted or encouraged

sentence would be prison. *See Gall*, 552 U.S. at 602 & n. 11, 594 (finding court did not abuse

discretion in imposing three years of probation where guidelines calculated range of 30-37

months).  Congress has encouraged non-custodial sentences whenever warranted. *See* S. Rep.

No. 98-225 at 59 & n. 531 (stating "if an offense does not warrant imprisonment for some

purpose of sentencing, the committee would expect that such a defendant would be placed on

probation."); *see also* 28 U.S.C. § 994(j) (which encourages non-custodial sentences for non-

violent first-offenders).

For the many reasons addressed in this submission, the Court should impose a non-

custodial sentence on David Riley, a non-violent first-time offender, which we respectfully

submit is the only sentence that would be "sufficient, but not greater than necessary."   Such a

sentence would save taxpayers money where there is no risk to the public and allow David Riley,

who already has suffered and been punished, to continue to contribute to his family and

community.[18]

---

[18] Even a sentence of probation is punitive.  In *Gall* the Supreme Court emphasized that a
non-incarcerative sentence does not mean "letting an offender off easily."  The Court wrote:

> We recognize that custodial sentences are qualitatively more severe
> than probationary sentences of equivalent terms.  Offenders on
> probation are nonetheless subject to several standard conditions
> that substantially restrict their liberty.  Probationers may not leave
> the judicial district, move, or change jobs without notifying, and in
> some cases receiving permission from, their probation officer or
> the court.  They must report regularly to their probation officer,

-33-

4.  <u>After considering the Guidelines sentencing range in this case, the Court should vary from the Sentencing Guidelines and impose a non-custodial sentence on David Riley.  Additionally, we respectfully submit that the range calculated in the PSR is in error.</u>

   a.  *The Sentencing Guidelines are not mandatory and are only one factor to be considered when imposing a sentence.*

As noted above, the Supreme Court has made clear that sentencing courts must treat the

Sentencing Guidelines as only one of the number of sentencing factors set forth in 18 USC §

3553(a).  *See Booker*, 543 U.S. at 220.  There is no presumption of reasonableness of the

Guidelines range, *Gall*, 552 U.S. at 49, and there can be no "thumb on the scales" in favor of a

Guidelines sentence.  *Kimbrough*, 552 U.S. at 577.  *See also Simon*, 361 F. Supp. 2d at 40 (the

"Guidelines are advisory and entitled to the same weight accorded to each other factor that the

Court is instructed to consider by § 3553(a).")

---

permit unannounced visits to their homes, refrain from associating
with any persons convicted of a felony, and refrain from excessive
drinking.  Most probationers are also subject to individual "special
conditions" imposed by the court.

552 U.S. at 59.

-34-

> *b.*     *The Pre-Sentence Report contains specific errors that result in a miscalculated offense level for the offense conduct.[19]*
>
> > i)     The Gains/Loss Calculation Is In Error. The Gains/Loss Avoidance Is Overstated.

Under the Sentencing Guidelines and Second Circuit case law, loss for sentencing purposes is generally the greater of a) "actual loss" that is "reasonably foreseeable" or b) "intended loss." U.S.S.G. § 2B1.1, cmt. n. 2; *see also United States v. Canova*, 412 F.3d 331, 354 (2d Cir. 2005) ("if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than actual loss") (quoting § 2F1.1, cmt. n. 8, which was re-codified in § 2B1.1). U.S.S.G. § 2B1.4 applies in an inside trading case and then utilizes the . . . § 2B1.1 "loss" table to place the "gains" from the inside trading to arrive at an offense level. The "Background" commentary to § 2B1.4, in turn, speaks of "the total increase in value *realized* through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information." (Emphasis added). Given this commentary, two points come to the fore. First, an increase in value or loss avoided must be *realized.* Second, the gain/loss avoided must be realized by someone acting in concert with the defendant or by the person to whom the defendant provided the information. Given that David Riley is alleged only to have provided information to Teeple and Teeple himself did not trade on that information, our argument, based on the language of the Guideline, is that there was no gain realized by the person

---

[19] Paragraphs 9 through 24 of the PSR describe the Government's version of the offense. Given that David Riley pled not guilty, disputed the Government's allegations at trial, put on a defense and plans to pursue an appeal, he objects to all statements in the "Offense" section of the PSR that are inconsistent with David Riley's defense at trial or which suggest that he is guilty of the charged offenses. Other specific minor factual corrections are set forth in the letter sent to Probation and dated April 3, 2015, a copy of which is annexed hereto as Exhibit "5."

to whom the defendant provided the information, and David Riley had no contact with either Artis

to Teeple's friends and did not act in concert with them. There was no evidence that David Riley

knew that Teeple worked at Artis. Granted there was a single email, GX 4101, wherein David

Riley stated that Teeple "works *with* several fund (Hedge and Mutual) managers with a primary

focus on Silicon Valley tech companies," but that did not prove that David Riley knew that

Teeple worked for or at Artis or that Artis or any hedge or mutual fund manager that Teeple

worked with, would receive the information from Teeple and then trade on it. Further, as noted,

Artis did not act in concert with David Riley as Riley had no contact with Artis and did not know

of its existence or its role in the case so that prong of the commentary is not a basis on which to

impose the gain on David Riley. Apart from the slender reed on which the PSR seeks to place the

entirety of the purported gain on Riley, we note that, while the jury convicted the defendant of

securities fraud, there was no determination of a gain/loss avoidance amount; we think the amount

chosen by Probation in the PSR is too high.

　　　In any event, the PSR calculates a gains/loss avoidance greater than $36,000,000. This

results, according to the PSR, in a 22-level Guidelines enhancement pursuant to U.S.S.G. 2

B1.4(b)(1) and 2 B1.1(b)(L). Quite apart from our argument that David Riley should not be

saddled with this amount, for the reasons set forth below and in the chart annexed hereto as

Exhibit "8", it is our view that these calculations are not correct.

　　　What the PSR (and the Government) has done here is to take the stock price at an alleged

tip date/time and then compare that price to the stock price at the time of a public announcement

and say that subtracting one from the other yields a gain or a loss avoided equal to the amount of

the difference, without a complete analysis of what gain or loss avoidance, if any, actually was

-36-

*realized*, which, pursuant to the commentary, is the measure of the gain or loss avoided. That can be determined only by examining the acquisition price of the stock and the sales price, and as we set forth in Exhibit "8," the method outlined in the PSR results in a gain/losses avoided amount much greater than warranted.

        ii)     The Gain/ Loss Avoidance Was Not Reasonably Forseeable.

However, as we have noted above, the evidence did not establish any awareness on the part of David Riley that Teeple would pass any information on to his friends or to Artis, and that they then would trade on it, and certainly not to the magnitude that was done. None of this was forseeable to David Riley. We think that the "Background" commentary to 2B1.4 brings some measure of forseeability into the equation in that it imposed liability only for the gains/losses avoided of the person to whom the information was given or those acting in concert with the tipper. *See* U.S.G.G. § 1B1.3(a)(1)(B). For that reason, *United States v. Kluger*, 722 F.3d 549(3d Cir. 2013) does not require a contrary result such that David Riley would be held responsible in the Guidelines calculation for gains/losses avoided by Teelpe's friends and by Artis. In *Kluger*, the Court held that forseeability was not necessary because the Guideline 2B1.4 in the commentary specifically states that a defendant is responsible for the gains/losses avoided incurred by the person to whom the tip was given and persons with whom the defendant acted in concert. Kluger passed the information to Robinson, who passed it to Bauer, who used the information to acquire stock for himself, for Robinson and for Kluger. Thus, Kluger was held responsible for all the trading, not an unfair result since Kluger himself was the beneficiary of some of the stock purchases and plainly acted in concert both with Robinson and with Bauer.

-37-

Here, bycontrast, David Riley had no dealings with Artis, was not the beneficiary of any stock purchase by Artis (or by Teeple's friends) and did not act in concert with Artis. In fact David Riley had no knowledge of Artis and did not know it even existed. Additionally, for the reasons which follow, we think that even if calculated correctly in the PSR, the huge enhancement for gain/losses avoided calculated and used in the PSR, should not drive the sentencing in this case.

> c.     *The "loss" factor in the Sentencing Guidelines drives up the offense level for white collar crimes disproportionately and should not be followed.*

Whatever gain/loss avoided amount is determined by the Court to be applicable here, we believe that the emphasis on this metric in the Guidelines does not square with the other § 3553(a) factors. For that reason (and others), Judges "may vary [from the calculated guideline range] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 707 (internal quotations omitted). Whether a Judge may draw useful advice from the Guidelines depends on whether the Sentencing Commission acted in "the exercise of its characteristic institutional role" in promulgating the guideline. *Id.* at 575. This role has two basic components, to wit, reliance on empirical evidence of pre-Guidelines sentencing practices and review and revision after taking into account sentencing data, judicial decisions and comments from those in the field. *See Rita v. United States*, 551 U.S. 338, 349-50 (2007). The "loss" Guidelines were not developed by the Sentencing Commission based upon "empirical data and national experience," and thus it is not an abuse of discretion for a court to conclude that the § 2B1.1 "loss" guideline results in a sentence "greater than necessary" to achieve the purposes set forth in § 3553(a). *See Kimbrough*, 552 U.S. at 575; *see also Spears*, 555 U.S. at 264-66 (2009) (explaining when Commission fails to fulfill its institutional role, a district court can vary from

-38-

the guidelines based on policy disagreement). The "gain"/"loss avoidance" Guidelines used in

this case were not based on pre-Guidelines practice and the Commission adopted the "loss" table

contained within the Guidelines with no empirical basis.

In fact, "loss" based Guidelines have been widely criticized by judges and legal scholars.

As stated in one opinion, the Guidelines "in an effort to appear 'objective,' tend to place great

weight on putatively measurable quantities, such as . . . [the] amount of financial loss in fraud

cases, without, however, explaining why it is appropriate to accord such huge weight to such

factors." *Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), citing Kate Stith & Jose A.

Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). *See also*

Derek R. Vollrath, *Losing the Loss Calculation: Toward a More Just Sentence Regime in White-*

*Collar Criminal Case*, 59 Duke L.J. 1001, 1025 (2010) ("The Guidelines fail to achieve justice in

white-collar criminal cases. Their sentencing recommendations are irrationally high and, due to

the Guidelines' overemphasis on the loss calculation, fail to accurately reflect a defendant's

culpability"). Courts have found Guidelines increases based on loss in fraud cases to defy

common sense. *See Adelson*, 441 F. Supp. 2d at 509 (criticizing "the inordinate emphasis that the

Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss");

*United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-8 (S.D.N.Y. 2004) (reasoning amount of

loss is often "a kind of accident" and therefore "a relatively weak indicator of [ ] moral

seriousness . . . or the need for deterrence." *United States v. Parris*, 573 F. Supp. 2d 744

(E.D.N.Y. 2008) (recognizing Guidelines range of 360 months to life resulting from increases

caused by Guidelines amendments passed after highly publicized frauds such as Enron defied

common sense in that securities fraud case and imposed 60 months sentence); *see also* Frank O.

Bowman III, *Sentencing High-Loss Corporate Insider Frauds after Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039 at *4 (Feb. 2008) ("since Booker, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient but not greater than necessary' to comply with its objectives").

More recently, in *United States v. Gupta*, 904 F. Supp.3d 349 (S.D.N.Y. 2012), an insider trading case, Judge Rakoff, repeated his concerns, expressed earlier in *Adelson*, with the application of the Guidelines' "loss" table and its disproportionate and unrealistic effect of the measure of an appropriate sentence in an insider trading case. In words appropriate here, Judge Rakoff stated:

> "Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results."

*Id.* at 350.

Regarding the specific Guidelines to be applied in securities fraud cases, Judge Rakoff noted that "[t]he Guidelines' calculations for this offense [insider trading] are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data." *Id.* at

351.

Judge Rakoff went on to conclude that in focusing largely on the amount of monetary gain or loss occasioned by an offense, the Sentencing Commission "effectively ignored the statutory requirements that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Id.*

What Judge Rakoff called the "irrationality of this approach," is likewise present here where over two-thirds of the total of 30 offense levels determined by the PSR to be applicable, "are exclusively" the product of Artis' and Teeple's friends' monetary gain (or loss avoidance), in which David Riley "did not share in any direct sense." *Gupta* at 350-51. All of which, in Judge Rakoff's view, created "in the name of promoting uniformity, a sentencing disparity of the most unreasonable kind." *Id.* at 351.

In drilling down farther on this issue, Judge Rakoff noted further that "Congress has never treated it [insider trading] as a fraud on investors, the Securities Exchange Commission has explicitly opposed any such legislation, and the Supreme Court has rejected any attempt to extend coverage of the securities fraud laws on such a theory." *Id.* (citation omitted). Under Judge Rakoff's analysis "[i]n the eye of the law," David Riley's offense of conviction "was to breach his fiduciary duty of confidentiality" to Foundry. *See Id.* at 352. Put another way, Judge Rakoff would conclude here that Foundry and not the marketplace was the victim of the offense. *Id.* Yet, as observed by Judge Rakoff in *Gupta*, "the Guidelines assess . . . punishment almost exclusively on the basis of how much money" others gained by trading on the information. According to Judge Rakoff, "this is a very rough surrogate for the harm to Foundry." *Id.*

-41-

We think that Judge Rakoff's analysis of the place of the "loss" factor in sentencing hits

the mark. For all of the reasons set forth herein, the Guidelines here should not be determinative

of the sentence to be imposed. Such a disjunct between the Guidelines and the Section 3553(a)

factors is present in this case.

### 5.    Imposing a non-Guidelines and non-custodial sentence on David Riley will not result in unwarranted sentencing disparities.

Imposition of a non-Guidelines and non-custodial sentence on David Riley will not create

sentencing disparities. In fact, imposing a Guidelines sentence would likely result in a

sentencing disparity given the significant departures and variances from the Guidelines that

Judges have imposed in other insider trading cases in this district.

We have annexed hereto as Exhibit "6 " a chart submitted by counsel for Teeple in

connection with Teeple's sentencing which charts the sentences imposed in many of the recent

insider trading cases in this district. (See Docket Entry No. 189-4). Not surprisingly, in most of

those cases the Courts imposed a non-Guidelines sentence, and, in many of those, a sentence

substantially below the otherwise applicable Guidelines sentencing range. Similarly, in *United

States v. Peterson*, 11 Cr. 665 (RPP), a case instructive here, involving an outside director of a

public company who disclosed its not yet announced merger, Judge Patterson, to whom this case

had been assigned, declined to sentence within the advisory Guidelines range of 12-18 months

and instead imposed a sentence of two years of probation and three months of home

confinement, stating:

> I'm making that determination based on the content of the
> presentence report, which shows that he engaged in a number of
> civic activities not as a figurehead, but as a participant, a person
> who gave of himself, not just of his wallet, and engaged in

-42-

> community activities to help his community. And that's
> significant. The record is – and he's done that throughout his life
> from what I gather.

Peterson's Sentencing Transcript at 19 annexed hereto as Exhibit "7 ".

Nor can nor should David Riley be compared in any meaningful way with Teeple. While

Teeple pleaded guilty, his activities were far more egregious and far more widespread. First,

Teeple received an enormous and direct monetary gain in the form of a $2 million signing bonus

with Artis and appreciation in his own Artis accounts. Second, Teeple's conduct extended far

beyond Foundry as he reached into several other companies – at least 15 as testified to by John

Johnson, and cultivated sources at those companies, as well as cultivating other sources at

Foundry. On the other hand, any benefit to David Riley, whatever benefit the jury concluded met

the government's burden on this element, was minimal.[20] For this reason as well, the advisory

Guidelines range resulting from the profits of others is not a fair touchstone for sentencing. [21]

David Riley also compares favorably with Karl Motey, who testified for the government

at the trial. Granted Motey cooperated and earned credit for that cooperation in the form of his

no jail sentence. But Motey, in one year earned $600,000 for providing inside information to

---

[20]Apart from the minor stock gains in Palm, Motorola and Marvel (and losses in STEC), David Riley realized nothing. Nothing ever came of the HDTV venture, Teeple introduced them to no one; Teeple did not participate in the pool-Foundry "angel" funding group with which David Riley became involved with other former Foundry employees, and Teeple provided no job-related assistance after Mr. Riley left Foundry. In fact, after leaving Foundry, David Riley attended MIT and then secured employment at Synaptics Inc. Teeple had absolutely no role in either Mr. Riley's decision to attend MIT or in securing a job at Synaptics.

[21]Nor should the fact that David Riley exercised his constitutional right and went to trial provide a basis to penalize him further in sentencing. *See United States v. Jiau*, 11 Cr. 161 (JSR)("We don't want to place a premium on that aspect that we discourage people from exercising their constitutional rights.").

-43-

several of his clients. And Douglas Schultz and Terry Wright, former Foundry employees, both

of whom testified pursuant to immunity agreements, both of whom lied previously to the

Government about their activities, and both of whom had provided Teeple with the same type of

financial data which David Riley was convicted for, were not prosecuted.

Furthermore, defendants convicted of similar conduct may vary in culpability, risk of

recidivism, dangerousness and other variations that Judges must now take into account. *See*

*Kimbrough*, 552 U.S. at 108 ("some departures from uniformity were a necessary cost of the

remedy we adopted"). David Riley compares favorable on each of these touchstones. And most

respectfully, what David Riley has undergone during the approximately last two years and the

impact on his family and professional life already represents substantial punishment. *See United*

*States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (the "need for deterrence and protection of the

public is lessened because the conviction itself already visits substantial punishment on the

defendant"); *United States v. Coughlin*, No. 06-2005, 2008 U.S. Dist. Lexis 11263, at *27 (W.D.

Ark. Feb 1, 2008) (in sentencing Thomas Coughlin, the former Chief Operating Officer of Wal-

Mart, the Court found that a sentence of probation and home detention was "capable of deterring

corporate executives like Coughlin, who cherish their freedom of movement and right to privacy,

from engaging in conduct similar to Coughlin's").

### 6.      The Need To Provide Restitution

The need to provide restitution also is a factor militating in favor of a sentence of

probation with conditions and mitigates against lengthy incarcerations. *See United States v.*

*Menyweather*, 447 F3d 625, 634 (9th Cir. 2006). *United States v. Peterson*, 363 F. Supp.2d 1060,

1061-62 (E.D. Wisc. 2005). Here, reimbursement of legal fees attendant to the trial is being

-44-

sought as restitution by Brocade. A working and societally productive David Riley would advance an ability to make restitution.

**7.    No Fine Should Be Imposed**

David Riley's financial picture is poor and his cash flow is worse still. His debts continue to mount. He is in the process of settling with the SEC the companion civil case, which will deplete his resources further.

### CONCLUSION

So where does all of this leave David Riley? As noted, the jury convicted David for his involvement in an insider trading conspiracy from which he barely profited monetarily or otherwise (if one accepts the approximately $4,000 earned in the trades in Palm, Motorola and Marvel, and not counting the losses in STEC). That he and his family already have suffered greatly cannot be disputed seriously. His and his family's lives has been disrupted; they have moved cross-country to try to survive economically; their savings have been substantially depleted; Mrs. Riley is suffering from clinical depression and David's father is dying. Apart from the acts at issue in this case and on which the conviction is based, David has led an exemplary life. He has been charitable both with his money and his time and he served his country honorably in the Air Force and in the Central Intelligence Agency. All of this must count for something. We think it does under 18 U.S.C. § 3553(a) and that a non-Guidelines and non-custodial sentence is supported by the facts relevant to the case and to David Riley.

For all of the foregoing reasons, David Riley respectfully requests, on the facts of this case and considering all of the sentencing factors, that the Court impose a non-custodial sentence.

-45-

Such a sentence will be sufficient, but not greater than necessary, to achieve the purposes set forth

in 18 U.S.C. § 3553(a).

Dated: April 20, 2015
       New York, New York

                    Doar Rieck Kaley & Mack

                  By:

                  John F. Kaley
                  217 Broadway, Suite 707
                  New York, New York 10007
                  Tel: (212) 619-3730

                  Anthony Cecutti
                  217 Broadway, Suite 707
                  New York, NY 10007
                  Tel: (917) 741-1837
                  *Attorneys for David Riley*

To:     Telemachus Kasalis, Esq.
        Asst. U.S. Attorney
        (Via e-mail & ECF filing)

        Mr. Jemmard Thomas
        U.S. Probation Officer
        (Via e-mail & ECF filing)

-46-